MICHAEL TARASKA, IN PRO PER
1460 Ocean Drive, #207
Miami Beach, Florida 33139
Telephone: (602) 400-5885
Email: taraska@gmail.com

# UNITED STATES DISTRICT COURT

## for the Southern District of Florida

### Miami-Dade Division

FILED BY_____MC_____D.C.

JAN 17 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

MICHAEL TARASKA, an individual

                    Plaintiff,

vs.

THE DRAKE CONDOMINIUM
ASSOCIATION, INC. a Florida not-
for-profit corporation;  ROYAL
MANAGEMENT GROUP, LLC. a
Florida limited liability company; JOE
CEPSIDES, an individual;
JOSEPHINE MANNING, an
individual; MELISSA RAPOSO a
Married person; DAVID RAPOSO a
Married Person; EDGAR MARTINEZ
a Married person; TAMK a Florida
Company;  MARIA ARENCIBIA, an
individual; "DOE 1" an individual
DRAKE BOARD MEMBER #3; and
DOES  2 through 10.

                    Defendants.

Case No:

25-cv-20274-RAR

**VERIFIED COMPLAINT
OF MICHAEL TARASKA FOR
BREACH OF FIDUCIARY DUTY;
NEGLIGENCE; GROSS NEGLIGENCE;
DECLARATORY RELIEF; INJUNCTIVE
RELIEF; FRAUD; RACKETEERING;
AIDING AND ABETTING**

**JURY TRIAL DEMANDED**

# **VERIFIED COMPLAINT**

Comes now Plaintiff, Michael Taraska (hereinafter "Plaintiff") in Pro Per and hereby sues the Defendants, THE DRAKE CONDOMINIUM ASSOCIATION, INC. a Florida not-for-profit corporation;  ROYAL MANAGEMENT GROUP, LLC. ("ROYAL MANAGEMENT") a Florida limited liability company; JOE CEPSIDES an individual and a Property Manager of ROYAL MANAGEMENT managing the DRAKE Condominium; JOSEPHINE MANNING, an individual ("Manning"); MELISSA RAPOSO a married person; DAVID RAPOSO a married Person; EDGAR MARTINEZ a married person; TAMK a Florida Company; MARIA ARENCIBIA, an individual DRAKE BOARD MEMBER #2;  DOE 1 an individual DRAKE BOARD MEMBER #3; and DOES  1 through 10.

## **INTRODUCTION**

This case is about a runaway homeowners' association and its management company that has been governed by a  3 member board of directors (the "Board") comprised of three of the thirty-one homeowners, which consistently acts in the best interest of themselves, or in the interests of one select board member "Josephine Manning" rather than the interests of the Association.

JOSEPHINE MANNING, ROYAL MANAGEMENT GROUP which is the

2

Management Company owned by DAVID RAPOSO overseeing the Management of the DRAKE CONDOMINIUM, DAVID RAPOSO, RAPOSO INSURANCE GROUP which provides Insurance Policies to the DRAKE and its owner MELISSA RAPOSO who is the wife of DAVID RAPOSO, and TAMK a contractor who has provided unauthorized construction work to the DRAKE in excess of $1,000,000 (one-million dollars) which is owned by EDGAR MARTINEZ who is also related to DAVID RAPOSO and MELISSA RAPOSO being married to DAVID RAPOSO'S sister have all been acting together contrary to the best interests of the DRAKE Homeowners as a whole.

Over the course of many years, the Board and ROYAL MANGEMENT and the related companies and its principals have engaged in self-dealing and self-interested conduct, converted funds of the DRAKE Homeowners to their own use, disregarded the DRAKE'S Governing Documents, conducted DRAKE business with gross negligence and acted with otherwise incorrigible behavior including but not limited to a Scheme or Artifice to Defraud perpetrated upon the rest of the Homeowner Members by purposely acting in a way including but not limited to a practice to ensure legal Notice of the business of the Association through its Board and Management Company and related persons and companies which provide services is always concealed and not given.

3

The Board has purposefully for many years acted in blatant defiance of the DRAKE Governing Documents and other applicable Statutory Law by failing to hold an annual election for Board members as required by the governing documents; purposely acting in concert with ROYAL MANGEMENT to keep themselves "in power"; passing numerous alleged "emergency" or "special" assessments that were not condoned by the Governing Documents, not Noticed to the Homeowners pursuant to Florida Statutory Law and the Governing Documents in a way which ensures the inability of Homeowners to elect fair and impartial Board Members; mismanaging the Association funds to the tune of millions of dollars; obtaining contracts for services from individuals and related entities occupying objective conflicts of interest without providing legally required disclosure; and generally operating a scheme and artifice to defraud Homeowners.

Upon discovery of the above by Plaintiff, the Board and ROYAL MANAGEMENT has consistently refused to provide documentation to the Plaintiff and members of the Association that the members are entitled to receive under statutory law and the Association's Governing Documents. Moreover, the Board's deceitful and illegal conduct has been left unchecked by carrying out and implementing various means to obstruct, conceal and fail to provide NOTICE both

4

before and after the fact for all of their illicit acts affecting Homeowner participation in the operation of the Condominium for years.

The DRAKE BOARD in conjunction with its Management Company ROYAL MANAGEMENT and its principals and related persons and entities involved in providing services to the Association such as Insurance Coverage, Contracting Services and Construction, maintenance and repairs have all encouraged, assisted, aided and abetted the Board in its dereliction of duties. This lawsuit is intended to finally rectify the Board's mismanagement, fraud, scheme and waste of the DRAKE'S Homeowners' funds and put an end to the breaches of Fiduciary Duties and Racketeer activity.

When Plaintiffs and other homeowners have repeatedly inquired about the legalities of the special assessments, Board Meetings, Annual Elections, Budgetary Proposals, work performed, contracts, financial activity, relationships amongst the various individuals and related companies at issue, the DRAKE Board in conjunction with the participation of ROYAL MANAGEMENT has either brushed them off completely or obstinately refused to change its ways.

At no point has the DRAKE Board owned up to its improprieties or even acknowledged that they have failed to follow minimum appropriate protocols

5

for a Homeowners' Association. This problem has only been magnified by the Board's counsel, the BECKER & POLIAKOFF law firm, who also refuses to acknowledge the Board's abject failure to adhere to any reasonable standard of care under the law and in fact has recently obstructed under the "color of legal counsel" Plaintiff's rights to receive information required to be given and obtained under Florida Law and the Governing Documents of the DRAKE. The refusal and failure of the BOARD, MANAGEMENT COMPANY and Association's Law Firm have engaged in a "cover up" to hide the documentary evidence from being disclosed in and of itself a part of the RACKETEER Pattern of Activity.

Through this lawsuit, Plaintiffs seek to remedy the egregious conduct by the Board, the individuals aiding and abetting the Board in the illegal and illicit activities and their associated entities and to recover monetary as well as punitive damages from the individual tortfeasors due to the Board's conversion, misappropriation and Fraudulent Scheme to access the DRAKE'S membership funds and to obtain injunctive and declaratory relief which prohibits the Board from continuing to ignore applicable law. After countless unsuccessful communications and requests for the Board to change their behavior that did not result in resolution of the claims herein, it is now clear that the Board and

6

collective Defendants will not change its and their ways absent litigation and a Court Order. Therefore, Plaintiffs will seek temporary and permanent injunctive relief removing the current illicit Board member[s], removing the Management Company, terminating its relationship with RAPOSO INSURANCE GROUP and TAMK and all of the principals involved as a result of their collective illegal conduct and refusal to act on behalf of the DRAKE Homeowners as a whole, as well as removing the Board's counsel BECKER & POLIAKOFF who has failed and refused to correct the Board's behavior.

## JURISDICTION AND PARTIES

1.  Jurisdiction is proper herein because this action is based upon the Federal Racketeer Statute 18 U.S.C. Sect. 1961-68 (RICO Claim) and Diversity of Citizenship between Plaintiff Michael Taraska a resident of Medellin, Colombia and all Defendants residents of Florida.

2.  This is an action for damages in excess of ONE-MILLION DOLLARS ($100,000,000.00), exclusive of attorney's fees and costs.

3.  Plaintiff, Taraska, is pro per and is the Homeowner of the real property located at the DRAKE Condominium at1460 Ocean Drive, #207, Miami Beach,

7

Florida 33139.

4. Defendant, THE DRAKE CONDOMINIUM ASSOCIATION, INC., is a Florida not-for-profit corporation doing business in Miami-Dade County, Florida.

5. Defendant, JOSEPHINE MANNING, is a resident of Miami-Dade County, Florida and is the President and Board Member of the DRAKE Association.

6. Defendant MARIA ARENCIBIA was a Board Member at all relevant times and a resident of Miami-Dade County, Florida.

7. Defendant "DOE 1" is an Unknown Board Member.

8. Defendant, ROYAL MANAGEMENT GROUP, LLC, is a Florida Corporation doing business in Miami-Dade County, Florida, where the property is located, and at all relevant times was a "debt collector" within the meaning of 15 U.S.C. §1692a(6) and Fla. Stat. §559.55(7).  In doing the acts alleged herein, the Management Company was an agent of the Association.

9. MELISSA RAPOSO is a resident of the State of Florida and is married person to DAVID RAPOSO the owner of ROYAL MANANGEMENT GROUP.

10. RAPOSO INSURANCE GROUP is an entity of unknown origin and is owned by Defendant MELISSA RAPOSA.

11. DAVID RAPOSO is a resident of the State of Florida and is married person

8

to MELISSA RAPOSO.

12. JOE CEPSIDES is the Property Manager employed by ROYAL MANAGEMENT, responsible for managing the DRAKE.

13. EDGAR MARTINEZ is a resident of the State of Florida and is married person to the sister of DAVID RAPOSO.

14. TAMK is a Florida Company in good standing and is owned by EDGAR MARTINEZ.

15. DOES 1 through 10 have not yet been identified.

16. Venue is proper in this County because the property which is subject of this action is located in Miami-Dade County.

17. All conditions precedent to this action have occurred or have been waived.

18. Plaintiff may retain legal counsel and is obligated to pay a reasonable fee for its services.

## FACTS AND BACKROUND

19. Plaintiff, an "immediate family member" of Gregory and Marlene Taraska obtained title to Unit #207 for valuable consideration.

20. Plaintiff is liable for all valid and legal assessments that come due while he is the owner. Florida Statute §718.116(1)(a) provides the following:

9

"A unit owner, regardless of how his or her title to property has been acquired, including by purchase at a foreclosure sale or by deed in lieu of foreclosure, is liable for all assessments that come due while he or she is the unit owner...."

21.  At all times material herein, the Association was created pursuant to the Declaration of Condominium for the Association (the "Declaration"), recorded in Official Records Book 15838, Page 2934, of the Official Records of Miami-Dade County. Pursuant to the Declaration, the Association is subject to all of the terms and provisions of the Declaration, the Articles of Incorporation of the Association (the "Articles of Incorporation"), the By-Laws of the Association (the "By-Laws"), the Rules and Regulations of the Association (the "Rules") (collectively referred to as the "Governing Documents"), Chapter 718, Florida Statutes (knownas the "Condominium Act" or the "Act") and when applicable, according to the Act, Chapter 617, Florida Statutes (known as the "Florida Not-For-Profit Corporation Act"). A copy of said Governing Documents were sent by email from JOE CEPSIDES on October 22, 2024 as reflected in the email attached hereto as Exhibit "1".

22.  At all times material herein, pursuant to the Governing Documents of the Association, the Association is responsible for the administration and management of the Association. Among its duties and obligations is the maintenance, repair and replacement of the common elements as defined in Section 5 and 10(a) of the Declaration, and the payment of the common expenses as

defined in Section 2(f) and Section 13 of the Declaration.

23. The administration of the Association at all relevant times herein was and is controlled by a three member Board of Directors. Josephine Manning, Maria Arencibia and Doe 1 comprised for all relevant times the three member Board of the Association Board of Directors.  Pursuant to Florida Statute 718.111(1)(a) of the Act, each member of the Association's Board of Directors owes each unit owner a fiduciary duty.

24.     Florida Statute §718.112(2)(c)1 provides in part:

"….written notice of a meeting at which a non-emergency special assessment or an amendment to rules regarding unit use will be considered must be mailed, delivered, or electronically transmitted to the unit owners and posted conspicuously on the condominium property at least 14 days before the meeting. Evidence of compliance with this 14-day notice requirement must be made by an affidavit executed by the person providing the notice and filed with the official records of the association. Notice of any meeting in which regular or special assessments against unit owners are to be considered must specifically state that assessments will be considered and provide the estimated cost and description of the purposes for such assessments.  Upon notice to the unit owners, the board shall, by duly adopted rule, designate a specific location on the condominium or association property where all notices of board meetings must be posted….".

25. The Association's By-Laws, Article VII 2(D) also provides similar language and requires the Association's Secretary to file all NOTICES as part of the official records of the Association.

## **PAST CONDUCT**

26.  On February 16, 2016, the Association passed a special assessment in the amount of $150,000.00 (one-hundred fifty-thousand dollars) without ever sending a proper notice to the Homeowners pursuant to Florida Statute §718.112 prior to the meeting.

27. On July 26, 2016, the Association passed a special assessment in the amount of $114,234.75 without ever sending a proper notice pursuant to Florida Statute §718.112 prior to the meeting.

28.  On March 7, 2017, the Association passed a special assessment in the amount of $500,000.00 (five- hundred thousand dollars) without ever sending a proper notice pursuant to Florida Statute §718.112 prior to the meeting.

29. On February 27, 2019, the Association passed a special assessment in the amount of $1,186,000.00 without ever sending a proper notice pursuant to Florida Statute §718.112 prior to the meeting.

30.  As a result, of the above $1,950,000 Special Assessments totaling almost $2 million ("2017 – 2019 $1.95M Special Assessment"), the Association levied the following pro rata portion against Unit #207: $4,541.00 on August 1, 2016, $4,541.00 on November 1, 2016, $3,313.00 on April 1, 2017, $3,313.00 on May 1, 2017, $3,313.00 on June 1, 2017, $3,313.00 on July 1, 2017,  $3,313.00 on August 1, 2017, $3,313.00 on September 1, 2017,  $3,313.00 on October 1,

2017. Section 10(c) of the Association's Declaration provides:

> "c.  <u>Alteration and Improvement of Common Elements</u>
> There shall be no material alterations or substantial additions to the
> Common Elements which exceed $10,000.00 in the aggregate to the
> Association in any calendar year, except as to the same are authorized by
> the Board and ratified by a majority vote of voting members of the
> Association present at any regular or special meeting of the Association
> called for that purpose, and at which a quorum is present. Alterations which
> do not exceed $10,000.00 in the aggregate to the Association in any
> calendar year may be approved by the Board of Directors. The cost of the
> foregoing shall be assessed as Common Expenses of the Condominium".

31.  The Association and Board of Directors violated Section 10(c) of the Association's Declaration by approving substantial additions to the Common Elements exceeding $10,000.00 without approval of the owners/members of the Association.

32.  On or about late 2015 or early 2016, without any record of the Board of Directors obtaining competitive bids from several contractors, the Association hired an unlicensed contractor to perform repairs and or replace the entire roof of the Association.

33.  On or around February, 2016, Unit #207 reported a roof leak to the Association. The Association refused to correct the leak, refused to submit it for insurance coverage and indicated that the upstairs neighbor was the source of the leak which wasn't true. The leak has caused an ongoing moist smell and inconvenience for Plaintiff even to this day.

34. On or around May 10, 2016, there was a fire on or about the roof and upper floors of the building. The fire caused smoke damage and a significant amount of water related damage into the interior of the Plaintiff's unit.

35. On or around January 2017 and continuously thereafter, Unit #207 reported a water leak within the unit and bathroom stemming from the backup drainage system and pipes that the Association is responsible for pursuant to Section 5(a) of the Association's Declaration.

36. The Association refused to remedy the leak and Unit #207 sustained damages requiring the hiring of a plumber to repair the damage.

37. On June 15, 2017, the Association and Management Company informed that no balance was owing on Unit #207's HOA account. However, this contradicts the ledger amount received by Unit #207 which shows that $6,097.50 was due through June 2017.

38. On October 27, 2017 after repeated attempts to obtain confirmation that Unit #207's payments were being applied, an email was sent to ROYAL MANAGEMENT again asking for verification of the debt and for proof that the Association sent statements to Unit #207's mailing address. However, the Management Company never responded.

39. On January 24, 2018, before ever verifying the debt for Unit #207, the Association sent a collection letter alleging that $20,210.68 was due through

14

February 1, 2018.

40. That same date, the Association's counsel, BECKER & POLIAKOFF was informed that no verification of the debt from the Association or Management Company was ever received, while additional interest, legal fees and costs were improperly added to the amount owed. The amount also did not match with the Association's earlier correspondence that the amount due through June 2017 was paid in full.

41. On February 2, 2018, since no response was ever received, another email was sent requesting verification of the amount owed and to confirm what was properly owed. However, no response was ever received

42. On June 26, 2018, over four months later, the Association's counsel sent an alleged verification of debt letter, again including additional late fees, interest, attorney's fees and costs, whereby those amounts never should have been incurred if the Management Company originally provided the proper verification.

43. That same day, on June 26, 2018, an email was sent to the Association's counsel explaining the failure by the Management Company and Association to properly verify the debtors mailing address of record, while indicating that no late fees, interest, attorney's fees and costs should be due. No response to that email was ever received.

44. On June 30, 2018, another email was sent to the Association's counsel

explaining how the Association and the Management Company failed to verify the debt or send correct notices to the record mailing address, however, again, no response or corrective estoppel removing the late fees, interest, attorney's fees and costs were received.

45. On or around April 2019 and May 2019, several emails were sent to ROYAL MANAGEMENT in an attempt to resolve the account. However, ROYAL MANAGEMENT refused to provide the requested information, verification of the amount owed, verification of the assessments or even confirmation as to what the mailing address on record was for Unit #207.

46. As a result of the actions of the Board, specifically Defendants JOSEPHINE MANNING, a decades-long resident, long-time Board Member and long-time President (on information and belief since 2005) of the HOA of the DRAKE, a lawsuit was filed by the previous owner of Unit #207 in 2019 [Case #2019-323764-CA-01] (hereinafter "the 2019 Lawsuit") against Defendants THE DRAKE CONDOMINIUM ASSOCIATION, ROYAL MANAGEMENT GROUP and its owner and at one time DRAKE Board Member DAVID RAPOSO, two additional DRAKE Board Members and the President and DRAKE Board Member JOSEPHINE MANNING, based upon the above facts from 2016 through 2019.

47. The 2019 Lawsuit was settled between the parties in October 2020 pursuant to the SETTLEMENT AGREEMENT AND RELEASE by the

16

Defendants DRAKE Insurance Carriers ARCH SPECIALTY INSURANCE

COMPANY, ARMOUR RISK MANAGEMENT, INC. and PHILADELPHIA

INDEMNITY INSURANCE COMPANIES paying the previous owners of

Plaintiff's Unit #207 $37,500 (thirty-seven thousand five hundred dollars) and a

substantial additional amount from the DRAKE Association in excess of the

amount of the insurance company payment. The SETTLEMENT AGREEMENT

AND RELEASE is attached hereto as Exhibit "2".

## NEW FACTS IN FURTHERANCE OF THE RICO AND FRAUD SCHEME

48. In or about 2022, Plaintiff's Unit #207 experienced significant water

damage coming down from the ceiling.

49. Shortly thereafter, Plaintiff contacted the general manager JOE

CEPSIDES of ROYAL MANAGEMENT asking for the buildings Insurance

Carrier Information and/or the insurance policy.

50. JOE CEPSIDES continually refused to provide the building's Insurance

carrier information and refused to provide the Insurance Policy so that Plaintiff

could make a water damage claim but instead informed Plaintiff that he should

make a claim against Unit #307's personal insurance policy (which is directly

above Unit #207) and not the DRAKE Insurance Carrier stating it "was an issue

between the two Units, not the building".

17

51. Plaintiff Taraska at that time, did not know of the issues and allegations surrounding the 2019 Lawsuit including the water damage and subsequent failures of the Management Company, Board and Association to adequately remedy the previous fire and water damage issues and thought it strange that ROYAL MANAGEMENT was refusing to provide requested information to Plaintiff of the Association's Insurance Carrier.

52. Upon making a claim on Unit #307's Insurance Carrier, the repair of the ceiling resulting from the water damage suffered by Unit #207 was addressed promptly and paid for by Unit #307's personal Insurance Carrier.

53. In or about January 2024 a massive water leak destroyed the hallway carpet, damaging the drywall of the second floor hallway and flooded several Units on the 2nd Floor of the DRAKE including Plaintiff's Unit #207 necessitating the City of Miami Beach Fire Department to intercede on an emergency basis.

54. The City of Miami Beach Building Department investigated the incident shortly thereafter in 2024 and numerous City building code violations were issued against the DRAKE.

55. The rotted carpet was unhealthy and caused the resident of Unit #201, a 3rd year medical student attending at the University of Miami Medical School, his wife and three children – a newborn, a three year-old and a 7 year old to vacate their unit permanently due to the ASSOCIATION failing to remove and remedy

18

the mildewed, rotted carpet from the hallway in front of all 2nd level Units.

56. On July 1, 2024 Plaintiff emailed JOE CEPSIDES that water damage had occurred to Unit #207 during Plaintiff's absence at his residence in Medellin, Colombia sometime after January 9, 2024.

57. The July 1, 2024 email is part of a string of emails between Plaintiff and JOE CEPSIDES and Unit #307, which is located above Plaintiff's Unit, which were exchanged and are attached hereto as Exhibit "3

58. The July 1, 2024 letter was in response to a letter from attorney Lilliana Farinas-Sabogal dated June 20, 2024 attempting to mislead Plaintiff into installing new windows at an exorbitant expense in his Unit by a "MANDATORY COMPLETION DATE OF JULY 12, 2024". See the BECKER letter dated June 20, 2024 attached hereto as Exhibit "4".

59. On February 23, 2024 Defendant ROYAL MANAGEMENT COMPANY sent an email to Units #207, #307 and #407 denying responsibility and or liability coverage for the water damage.

60. On March 21, 2024 Plaintiff received a telephone call and an email from DRAKE Unit #205 and #203 owner Jorge Ceballos informing that the monthly HOA Fees had "gone up" over 110% (one-hundred ten percent over calendar year 2023). Plaintiff was unaware of the assessment or the Budget since he did not receive Notice. The March 21, 2024 email is attached hereto as Exhibit "5" and

19

forwarded an email from JOE CEPSIDES dated March 19, 2024 by ROYAL MANAGEMENT addressed to "Dear unit owners" and reflecting the fact that the Homeowners had not received information allegedly sent out regarding the 2024 Budget and stated 'If you did not get the Notice prior to your February and March [increased] payments, please make up the deficit with your April payment". See the March 19, 2024.

61. The March 19, 2024 JOE CEPSIDES email attached a NOTICE OF APPROVED BUDGET FOR 2024 attached hereto as Exhibit "7" which states that "Dear members of the Drake Condominium Association, We are reaching out to inform you that the Annual 2024 Budget Meeting **took place** on Thursday, January 25th2024, in the building lobby area at 3 PM". Plaintiff never received either the initial NOTICE for the MEETING and did not receive the NOTICE OF APPROVED BUDGET FOR 2024 until the March 21, 2024 email from Jorge Ceballos.

62. The March 19, 2024 email from ROYAL MANAGEMENT included three attachments – 1. the attached Exhibit "7" NOTICE OF APPROVED BUDGET FOR 2024 ("Notice of Budget"); 2. The 2024 Approved Budget Allocation Per Unit Type ("Budget Allocation") attached hereto as Exhibit "8"; and 3. The 2024 Approved Budget with General Partial Reserves ("Approved 2024 Budget") attached hereto as Exhibit "9".

20

63.  The 2024 Approved Budget reflects the "Insurance" cost increasing from $40,000 (forty-thousand dollars) in 2023 to $150,000 (one-hundred fifty-thousand dollars) in 2024 and 2024 Approved Budget reflects <u>$50 (fifty dollars)</u> per month, or 600 (six hundred dollars) <u>per year</u> for 2023 ACCOUNTING FEES with no increase in 2024. Notwithstanding spending approximately $2 million for the 2019 Special Assessment project and illegally assessing another $1.2 Million (one-million two-hundred thousand dollars) on October 29, 2024 at the illegal SPECIAL BOARD MEETING which undersigned partially attended before being dropped from the ZOOM Video, only an inadequate $50 a month is being spent on "Accounting Fees" <u>to insure the Homeowners $3.2 Million since the 2019 and 2024 Assessments are being properly spent and disbursed</u> by the BOARD which Plaintiff believes it is not.

64.  Taraska believes the failure to give Notice of the Acts in approving the 2024 Budget is part and parcel of the common scheme or artifice to defraud perpetrated on all DRAKE Homeowners continuously and consistently by the BOARD, ROYAL MANAGEMENT and their principals by intentionally and purposely failing to give NOTICE of official acts required under the Governing Documents and Florida Law going back at least ten (10) years and probably as far back as 2005 when Josephine Manning became a Board Member and President of the Association.

65. On March 15, 2024 ROYAL MANAGEMENT by JOE CEPSIDES sent an email to "all occupants of Units 201, 202, 203, 204, 205, 206 and 207 on the second floor" stating that "If you have experienced [water] damage to your sheetrock due to the recent leak . . . [repair work commencing]". See the 3/15/24 email attached hereto as Exhibit "6".

66. On March 16, 2024 Plaintiff sent an email to Unit #307 and #407 reflecting that "Joe [Cepsides] and Royal have ignored the emails previously sent on our "07" thread regarding the water damage coming down to 407, 307 and to my Unit 207. I am forwarding this email to you f.y.i. <u>so you can see my attempts to get the INSURANCE CARRIER information for our '07's roof water damage issue' since Royal Management refuses to provide that information to me</u>".

67. Plaintiff received emails from Unit #407 stating that they have been struggling for **five years** with ROYAL MANAGEMENT and the BOARD to remedy the continual water leaks into their Unit from the roof of the building.

68. A string of emails attached to the Exhibit "4" Letter set forth previously discusses the failure of ROYAL MANAGEMENT to submit Plaintiff's claims to the DRAKE'S Insurance Carrier and provides a litany of excuses why ROYAL MANAGEMENT refused to respond to Plaintiff's claims and requests for the Insurance Carrier's information and other required by the Governing Documents, such as the Declaration to be provided to Plaintiff.

22

69. JOE CEPSIDES responded on July 2, 2024 to Plaintiff's July 1, 2024 email which attached the July 1, 2024 letter to attorney Lilliana Farinas-Sabogal. The July 2, 2024 email attached a "bid" to replace the windows in Unit #207 as alleged was required to be done based upon false information from attorney Lilliana Farinas-Sabogal's letter, in the abusive and outrageous amount of ($18,860). The July 2, 2024 email is attached hereto as Exhibit "11".

70. On July 3, 2024 Plaintiff responded to JOE CEPSIDES email copied to attorney Lilliana Farinas-Sabogal demanding a copy of "the DRAKE Condominium formal acts under the Declaration" and informing both ROYAL MANAGEMENT and the BECKER & POLIAKOFF Law Firm that "they might want to have the current Association take a look at this new recently enacted 2024 Florida Condo Law (HB 1021) **effective July 1, 2024** as set forth below [and that] I want to make sure that the DRAKE fully complies and adheres to this new law in all upcoming processes". The July 3, 2024 email is attached hereto as Exhibit "12".

71. The "new recently enacted 2024 Condo Law (HB 1021) effective July 1, 2024" that Plaintiff directed to the BOARD members to become aware of requires that: "720.3033 - Officers and directors. (1)(a) Within 90 days after being elected or appointed to the board, each director must submit a certificate of having satisfactorily completed the educational curriculum administered by a department-approved education provider. 1. The newly elected or appointed director must

23

complete the department-approved education for newly elected or appointed

directors within 90 days after being elected or appointed. . . . 4. The department-

approved educational curriculum specific to newly elected or appointed directors

must include training relating to financial literacy and transparency, recordkeeping,

levying of fines, and notice and meeting requirements. 5. In addition to the

educational curriculum specific to newly elected or appointed directors: a. A

director of an association that has fewer than 2,500 parcels must complete at least 4

hours of continuing education annually. . . . (b) A director who does not timely file

the educational certificate is suspended from the board until he or she complies

with the requirement. The board may temporarily fill the vacancy during the period

of suspension. . . . (3)     An officer, a director, or a manager may not solicit, offer

to accept, or accept a kickback. As used in this subsection, the term "kickback"

means anything or service of value for which consideration has not been provided

for an officer's, a director's, or a manager's benefit or for the benefit of a member

of his or her immediate family from any person providing or proposing to provide

goods or services to the association. An officer, a director, or a manager who

knowingly solicits, offers to accept, or accepts a kickback commits a felony of the

third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, and is

subject to monetary damages under s. 617.0834. If the board finds that an officer or

a director has violated this subsection, the board must immediately remove the

24

officer or director from office. The vacancy shall be filled according to law until the end of the officer's or director's term of office. . . .  (4)(a) A director or an officer charged by information or indictment with any of the following crimes must be removed from office and a vacancy declared: 1.Forgery of a ballot envelope or voting certificate used in a homeowners' association election as provided in s. 831.01. 2. Theft or embezzlement involving the association's funds or property as provided in s. 812.014. 3. Destruction of or the refusal to allow inspection or copying of an official record of a homeowners' association which is accessible to parcel owners within the time periods required by general law, in furtherance of any crime. Such act constitutes tampering with physical evidence as provided in s. 918.13.  4. Obstruction of justice as provided in chapter 843. 5. Any criminal violation under this chapter. (b) The board shall fill the vacancy as provided in s. 720.306(9) until the end of the period of the suspension or the end of the director's term of office, whichever occurs first. If such criminal charge is pending against the officer or director, he or she may not be appointed or elected to a position as an officer or a director of any association and may not have access to the official records of any association, except pursuant to a court order. However, if the charges are resolved without a finding of guilt or without acceptance of a plea of guilty or nolo contendere, the director or officer shall be reinstated for any remainder of his or her term of office. (5) The association shall maintain insurance

25

or a fidelity bond for all persons who control or disburse funds of the association. The insurance policy or fidelity bond must cover the maximum funds that will be in the custody of the association or its management agent at any one time. As used in this subsection, the term "persons who control or disburse funds of the association" includes, but is not limited to, persons authorized to sign checks on behalf of the association, and the president, secretary, and treasurer of the association. . . .".

72. On July 8, 2024 another downpour of water came through the hallway ceiling in front of Unit #207 which Plaintiff videotaped causing and which caused water damage to the carpet and ceiling in the common area hallway and inside Unit #207.

73. On or about late July 2024 Plaintiff met with JOE CEPSIDES of ROYAL MANAGEMENT in the hallway in front of Unit #207 and provided him with the July 8, 2024 video of the new water leak and showed him the hallway ceiling damage and wet carpet under the leak.

74. Defendant ROYAL MANAGEMENT has employed "Juan" for years who was a "general maintenance man" on premises of the DRAKE who JOE CEPSIDES informed Plaintiff at the meeting in the hallway "would address the leak". In addition, ROYAL MANAGEMENT had confirmed in a letter the fact unknown to Plaintiff that "Juan" was the Father of Defendant DAVID RAPOSO.

75. On 10/21/24 Plaintiff received a mailed NOTICE OF BOARD OF DIRECTOR'S MEETING FOR PROPOSED SPECIAL ASSESSMENT dated October 15, 2024 setting a vote on approving the $1.2 Million Special Assessment in 14 days on October 29, 2024 attached hereto as Exhibit "13".

76. The NOTICE is insufficient, contrary to law, illegal and fails to give proper substantive as well as timely Notice under the DRAKE Governing Documents, Florida Statutory and Case law.

77. The NOTICE vaguely referred to twelve GENERAL CATEGORIES of items, such as "New Lobby Windows, Landscaping, Safety Railings, Hallway Carpeting, etc …" **without providing any detail** and reflecting that the Board (consisting of only two members, JOSEPHINE MANNING and Mari Arencibia, instead of the required three and fill of vacancy) will consider, and surely pass a $1.2 Million Special Assessment, without even providing Homeowners the opportunity to review a line-item proposal supposedly supporting a $1.2 Million hand-out.

78. The rotted, unsightly, unhealthy carpet that was damaged by the water leak remains rolled up in the lobby to date (almost one-year) since February 2024 and should have otherwise been removed and discarded immediately.

79. Plaintiff initially contacted the five Homeowners who he personally knows out of the 31 Unit Homeowners of the DRAKE and four of the five stated

they DID NOT RECEIVE NOTICE AND HAD NO KNOWLEDGE THAT A SPECIAL ASSESSMENT was under consideration.

80. Plaintiff believes that the two Member Board, with JOSEPHINE MANNING as the principal, in conjunction with ROYAL MANAGEMENT GROUP enters into agreements to deprive Homeowners of NOTICE and pass illegal, improper and otherwise actionable resolutions and assessments in violation of the Governing Documents, Florida statutory law and Homeowners' rights.

81. Plaintiff believes that the fact that four of the five Homeowners who undersigned personally knows and who were contacted at that time in regard to this matter did not receive ANY NOTICE of the proposed $1.2 Million Special Assessment and Meeting thereto is NOT COINCIDENCE, and demanded by letter that proof that the other 25 Homeowners (the total 31 Homeowners minus the five plus Plaintiff) received NOTICE.

82. On October 25, 2024 at 10:48 a.m. after receiving the above NOTICE, Taraska emailed the attached Exhibit "14" October 25, 2024 letter to JOE CEPSIDES and DAVID RAPOSO, Manager and Owner of ROYAL MANAGEMENT.

83. The October 25, 2024 letter initiated the inquiry by Plaintiff of the BOARD and ROYAL MANAGEMENT's activities leading to this Complaint. In an effort to obtain Notice, and to continue the upcoming October 29, 2024

BOARD MEETING until an inquiry of the basis of the Meeting could be

investigated, the Letter stated in part:

> "**_Re: DRAKE – ILLEGAL BOARD MEETING AND ALLEGED ASSESSMENT SET FOR OCTOBER 29, 2024_**
>
> *[PLEASE CONFIRM **UNDERSCORE** IMMEDIATELY BY EMAIL THAT THIS LETTER WAS RECEIVED]*
>
> *Joe,*
>
> *. . .  I just received the NOTICE OF THE BOARD OF DIRECTOR'S MEETING FOR PROPOSED SPECIAL ASSESSMENT five days ago from my brother Gregory Taraska, M.D. and his wife Marlene which reflects it was mailed to them on October 15, 2024 which they received on Saturday, October 19th and I have had to scramble working with attorneys to get this out before close of business today given the expediency of the proposed Board Meeting this Tuesday, October 29th. . . .*
>
> *I contacted five DRAKE Homeowners as set forth in the [Draft] Complaint. Only one had any knowledge of the BOARD MEETING on Tuesday October 29th and the Proposed Special Assessment. I find it curious that only one out of the five people I personally know from the DRAKE knew about this significant event. I believe NOTICE is not being given to many of the other 26 Homeowners which we will find out during the course of the lawsuit if I am forced to pursue litigation.*
>
> *I have the backing of the five Homeowners I have contacted and they are all receiving a copy of this letter and the COMPLAINT and have expressed their willingness and desire to support my claims and requests. I am sure many more Homeowners will provide support upon properly being informed. I can obtain proxies for 6 of the 32 Homeowners as of today's date which is 18.75% of the 32 Units at DRAKE which provides my represented group, without even contacting the other 26 Homeowners, certain powers under the ARTICLES. See Article IX.B.*
>
> *Here are my starting requests:*
>
> 1.  *VACATE THE HEARING DATE of October 29, 2024 so that I can ensure that ALL DRAKE Homeowners receive adequate knowledge of the proposals set forth by the Board in the October 15th, 2024 NOTICE;*
>
> 2.  *Provide me with the emails for all 32 Homeowners so that I can email them this information;*
>
> 3.  *Provide me with a <u>line-item</u> summary and bid from the Contractor that is allegedly going to perform the $1.2 million of repairs, upgrades, etc... vaguely reflected in the October 15th, 2024 NOTICE so that I can perform my due diligence and seek comparative and cost effective bids;*
>
> 4.  *Provide me with a copy of all current Insurance Policies costing and budgeted for $150,000 (one-hundred fifty thousand dollars) so that I can perform my due diligence and seek comparative and cost effective bids;*
>
> 5.  *Provide me with timely access to all of the books and records of the ASSOCIATION for the last five years since the almost $2 Million in Assessments were levied since 2017 – 2019 for the most*

29

*recent building project which to date isn't even completed.*

6. *Provide me with the names and contact information of the current Biard Members of the DRAKE ASSOCIATION and any and all PROXIES held by any of these three Board members;*

7. *Copies of all Fidelity Bonds "of all persons who control or disburse funds of the Association" – DECLARATION at page DC-22, item j.*

8. *The Workers Compensation policy. DECLARATION page DC-22, item i.*

9. *Please provide me with the email for President and Board Member Josephine Manning so that I can email this letter and the VERIFIED COMPLAINT to her today.*

10. *Please provide me with the names of the two other of the three current Board members in addition to Josephine Manning so the lawyers can fill in the blanks of the VERIFIED COMPLAINT adding them as Defendants in place of the DOE 1 and DOE 2 references.*

11. *Please email me back **immediately** that you received this letter and the VERIFIED COMPLAINT to ensure that the BOARD has proper NOTICE from me before proceeding on October 29, 2024 and to avoid a "rushed" filing with the Court.*

> *Joe and the Board, this is NOT an Emergency Assessment. **There is no basis to rush this matter forward without providing all Homeowners with proper NOTICE in order to provide adequate time to perform their due diligence.** Any refusal, will add to the already presented causes of action set forth in the VERIFIED COMPLAINT.*

> *It's time for TRANSPARENCY at the DRAKE. I believe that a new BOARD needs to be elected and that a new Management Company needs to be hired".*

84. Plaintiff shortly thereafter obtained from another Homeowner, the email address of Defendant JO MANNING which he did not have and at 2:15 p.m. on October 25, 2024 Plaintiff emailed "Jo Manning" the October 25th, 2024 Letter. See the attached 2:25 p.m. email attached hereto as Exhibit "15" stating "Hi Jo, Let me know by response email as soon as practicable if this is your correct email address".

85. On October 25, 2024 at 3:21 p.m. Homeowners "Rabi and Lousie Adakari" responded to Plaintiff's October 25, 2024 email and copying Defendants

Manager JOE CEPSIDES and DAVID RAPOSO stating they:

> *"can confirm that the Adakaris have not received any notification of a Board meeting to be held next week, nor of any Special Assessment and support Mr. Taraska's request for visibility and transparency into this action".*

86. In response to the Adakari's October 25, 2024 email, Homeowner Jorge Ceballos emailed the attached Exhibit "16" October 26, 2024 email in response to the Adakari's email and stated:

> *"Hi good afternoon to everybody wee need this action in the proper way follow the rules is why there to protect I am requesting for visibility and transparency in this matter".*

87. No response was received by either JOE CEPSIDES, DAVID RAPOSO or President JOSEPHINE MANNING to Plaintiff's October 25th, 2024 Letter and on October 28, 2024 Plaintiff text messaged Joe Cepsides and asked "Is the DRAKE Board Meeting going forward tomorrow?" and did not receive a response.

88. Plaintiff attended the ZOOM BOARD MEETING on October 29, 2024 and was dropped from the meeting after approximately 35 minutes at 2:41 p.m. because the ROYAL MANAGEMENT, the DRAKE BOARD and lawyer Lilliana Farinas-Sabogal representing the BOARD didn't want the Homeowner's in attendance to hear the truth about the illegal attempt to assess $1.2 Million as set forth in the NOTICE OF BOARD OF DIRECTORS MEETING FOR PROPOSED SPECIAL ASSESSMENT ("NOTICE OF BOARD MEETING") which was not

sent to a number of Homeowners. At the Meeting Plaintiff asked if either ROYAL

MANAGEMENT, DAVID RAPOSO, JOE CEPSIDES and the attorney Lilianna

Farinas-Sabogal from BECKER & POLIAKOFF representing either or both the

BOARD and ROYAL MANAGEMENT and ALL stated on the record that none

had received Plaintiff's October 25th emails, Letter and were all "unaware" of the

communications and the DRAFT COMPLAINT attached thereto.

89. It was learned by Plaintiff and all Homeowners in attendance at the

BOARD MEETING on October 29, 2024 that the vague items listed in the

NOTICE OF MEETING at item #1 was explained as a $750,000 (three-quarters of

a million dollars) amount owed for work **ALREADY PERFORMED AND**

**COMPLETED** by general contractor Edgar Ramirez, apparently hired by the

BOARD in 2023 without notice to any Homeowner.

90. THE $1.2 MILLION ASSESSMENT including the "$750k for past

work" <u>completely and unequivocally violates, among other legal grounds, Section</u>

<u>10.c. of the DECLARATION OF CONDOMINIUM.</u>

91. Defendants did not respond to Plaintiffs written demands at that time

and Plaintiff was unable to obtain any of the INSURANCE POLICY information

that he had been tirelessly seeking from ROYAL MANAGMENT GROUP owned

by David Raposo but ultimately obtained, from an undisclosed third-party, a

CERTIFICATE OF PROPERTY INSURANCE insuring the "Drake Condominium

Association, Inc." dated 08/05/2021 which lists "Raposo Insurance Group, A Great Florida Agency" as the "Producer" and "Melissa Raposo" as the "contact" with an effective Policy date of 5/15/2021 through expiration date 06/14/2022 with "Directors & Officers" coverage with a "$1,000,000 (one-million dollars)".

92.  On October 31, 2024 Plaintiff sent the attached Exhibit "17" email to attorney Farinas-Sabogal, JOE CEPSIDES, DAVID RAPOSO "forwarding the email with my letter dated October 25, 2024 and the Draft Complaint, both attached hereto" also attaching a "scanned copy of my letter today and the updated Draft Compliant, to reflect the information I received during my attendance of the ZOOM Board Meeting on October 29, 2024 [and] I am also attaching portions of the recorded meeting referred to in my October [31] 2024 letter to you".

93.  The October 31, 2024 letter, attached hereto as Exhibit "18" reiterated the demand made on October 25, 2024 for the eight categories of Documentation requesting "**COMPLETE TRANSPARENCY BY THE BOARD AND ABSOLUTE ACCESS TO ALL ASSOCIATION DOCUMENTS REQUESTED** to be able to assure the Homeowners with whom [Plaintiff] discussed this matter and who likewise are now insisting on FULL TRANSPARENCY that all of the action taken by the Board can and will be explained and supported without obstruction".

94. The October 31, 2024 letter again demanded at item 3. the Insurance Policies, among other documents, asking the Defendants to:

> *Provid[e] [Plaintiff] with full copies of all current Insurance Policies for the last three years, including the one budgeted for $150,000 (one-hundred fifty thousand dollars) as reflected in the NOTICE OF APPROVED BUDGET FOR 2024 authored by Joe Céspedes – LCAM (ROYAL) allegedly sent to "The members of the Drake Condominium Association" (undated but referring to "inform [all] that the Annual 2024 Budget Meeting took place on Thursday, January 25th".*

95. On November 1, 2024 Plaintiff emailed the attached Exhibit "19" email to attorney Farinas-Sabogal, JOE CEPSIDES and DAVID RAPOSO "To ensure proper notice, please confirm by email that you received my email of yesterday". None of the Defendants or their attorney responded.

96. On November 1, 2024 undersigned received an email attached hereto as Exhibit "20" from JOE CEPSIDES copied to DAVID RAPOSO titled "DRAKE CONDOMINIUM – APPROVED SPECIAL ASSESSMENT NOTICE" stating that "The [two person – Josephine Manning and Maria Arencibia] Board approved the [illegal] $1,200,000 (one-million two-hundred thousand dollar) assessment" with the attached APPROVED SPECIAL ASSESSMENT. ROYAL MAAGEMENT and JOE CEPSIDES purposely attached an old 2019 Approved Budget with General Partial Reserves to confuse all Homeowners and reflecting 2018 yearly Insurance cost at $45,520.00 and 2019 yearly Insurance cost at $43,100.

97. In response, Plaintiff on November 1, 2024 emailed JOE CEPSIDES, DAVID RAPOSO and JO MANNING the attached Exhibit "21" email stating:

*"Your email that I'm now responding to and David's email address reflected in your email are the same email addresses that I have been sending the letters and draft legal Complaints before and after the Board Meeting on October 25th, 28th and 31st, I have asked numerous times for you, David and Jo Manning to confirm receipt of emails. Al of you have refused to acknowledge receipt and stated at the Board Meeting that none of you received on October 25th email. It appears you are purposely refusing to acknowledge receipt in order to claim 'ignorance' prior to the actions of the Board on October 28th. This will be addressed in the legal filing".*

.

98. On November 22, 2024 JOE CEPSIDES sent Plaintiff the attached Exhibit " 22" email which included a "drop box" link reflecting the construction work performed by TAMK Construction, the company owned by Edgar Ramirez, the brother in-law of Defendant DAVID RAPOSO.

99. As result of obtaining the 2021 Insurance Certificates information obtained by Plaintiff from a third party source reflecting Defendant MELISSA RAPOSA owning the Insurance Company as reflected in the CERTIFICATE OF INSURANCE for 2021, further written demands were made on the BOARD, the MANAGEMENT COMPANY, MELISSA RAPOSA and the DRAKE'S lawyer Lilliana Farinas-Sabogal of BECKER & POLIAKOFF to provide all insurance policies for 2018 through 2024. Plaintiff was forced to threaten attorney Farinas-Sabogal with obstruction and collusion with the BOARD and ROYAL MANAGEMENT for violations of the July 1, 2024 CONDOMINIUM ACT regarding providing documentation including the demanded Insurance policies for

2018 through 2024. See the email by Plaintiff to attorney Farinas-Sabogal dated November 21, 2024; Attorney Farinas-Sabogal's response emailed on November 25, 2024 and Taraska's reply email dated November 26, 2024 attached hereto as Exhibits "23", "24" and "25" respectively. These emails further set forth the objective refusal of Defendants and their counsel to adhere to the statutory law and Governing Documents of the DRAKE in their actions.

100.   Attorney Farinas-Sabogal used the excuse for not responding or having Notice of Plaintiffs claims made starting on October 25, 2024 because Plaintiff's emails were allegedly going to her "spam". See the November 25th, 2024 Exhibit "24" stating:

> "Good afternoon Mr. Taraska,
> Unfortunately, your emails to me were caught in my spam filter for some reason, and I am only now receiving them".

101.   On November 22, 2024 Taraska emailed the attached Exhibit "25" email to attorney Farinas-Sabogal, the BOARD, ROYAL MANAGEMENT and several DRAKE Homeowners whom Taraska was able to contact regarding a simple question being:

> "To: David Raposo (Royal Group Management); Lilliana Farinas-Sabogal; The DRAKE Board;
>
> It's apartment you are ignoring my emails, demands for information and inquiries in violation of the Governing Documents.
>
> Please answer a simple question:
>
> IS THERE ANY FAMILIAL OR BLOOD RELATIONSHIP BETWEEN EDGAR RAMIREZ WHO IS THE CONTRACTOR OR HIS BUSINESS THAT SUPPOSEDLY PERFORMED $750K OF WORK THAT

*WAS NOT PAID FOR IN 2024 AND DAVID RAPOSO; "JAUN";  and/or MELISSA REPOSO AND WHAT IS THAT RELATIONSHIP?*

*Please answer this simple question **by reply email, immediately.***

*Thank you,*

*Mike Taraska, Unit #207"*

102.   On November 26, 2024 Plaintiff again emailed attorney Farinas-Sabogal the email attached hereto as Exhibit "39" demanding documents that Plaintiff requested "27 days ago" and quoting applicable statutory as well as mandates under the DRAKE Governing Documents with which the Defendants were failing to comply.

103.   On November 25, 2024 attorney Farinas-Sabogal responded to Plaintiff's November 26, 2024 email by the attached Exhibit "40" email to Plaintiff's November 22, 2024 and November 26, 2024 email in which she refused to answer the simple question whether EDGAR MARTINEZ had any blood or legal relationship with DAVID RAPOSO or any related entity. Attorney Farinas-Sabogal stated:

*"Your [Plaintiff's] demands for immediate answers to questions are not supported by the Florida Condominium Act. You are welcome to send your inquiry to the Association at its mailing address as noted in the statute".*

104.   On December 2, 2024 after Defendants FAILING and REFUSING to answer the simple question regarding the relationship of  EDGAR MARTINEZ (who it was later admitted by DAVID RAPOSO at the December 12, 2024

Election of Board Members Meeting was married to DAVID RAPOSO'S sister and who was the owner of the contracting construction Company TAMK), Plaintiff was forced to make yet another email, attached hereto as Exhibit "26" demand as follows:

> "Lilianna,
>
> Your refusal to provide me as a Homeowner/POA with the answer to this simple question is in violation of the DRAKE Governing Documents. How can you refuse to answer this question asked by a Homeowner wanting to know if there is a conflict of interest between the Contractor that allegedly is owed $750k of monies for work done, for the Homeowner's benefit and assessed (illegally) by the Board for the Homeowner to partially pay? Statutory Florida Law creates a presumption of conflict in this case.
>
> PLEASE ANSWER THE QUESTION. Your failure to answer the question is a clear admission that an improper relationship exists as disclosed previously ad nauseam, which your firm is covering up.
>
> **I am hereby putting you on written notice that your firm has a CONFLICT OF INTEREST** in representing the Board, Royal Management Company, David Raposo and Edgar Ramirez and his construction company collectively that is allegedly owed $750k from the DRAKE Association and the Board's and Royal Management Companies acts facilitating the wrongful attempts to legitimize the claims of monies allegedly owed to Mr. Ramirez' company which is a clear conflict of interest violative of the Florida law protecting against "insider" transactions between the Board, the Management Company and Service Providers of Condominium Associations.
>
> If you don't **immediately** de-couple from the interests of Mr. Ramirez' and/or Royal Management which are at odds with the DRAKE Homeowners Association, I will be filing a Bar Complaint against you and your firm for the objectively demonstrated ethical violations.
>
> See Florida Statutes: 718.3027; 718.3025;718.3026.
>
> The Legislative Intent to regulate rogue and corrupt Boards and Management Companies Acts can be found in the Legislative Bill Summaries which includes the following:
>
> **Community Association Managers**
> The bill requires community association managers (CAMs) and CAM firms to return all community association records in their possession within 20 business days of termination of a services agreement or a written request whichever occurs first, with license suspension and civil penalties for noncompliance, except that the time frames applicable to timeshare plans apply to the records of a timeshare plan.
> **The bill provides conflict of interest disclosure requirements and a process for associations to follow when approving contracts with CAMs and CAM firms, or a relative, that may present a conflict of interest.** The requirements are similar to the conflicts of interest provisions for condominium associations and their officers and directors, including:
> - Providing that, if the association receives and considers a bid to provide a good or service that exceeds $2,500, other than community association management services, from a CAM or CAM firm, <u>including directors, officers, persons with a financial interest in a CAM firm, or a relative of such persons, **the association must also solicit multiple bids from other third-party providers of such good or service.**</u>
> - **<u>Requiring</u>** that the proposed activity that may be a conflict of interest **must** be listed on, and all contracts <u>and transactional documents related to the proposed activity **must be attached to, the board's meeting agenda and entered into the meeting minutes.**</u>

- *Requiring the board must approve the contracts with a potential conflict of interest, and all management contracts, by an affirmative vote of two-thirds of all directors present.*

**Milestone Inspections**
   *Currently, single-family, two-family, and three-family dwellings are exempt from the milestone inspection requirements. The bill exempts four-family dwellings with three or fewer habitable stories above ground.*

**Official Records – Condominiums**
   *Regarding access to the official records of a condominium association, the bill:*

- *Provides that, if records are lost or destroyed, there is a good faith obligation to obtain and recover the records as is reasonably possible.*
- ***Allows e-mail addresses and facsimile numbers to be accessible to unit owners if consent to receive notice by electronic transmission has been provided.***
- *Prohibits the sale or sharing of such personal information to third parties.*
- *Effective January 1, 2026, decreases from 150 units to 25 units the threshold requirement for an association to maintain specified records available on the association's website or on a mobile device.*
- *Requires official records to be provided to the unit owner at no charge if the Division of Condominium, Timeshares, and Mobile Homes (division) within the Department of Business and Professional Regulation (DBPR) subpoenas records an association has failed to timely provide in response to a unit owner's written request.*
- *Requires associations to maintain additional financial records (e.g., invoices and other documentation that substantiates any receipt or expenditure).*
- *Requires associations to respond to a records request with a checklist of all records provided.*
- *Authorizes the division to request access to an association's website to investigate complaints related to unit owner access to official records on such website.*

**Criminal Violations – Condominiums**
   *The bill provides the following criminal penalties related to condominium associations, and the official records of the association:*

- ***Second degree misdemeanor for any director or member of the board or association to knowingly, willfully, and repeatedly violate (two or more violations within a 12-month period) any specified requirements relating to inspection and copying of official records of an association;***
- ***First degree misdemeanor for knowingly and intentionally defacing or destroying required accounting records, or failing to create or maintain required accounting records, with the intent of causing harm to the association or one or more of its members;***
- ***Third degree felony to willfully and knowingly refuse to release or produce association records, with the intent to avoid or escape detection, arrest, trial, or punishment for the commission of a crime, or to assist another person with such avoidance or escape;***
- ***Third degree felony for an officer, director, or manager of a condominium association to knowingly solicit, offer to accept, or accept a kickback; and***
- ***First degree misdemeanor for engaging in specified fraudulent voting activity, and knowingly aiding, abetting, or advising a person in the commission of a fraudulent voting activity related to association elections.***
   ***The bill provides that officers and directors charged with a criminal violation under ch. 718, F.S., are deemed removed from office and a vacancy declared.***

**Director Education – Condominiums**
   *The bill provides education requirements for the officers and directors of condominium associations to require:*

- *Newly elected or appointed directors to submit both the written certification that they have read the association's governing documents, will work to uphold the documents to the best of their ability and faithfully discharge their duties, and submit a certificate of completion of an approved condominium education course;*
- *Four hours of training which includes instruction on milestone inspections, SIRS, elections, recordkeeping, financial literacy and transparency, levying of fines, and meeting requirements;*
- *Directors to annually complete at least one hour of continuing education about recent changes to the condominium laws and rules during the past year; and*

- *Association directors, excluding directors for a timeshare condominium, to certify, on a form provided by the division, that all directors have completed the required written certification and educational certificate requirements.*

    *The bill expands the division's post-turnover jurisdiction to include:*
- *Procedures and records related to financial issues, including annual financial reporting, assessments for common expenses, fines, and commingling funds;*
- *Elections, including election and voting requirements, and recall of board members;*
- *The maintenance of and unit owner access to association records;*
- *The procedural aspects of meetings, such as unit owner meetings, quorums, voting requirements, proxies, board of administration meetings, and budget meetings;*
- *Disclosure of conflicts of interest;*
- *Removal of a board director or officer under ch. 718, F.S.;*
- *The procedural completion of structural integrity reserve studies; and*
- *Any written inquiries by unit owners to the association.*
    *In addition, the bill:*
- ***Requires that the division must refer to local law enforcement authorities any person it believes has engaged any criminal activity.***
- *Provides that the division and the office of the condominium ombudsman may attend and observe any meeting of the board or any unit owner meeting, for the purpose of performing the duties of the division or the office of the ombudsman.*
    *The division must submit findings by January 1, 2025, to the Governor, the President of the Senate, and the Speaker of the House of Representatives, of its review and recommendations of the website or application requirements for official records.*

    *The above provisions took effect July 1, 2024.*
    *Vote: Senate 40-0; House 111-0*

    *These provisions will be incorporated in the to-be-filed Federal Lawsuit which I have previously disclosed to you.*

    *YOU HAVE FAILED TO RESPOND TO MY DEMAND THAT THE BOOKS, RECORDS AND DOCUMENTS BE MADE AVAILABLE TO ME ON DECEMBER 3, 2024 WHICH YOU IN PREVIOUS CORRESPONDENCE IS REQUIRED,*

    ***PLEASE RESPOND TO THIS EMAIL FORTHWITH****. I need to make appropriate plane reservations. I am still here in Medellin, Colombia awaiting your response and compliance with the State Laws and DRAKE Governing Documents.*

    *Michael Taraska"*


105.    On December 4, 2024 ROYAL MANAGEMENT through its manager

Joe Cepsides finally emailed Plaintiff the 2018 through 2024 Insurance Policies

which were forwarded from MELISSA RAPOSO "GreatFlorida Insurance Agent-

Owner in Miami Shores, FL". The December 4, 2024 email is attached hereto as

Exhibit "27".

106.   On December 5, 2024 Taraska emailed the BOARD, ROYAL MANAGEMENT and attorney FARINAS-SABOGAL thanking them for the Insurance policies which were tardily provided, in violation of statutory disclosure laws, but cautioning them regarding their failure to provide six of eight categories of documents required to be provided to Taraska under the Florida Condominium Act reiterating those categories. See the attached Exhibit "28" December 5, 2024 email.

107.   The December 5, 2024 email attached a rough summary of the insurance premiums for 2023 and 2024 provided for in the emailed policies in the amount of $59,075 for 2023 and $34,490 in 2024 and Taraska asking why the budgeted and collected amounts from the DRAKE Homeowners amounted to $150,000 (one-hundred fifty thousand dollars for 2024) and $40,000 (forty-thousand dollars) in 2023. The December 5, 2024 emails stated in part:

> Thank you for the requested Insurance Policies. As explained in my previous emails and letters dating back to my October 25th and 29th, 2024 dated and emailed to the Board (Jo Manning - President) and Royal Management (to its owner David Raposo and you) as well as to the DRAKE'S Lawyers Becker & Poliakoff (attorney Farinas-Sabogal) on October 31, 2024 **I HAVE ONLY BEEN PROVIDED WITH 1/4th (2 out of 8 categories) OF THE REQUESTED DOCUMENTATION.**
>
> As explained in my email sent on November 26, 2024, <u>the DRAKE Board, Royal Management Group and the lawyers Becker & Poliakoff **are in violation of the Florida Statutes by failing to provide me with all of the documentation requested.**</u>
>
> By way of example, Royal Management's owner David Raposo who presided over the October 29, 2024 $1.2 Million Illegal Board Special Assessment held up the DECLARATION OF MAILING reflecting NOTICE for that meeting and said he had it right there when I asked for it. You will recall that I emailed all thereafter, several portions of the tape-recording I made from the meeting. I asked you and David Raposo for that DECLARATION and you said you would get it to me. In my letter dated October 31st, 2024 I wrote:

*"To be able to resolve the issues, it will require COMPLETE TRANSPARENCY BY THE BOARD AND ABSOLUTE ACCESS TO ALL DOCUMENTS REQUESTED. I want to be able to assure the Homeowners with whom I have discussed this matter and who likewise are now insisting on FULL TRANSPARENCY that all of the action taken by the Board can and will be explained and supported without obstruction. This will necessarily include the following:*

*1. Providing me with the email address for all 32 Homeowners so that I can email them to ensure that all Homeowners receive Notice of the issues; NOT PROVIDED.*

*2. Providing me with the bid, the line-item summary of all work to-be and/or which was, performed comprising the $750k allegedly owed to the Contractor and all invoices submitted thereto [DECLARATION 9.b.(3); 9.(e)]; PROVIDED.*

*3. Providing me with full copies of all current Insurance Policies for the last three years, including the one budgeted for $150,000 (one-hundred fifty thousand dollars) as reflected in the NOTICE OF APPROVED BUDGET FOR 2024 authored by Joe Céspedes – LCAM (ROYAL) allegedly sent to "The members of the Drake Condominium Association" (undated but referring to "inform [all] that the Annual 2024 Budget Meeting took place on Thursday, January 25th". PROVIDED.*

*4. Providing me with timely access to all of the books and records of the ASSOCIATION for the last seven years which reflects the disbursement of the almost $2 Million in Assessments levied in 2017 – 2019 [Bylaws, Art. X4. at page BL-12]; REFUSED TO COMPLY WITH THE STATUTORY TIME PERIODS.*

*5. Providing me with the names and contact information of the current Board Members of the DRAKE ASSOCIATION and any and all PROXIES held at any time by any of these three Board members for the past seven years to date; NOT PROVIDED.*

*6. Providing me with copies of all Fidelity Bonds "of all persons who control or disburse funds of the Association" – [DECLARATION at page DC-22, item j.; Bylaws, Art. X3. Page BL-12] covering the last seven years to date;*
*NOT PROVIDED.*

*7. Providing me access to review and copy any and all minutes of meetings, roll calls, assessments and any other correspondence to/from the BOARD, Association and the Royal Management Group for the last seven years to date [Bylaws, Art. V4.A. page BL-5]; NOT PROVIDED - INCLUDING THE DECLARATION OF MAILING NOTICE.*

*8. Providing me with access to review and copy all Workers Compensation policies for the last seven years to date.[ DECLARATION page DC-22, item i]. NOT PROVIDED."*

*The Board, Royal Management Group and its lawyers Becker & Poliakoff are continuing to violate my contractual, statutory and constitutional rights by obstructing, delaying and failing to provide me with the required and demanded documents in violation of, but not limited to, the Florida Statutory citations in my email to all dated November 26, 2024 including the Board, Royal Management Group, Becker & Poliakoff and their principals facing criminal repercussions.*

*PLEASE BE PUT ON NOTICE THAT the delay, failure to provide documentation and obstruction is a continuation of the tortious acts that already comprise the ongoing torts previously set forth in my prior communications and also create new actionable claims that will be added to my soon to-be-filed edited Federal Complaint.*

*Given that the Board has decided per the SECOND NOTICE OF ANNUAL MEETING to "move up" the Budget Meeting and Annual Meeting by several months (the last one was held on January 25th, 2024) obviously as a result of my NOTICED CLAIMS in an effort by the Board to try to quickly "push through" otherwise non-beneficial to homeowners dictates, IT IS IMPERATIVE THAT I RECEIVE THE DECLARATION OF NOTICE*

*OF MAILING which I requested during the October 29th, 2024 $1.2 Million Illegal Special Assessment Meeting as* **well as the DECLARATION OF NOTICE OF THE FIRST AND NOW SECOND NOTICE OF ANNUAL MEETING OF THE DRAKE CONDOMINIUM ASSOCIATION, INC.** *The "SECOND NOTICE" setting the Meeting for December 12, 2024 provides less than the required time to NOTICE the meeting.* **I am demanding that I receive the DECLARATION OF NOTICES FORTHWITH. Please email them to me immediately along with the DECLARATION OF NOTICE held up by David Raposo at the October 29th, 2024 meeting.** *There is NO EXCUSE for you to not email those to me IMMEDIATELY.*

*I have reviewed the INSURANCE POLICY documentation (Item #3) as well as all of the LINE-ITEM DOCUMENTATION (Item #2) that was provided.*

*To make it clear, your attempts to act as though you are complying with the Statutory Requirements by providing two of the eight categories of items fails under the Statutes. I know what you're doing and this letter is confirming that so it will be before the Judge in writing when we get into the litigation. The LINE-ITEM documentation is essentially irrelevant to the* **MAIN ISSUES** *that all of the statutory requirements regarding NOTICE required and the procedures mandated to be taken thereto and in the Governing Documents to address services provided* **have failed the mandates and in my opinion as set forth in the Complaint was willfully planned out.** *The LINE-ITEMS and the flow of money owed therefrom may in fact become paramount in analyzing the criminal ramifications once I "follow the money" but for right now, the failures to follow the mandated procedures are the issues.*

*I am attaching my hand-written summary of the last two years of the Yearly Insurance Premiums under the policies provided to me yesterday by link access. I'm not understanding the totals of the cost of the coverage. maybe the files you sent me are incomplete. PLEASE EDUCATE ME, I'M PROBABLY MISSING SOMETHING. The NOTICE OF APPROVED BUDGET FOR 2024 which "took place on January 25th, 2024, in the building lobby area at 3 PM" which by Joe Cepsides stated in his email of March 19, 2024 reflects that "We have received feedback from some of you* that you have not received the new budgeted payments for 2024 " and that as such *"We have attached a copy of the unit's payment breakdown and a copy of the notice" reflects a cost of "2023 Annual Insurance - $40,000" and in "2024 Annual Insurance - $150,000".* **PLEASE EXPLAIN TO ME HOW THE $150,000 AND THE $40,000 RECONCILES WITH THE INSURANCE POLICY PREMIUMS REFLECTED IN THE POLICIES YOU PROVIDED TO ME YESTERDAY AND SUMMARIZED IN MY HAND-WRITTEN NOTE REFLECTING $59,075 COVERING VARIOUS DATES STARTING AT 5/18/22 THROUGH 9/16/23 AND $34,490 COVERING DATES 6/14/24 THROUGH 6/14/25.** *In addition, please explain how, as reflected in the just received SECOND NOTICE OF ANNUAL MEETING which includes "THE DRAKE CONDOMINIUM ASSOCIATION 2025 Proposed Budget with General Partial Reserves" which reflects "2025 ANNUAL Insurance - $150,000" is comprised.*

*PROVIDE ME WITH THE REMAINING ITEMS - #'s 1; 4; 5; 6; 7 and 8 so that I can properly participate at the December 12, 2024 Meeting.*

*I look forward to your anticipated cooperation and mutual consideration.*

*Michael Taraska, Unit #207".*

108.   On December 7, 2024 Plaintiff received an email attached hereto as Exhibit "29" reflecting an "expert" review opinion regarding the Insurance Documentation provided by JOE CEPSEDES reflecting the complete policies

provided and the overlapping insurance premiums for 2023 and 2024 provided for in the emailed policies in the amount of $59,075 for 2023 and $34,490 in 2024 stating that "there is $110,000 unaccounted as an insurance expense. It's time to call for an audit".

109.    On December 10, 2024 homeowner Louise Adakari sent an email attached hereto as Exhibit "30" to attend the December 12, 2024 ELECTION OF BOARD MEMBERS MEETING virtually asking ROYAL MANAGEMENT and the BOARD whether the Adakari's could "please provide an option to join virtually in a manner that we will be able to hear the voices of all presenters and participants. It's 2024 – you should not dis-advantage non-resident owners from participating by hosting a meeting in the lobby area". That request to attend the Meeting was denied by the BOARD and MANAGEMNET COMPANY.

110.    On December 12, 2024, just prior to the December 12, 2024 ELECTION OF BOARD MEMBER MEETING Plaintiff emailed, and had hand-delivered, to the BOARD and ROYAL MANAGEMENT the attached Exhibit "31" email attaching a "PROXY PACKET" which included a letter dated December 12, 2024.

111.    Plaintiff by that time, had the PROXY support of nine Homeowners (owning 11 Units) of DRAKE which are all of the Homeowner's Plaintiff knew personally at that time (excluding two more) and whom Plaintiff contacted which

44

consists of 35.5% (thirty-five and a half percent) of the 31 Units which enables that group to call a Special Meeting of Members pursuant to Article VII1.B. of the Bylaws stating that "It **shall be the duty** of the President to call a special meeting of the Association . . . upon a petition signed by ten percent (10%) of the members having presented to the Secretary".

112.   Astonishingly, during the December 12, 2024 ELECTION OF BOARD MEMBERS MEETING upon questioning by Plaintiff about the $34,490 in Insurance Premiums paid in 2024, ROYAL MANAGEMENT by DAVID RAPOSO admitted, that out of the $150,000 (one-hundred fifty-thousand dollars) of the 2024 BUDGETED and ASSESSED and COLLECTED of Homeowner's funds to purchase the policy from DAVID RAPOSO'S wife, MELISSA RAPOSO, "$70,000 of the funds were still in the HOA Account".

113.   When Plaintiff then asked where the remaining approximate "$50,000 was" DAVID RAPOSO stated in front of all attendees at the Meeting that they were spent on "unexpected and unanticipated expenditures".

114.   Even more shocking, the 2025 BUDGET was passed by the BOARD as set forth below, at a cost again of $150,000 per the BUDGET despite the BOARD and ROYAL MANAGEMENT knowing that the previous years cost of premiums although budgeted at $150,000 only amounted to $34,490.

115.   On December 19, 2024 Plaintiff emailed the BOARD and ROYAL

MANAGEMENT asking the above questions and asking for an explanation. See the attached Exhibit "32" email.

116.   On December 19, 2024 Plaintiff emailed ROYAL MANGEMENT, all Defendants and attorney Farinas-Sabogal informing them in the attached Exhibit "33" email that they again "HAVE FAILED TO PRODUCE DOCUMENTS AS AGREED AND REQUIRED  BY LAW".

117.   On December 19, 2024 JOE CEPSIDES  emailed Plaintiff the attached Exhibit "34" stating that DAVID RAPOSO asked CEPSIDES to email Plaintiff a copy of the "early 1.2 million assessment" in an attempt to "bootstrap" the illegal $1.2 October 29th, 2024 Special Assessment to the $1.95M 2017 – 2018 Assessment. The December 19, 2024 email attached the bids and a cover letter from SWAYSLAND Engineering Consultants to "Darryl Brown, Project Manager". The email went on to state that Defendants did not produce the requested documents because Plaintiff was "asking for them during the busy season". In ither words, Defendants were "too busy" to comply with the statutory law.

118.   On December 20, 2024 Plaintiff responded by email attached hereto as Exhibit "35" to JOE CEPSIDES and all Defendants and asking for Documentation promised by DAVD RAPOSO at the December 12, 2024 BOARD MEETING to be provided to Plaintiff which was not.

119. On December 23, 2024 JOE CEPSIDES sent an email, attached hereto as Exhibit "36", to undersigned, 15 homeowners, the BOARD, copied to DAVID RAPOSO and attorney Lilliana Farinas-Sabogal attaching the AFFIDAVITS OF MAILING of the October 29, 2024 BOARD MEETING ON SPECIAL ASSESSMENT and the December 12, 2024 ELECTION OF BOARD MEMBERS MEETING.

120. On December 26, 2024 JOE CEPSIDES emailed the attached Exhibit "37" email to "Dear Members of the Drake Condominium Association . . . inform[ing] that the 2024 Annual and 2025 Budget meeting was held on Thursday, December 12, 2024 [and] enclosed is a copy of the approved 2025 budget".

121. On December 30, 2024 Plaintiff emailed the BOARD and ROYAL MANAGEMENT setting forth in detail "VIOLATIONS OF FLORIDA STATTORY AND COMMON LAW" with the attached legal authority. The December 30, 2024 is attached hereto as Exhibit "38".

## COUNT 1

### BREACH OF FIDUCIARY DUTY (AGAINST MANNING; MARIA ARENCIBIA and DOE BOARD MEMBER #1)

122. The Plaintiff re-alleges and incorporates by reference the allegations asserted inparagraphs one (1) through (122) above as though fully set forth

47

herein.

123.    The Defendants herein breached their Fiduciary Duties as set forth in the above incorporated facts by violating Florida Statute 718.111(1)(a).

124.    At all times material herein, MANNING, ARENCIBIA and the DOE" "BOARD MEMBERS owed the Plaintiff a fiduciary duty. At all times material herein, upon breach of her fiduciary duty which she owed to the Plaintiff which, in in addition to the allegations provided above, include, but are not limited to the following:

a. Betraying the trust of the Association, community, owners and Plaintiff by knowingly refusing to uniformly apply the provisions of the Condominium Association's Governing Documents; by refusing to repair Plaintiff's water damages to his Unit; by attempting to have Plaintiff alter his Unit windows at great expense without basis by purposely and intentionally violating Florida Statutory law regarding the management of the Association including not allowing proper Board member elections to take place and denying Notice to potential otherwise interested Board Nominees.

b. Hiring vendors and contractors without obtaining the necessary bids from competitive vendors and contractors and engaging in business while occupying a conflict of interest or a possible conflict of interest with related parties.

48

c. Knowingly and illegally hiring unlicensed contractors to perform work on the common elements. Betraying the trust of the Association, community, owners and Plaintiff by attempting to pass special assessments and levying special assessments on the ledger without ever sending a proper notice pursuant to Florida Statute §718.112 prior to a special assessment meeting.

d. Betraying the trust of the Association, community, owners and Plaintiff by approving and assessing substantial additions to the Common Elements exceeding $10,000.00 without approval of the owners/members of the Association in violation of Section 10(c) of the Association's Declaration.

125.   As a direct and proximate result of Manning's and the Board's commission of the above- described acts, she has betrayed the trust of all owners, including thePlaintiff who has suffered damages.

126.   Manning's and the Board's aforesaid acts were intentional, maliciously motivated, performed in bad faith andwere based on advancing her self-interest.

127.   Pursuant to Florida Statute 718.111(2)(d), "[a]n officer, director, or agent shall be liable for monetary damages as provided in Florida Statute 617.0834 if such officer, director, or agent breached or failed to perform his or her duties and the breach of, or failure to perform, his or her duties constitutes a violation of criminal law as provided in Florida Statute 617.0834; constitutes a transaction from which the officer or director derived an improper personal benefit either indirectly

49

or directly; or constitutes recklessness or in act or omission that was in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety or property.

128.   Failure to adhere to the language of the DRAKE DECLARATION ARTICLE X – INDEMNIFICATION, at page AI-5 that BOARD MEMBERS will not be covered under the INDEMNIFCATION provisions "wherein the director or officer is adjudged guilty of willful misfeasance or malfeasance in the performance of the director's or officer's duty" and BOARD members involved in the improper and illegal activity, including attempts to "cover up" the violations of the Governing Documents and Florida statutory requirements.

129.   The failure of the Board Members to provide Plaintiff after numerous written demands with ALL Minutes of past Meetings and Actions by the Board or Homeowners during formal meetings or actions as is required to be kept by the Secretary of the Board.

130.   The refusal to allow inspection or copying of an official record of a condominium association that is accessible to unit owners within the time periods required by general law in furtherance of any crime is punishable as tampering with physical evidence as provided in Fla. Stat. 918.13 or as obstruction of justice as provided in chapter 843. . . .". Fla. Stat. 718(1)(d).

131.   Failure to provide Plaintiff with "each unit owners  . . . address last furnished to the Association, as such addresses as it appears on the books of the Association" which the above AFFIDAVITS of Notice of Mailing attest and state such Notices were mailed.

132.     Failure to produce the addresses to which the AFFIDAVITS of Notice of Mailing attest the Notices were allegedly mailed are "OFFICAL RECORDS" of the Association as specifically defined by Florida Statutory Law at 720.303(2)(c)(4)(a)7 as follows: "7.   A current roster of all unit owners and their mailing addresses, unit identifications, voting certifications, and, if known, telephone numbers. The association shall also maintain the e-mail addresses and facsimile numbers of unit owners consenting to receive notice by electronic transmission. The e-mail addresses and facsimile numbers are not accessible to unit owners if consent to receive notice by electronic transmission is not provided in accordance with sub-subparagraph (c)3.e" and Fla. Stat. 718.111(12)7.

133.   Defendants failed to provide to Plaintiff "the e-mail addresses and facsimile numbers of unit owners consenting to receive notice by electronic transmission" which constitute OFFICIAL RECORDS of the DRAKE CONDOMINIUM ASSOCIATION, INC. mandated by law to be provided to all Homeowners in continuous violation of Fla. Stat. 718.11 and 720.303.

134.   Defendants officers, directors, and/or managers solicited, offer to accept, or accept anything or service of value or kickback for which consideration

has not been provided for his or her own benefit or that of his or her immediate family, from any person providing or proposing to provide goods or services to the association. Any such officer, director, or manager who knowingly so solicits, offers to accept, or accepts anything or service of value or kickback is subject to a civil penalty pursuant to s. 718.501(1)(d) and, if applicable, a criminal penalty as provided in paragraph (d). . . .

(b)   A director of the association who is present at a meeting of its board at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless he or she votes against such action or abstains from voting. A director of the association who abstains from voting on any action taken on any corporate matter shall be presumed to have taken no position with regard to the action. . . .

(d)   As required by Fla. Stat. 617.0830, an officer, director, or agent shall discharge his or her duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the interests of the association. An officer, director, or agent shall be liable for monetary damages as provided in Fla. Stat. 617.0834 if such officer, director, or agent breached or failed to perform his or her duties and the breach of, or failure to perform, his or her duties constitutes a violation of criminal law as provided in Fla. Stat. 617.0834; constitutes a transaction from which the officer or director derived an improper personal benefit, either directly or indirectly; or constitutes recklessness or an act or omission that was in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . .  theft or embezzlement of

funds of a condominium association is punishable as provided in Fla. Stat. 812.014 and destruction of or the refusal to allow inspection or copying of an official record of a condominium association that is accessible to unit owners within the time periods required by general law in furtherance of any crime is punishable as tampering with physical evidence as provided in Fla. Stat. 918.13 or as obstruction of justice as provided in chapter 843. . . .".

135.    Under Fla. Stat. "718.111 - (a) The officers and directors of the association have a fiduciary relationship to the unit owners. It is the intent of the Legislature that nothing in this paragraph shall be construed as providing for or removing a requirement of a fiduciary relationship between any manager employed by the association and the unit owners"

136.    Under Fla. Stat. "718.111 - (a) (11)    INSURANCE.—In order to·protect the safety, health, and welfare of the people of the State of Florida and to ensure consistency in the provision of insurance coverage to condominiums and their unit owners, this subsection applies to every residential condominium in the state, regardless of the date of its declaration of condominium. It is the intent of the Legislature to encourage lower or stable insurance premiums for associations described in this subsection. . . . (c)    Policies may include deductibles as determined by the board. 1. The deductibles must be consistent with industry standards and prevailing practice for communities of similar size and age, and having similar construction and facilities in the locale where the condominium property is situated which the Defendants did not adhere to. 2. The deductibles may be based upon available funds, including reserve accounts, or predetermined assessment authority at the time the insurance is obtained which

the Defendants did not ensure. 3.   The Defendants did not establish the amount of deductibles based upon the level of available funds and predetermined assessment authority at a meeting of the board in the manner set forth in Fla. Stat. 718.112(2)(e).

137.   In violation of Fla. Stat. 720.303(4) and 718.111(12)(a) OFFICIAL RECORDS the association did not maintain and/or failed to provide upon Plaintiff 's demands each of the following items which constitutes the official records of the association: 1. A copy of the plans, permits, warranties, and other items provided by the developer under s. 718.301(4). 2.A photocopy of the recorded declaration of condominium of each condominium operated by the association and each amendment to each declaration. 3. A photocopy of the recorded bylaws of the association and each amendment to the bylaws. 4. A certified copy of the articles of incorporation of the association, or other documents creating the association, and each amendment thereto. 5. A copy of the current rules of the association. 6. A book or books that contain the minutes of all meetings of the association, the board of administration, and the unit owners. 7. A current roster of all unit owners and their mailing addresses, unit identifications, voting certifications, and, if known, telephone numbers. The association shall also maintain the e-mail addresses and facsimile numbers of unit owners consenting to receive notice by electronic transmission. The e-mail addresses and facsimile numbers are not accessible to unit owners if consent to receive notice by electronic transmission is not provided in accordance with sub-subparagraph (c)3.e. However, the association is not liable for an inadvertent disclosure of the e-mail address or facsimile number for receiving electronic transmission of notices. 8. All current insurance policies of the association and

condominiums operated by the association. 9. A current copy of any management agreement, lease, or other contract to which the association is a party or under which the association or the unit owners have an obligation or responsibility. 10.    Bills of sale or transfer for all property owned by the association. 11.    Accounting records for the association and separate accounting records for each condominium that the association operates. Any person who knowingly or intentionally defaces or destroys such records, or who knowingly or intentionally fails to create or maintain such records, with the intent of causing harm to the association or one or more of its members, is personally subject to a civil penalty pursuant to 718.501(1)(d). The accounting records must include, but are not limited to: a. Accurate, itemized, and detailed records of all receipts and expenditures. b. A current account and a monthly, bimonthly, or quarterly statement of the account for each unit designating the name of the unit owner, the due date and amount of each assessment, the amount paid on the account, and the balance due. c. All audits, reviews, accounting statements, and financial reports of the association or condominium. d. All contracts for work to be performed. Bids for work to be performed are also considered official records and must be  maintained by the association for at least 1 year after receipt of the bid. 12. Ballots, sign-in sheets, voting proxies, and all other papers and electronic records relating to voting by unit owners, which must be maintained for 1 year from the date of the election, vote, or meeting to which the document relates, notwithstanding paragraph (b). 13.All rental records if the association is acting as agent for the rental of condominium units. 14. A copy of the current question and answer sheet as described in s. 718.504. 15. A copy of the inspection report as described in s. 718.301(4)(p). 16. Bids for materials, equipment, or services. 17. All affirmative

acknowledgments made pursuant to s. 718.121(4)(c). 18. All other written records of the association not [1]specifically included in the foregoing which are related to the operation of the association. (b) The official records specified in subparagraphs (a)1.-6. must be permanently maintained from the inception of the association. Bids for work to be performed or for materials, equipment, or services must be maintained for at least 1 year after receipt of the bid. All other official records must be maintained within the state for at least 7 years, unless otherwise provided by general law. The records of the association shall be made available to a unit owner within 45 miles of the condominium property or within the county in which the condominium property is located within 10 working days after receipt of a written request by the board or its designee. However, such distance requirement does not apply to an association governing a timeshare condominium. This paragraph may be complied with by having a copy of the official records of the association available for inspection or copying on the condominium property or association property, or the association may offer the option of making the records available to a unit owner electronically via the Internet or by allowing the records to be viewed in electronic format on a computer screen and printed upon request. The association is not responsible for the use or misuse of the information provided to an association member or his or her authorized representative in compliance with this chapter unless the association has an affirmative duty not to disclose such information under this chapter. (c)1.The official records of the association are open to inspection by any association member or the authorized representative of such member at all reasonable times. The right to inspect the records includes the right to make or obtain copies, at the reasonable expense, if any, of the member or authorized representative of such member. A renter of a unit has a right to inspect and copy

56

only the declaration of condominium and the association's bylaws and rules. The association may adopt reasonable rules regarding the frequency, time, location, notice, and manner of record inspections and copying but may not require a member to demonstrate any purpose or state any reason for the inspection. The failure of an association to provide the records within 10 working days after receipt of a written request creates a rebuttable presumption that the association willfully failed to comply with this paragraph. A unit owner who is denied access to official records is entitled to the actual damages or minimum damages for the association's willful failure to comply. Minimum damages are $50 per calendar day for up to 10 days, beginning on the 11th working day after receipt of the written request. The failure to permit inspection entitles any person prevailing in an enforcement action to recover reasonable attorney fees from the person in control of the records who, directly or indirectly, knowingly denied access to the records. 2. Any person who knowingly or intentionally defaces or destroys accounting records that are required by this chapter to be maintained during the period for which such records are required to be maintained, or who knowingly or intentionally fails to create or maintain accounting records that are required to be created or maintained, with the intent of causing harm to the association or one or more of its members, is personally subject to a civil penalty pursuant to 718.501(1)(d)".

138.    The Defendants failed to adhere to the Financial Reporting, Disclosure and Notice provisions of Florida statutory law in violation of: Fla. Stat. 720.303(7) and 718.111(13) "FINANCIAL REPORTING.—Within 90 days after the end of the fiscal year, or annually on a date provided in the bylaws, the association shall prepare and complete, or contract for the preparation and completion of, a

financial report for the preceding fiscal year. Within 21 days after the final financial report is completed by the association or received from the third party, but not later than 120 days after the end of the fiscal year or other date as provided in the bylaws, the association shall mail to each unit owner at the address last furnished to the association by the unit owner, or hand deliver to each unit owner, a copy of the most recent financial report or a notice that a copy of the most recent financial report will be mailed or hand delivered to the unit owner, without charge, within 5 business days after receipt of a written request from the unit owner. . . .  (a) An association that meets the criteria of this paragraph shall prepare a complete set of financial statements in accordance with generally accepted accounting principles. The financial statements must be based upon the association's total annual revenues, as follows: . . . 2. An association with total annual revenues of at least $300,000, but less than $500,000, shall prepare reviewed financial statements. . . . (e)    A unit owner may provide written notice to the division of the association's failure to mail or hand deliver him or her a copy of the most recent financial report within 5 business days after he or she submitted a written request to the association for a copy of such report. If the division determines that the association failed to mail or hand deliver a copy of the most recent financial report to the unit owner, the division shall provide written notice to the association that the association must mail or hand deliver a copy of the most recent financial report to the unit owner and the division within 5 business days after it receives such notice from the division. An association that fails to comply with the division's request may not waive the financial reporting requirement provided in paragraph (d) for the fiscal year in which the unit owner's request was made and the following fiscal year. A financial report received by the division pursuant to this paragraph shall

be maintained, and the division shall provide a copy of such report to an association member upon his or her request".

139.   The Defendants herein have Fiduciary Duties pursuant to Fla. Stat. 720.303 "(1) POWERS AND DUTIES.— . . .  The officers and directors of an association are subject to s. 617.0830 and have a fiduciary relationship to the members who are served by the association. The powers and duties of an association include those set forth in this chapter and, except as expressly limited or restricted in this chapter, those set forth in the governing documents . (2)   BOARD MEETINGS.— (a)   Members of the board of administration may use e-mail as a means of communication but may not cast a vote on an association matter via e-mail. A meeting of the board of directors of an association occurs whenever a quorum of the board gathers to conduct association business. Meetings of the board must be open to all members, except for meetings between the board and its attorney with respect to proposed or pending litigation where the contents of the discussion would otherwise be governed by the attorney-client privilege. . . .  (b) Members have the right to attend all meetings of the board. The right to attend such meetings includes the right to speak at such meetings with reference to all designated items. The association may adopt written reasonable rules expanding the right of members to speak and governing the frequency, duration, and other manner of member statements, which rules must be consistent with this paragraph and may include a sign-up sheet for members wishing to speak. . (c) The bylaws shall provide the following for giving notice to parcel owners and members of all board meetings and, if they do not do so, shall be deemed to include the following: 1. Notices of all board meetings must specifically identify agenda items for the

meetings and must be posted in a conspicuous place in the community at least 48 hours in advance of a meeting, except in an emergency. In the alternative, if notice is not posted in a conspicuous place in the community, notice of each board meeting must be mailed or delivered to each member at least 7 days before the meeting, except in an emergency. . . . 2. An assessment may not be levied at a board meeting unless the notice of the meeting includes a statement that assessments will be considered and the nature of the assessments. Written notice of any meeting at which special assessments will be considered or at which amendments to rules regarding parcel use will be considered must be mailed, delivered, or electronically transmitted to the members and parcel owners and posted conspicuously on the property or broadcast on closed-circuit cable television not less than 14 days before the meeting. 3. Directors may not vote by proxy or by secret ballot at board meetings, except that secret ballots may be used in the election of officers. This subsection also applies to the meetings of any committee or other similar body, when a final decision will be made regarding the expenditure of association funds, and to any body vested with the power to approve or disapprove architectural decisions with respect to a specific parcel of residential property owned by a member of the community. (d) If 20 percent of the total voting interests petition the board to address an item of business, the board shall at its next regular board meeting or at a special meeting of the board, but not later than 60 days after the receipt of the petition, take the petitioned item up on an agenda. The board shall give all members notice of the meeting at which the petitioned item shall be addressed in accordance with the 14-day notice requirement pursuant to subparagraph (c)2. Each member shall have the right to speak for at least 3 minutes on each matter placed on the agenda by petition, provided that the member signs the sign-up

sheet, if one is provided, or submits a written request to speak prior to the meeting. Other than addressing the petitioned item at the meeting, the board is not obligated to take any other action requested by the petition. . . .  (3) MINUTES.— Minutes of all meetings of the members of an association and of the board of directors of an association must be maintained in written form or in another form that can be converted into written form within a reasonable time. A vote or abstention from voting on each matter voted upon for each director present at a board meeting must be recorded in the minutes. (4) OFFICIAL RECORDS.— (a) The association shall maintain each of the following items, when applicable, for at least 7 years, unless the governing documents of the association require a longer period of time, which constitute the official records of the association: 1. Copies of any plans, specifications, permits, and warranties related to improvements constructed on the common areas or other property that the association is obligated to maintain, repair, or replace. 2. A copy of the bylaws of the association and of each amendment to the bylaws. 3.A copy of the articles of incorporation of the association and of each amendment thereto. 4.A copy of the declaration of covenants and a copy of each amendment thereto. 5.A copy of the current rules of the homeowners' association. 6.The minutes of all meetings of the board of directors and of the members. 7. A current roster of all members and their designated mailing addresses and parcel identifications. A member's designated mailing address is the member's property address, unless the member has sent written notice to the association requesting that a different mailing address be used for all required notices. The association shall also maintain the e-mail addresses and the facsimile numbers designated by members for receiving notice sent by electronic transmission of those members consenting to receive notice by

electronic transmission. A member's e-mail address is the e-mail address the member provided when consenting in writing to receiving notice by electronic transmission, unless the member has sent written notice to the association requesting that a different e-mail address be used for all required notices. The e-mail addresses and facsimile numbers provided by members to receive notice by electronic transmission must be removed from association records when the member revokes consent to receive notice by electronic transmission. However, the association is not liable for an erroneous disclosure of the e-mail address or the facsimile number for receiving electronic transmission of notices. 8. All of the association's insurance policies or a copy thereof. 9. A current copy of all contracts to which the association is a party, including, without limitation, any management agreement, lease, or other contract under which the association has any obligation or responsibility. Bids received by the association for work to be performed are considered official records and must be kept for a period of 1 year. 10. The financial and accounting records of the association, kept according to good accounting practices. The financial and accounting records must include: a. Accurate, itemized, and detailed records of all receipts and expenditures. b. A current account and a periodic statement of the account for each member, designating the name and current address of each member who is obligated to pay assessments, the due date and amount of each assessment or other charge against the member, the date and amount of each payment on the account, and the balance due. c. All tax returns, financial statements, and financial reports of the association. d. Any other records that identify, measure, record, or communicate financial information. 11. A copy of the disclosure summary described in s. 720.401(1). 12. Ballots, sign-in sheets, voting proxies, and all other papers and electronic records relating to voting by parcel owners,

which must be maintained for at least 1 year after the date of the election, vote, or meeting. 13. All affirmative acknowledgments made pursuant to s. 720.3085(3)(c)3. 4. All other written records of the association not specifically included in this subsection which are related to the operation of the association. . . . . (5)   INSPECTION AND COPYING OF RECORDS.— (a) Unless otherwise provided by law or the governing documents of the association, the official records must be maintained within this state for at least 7 years and be made available to a parcel owner for inspection or photocopying within 45 miles of the community or within the county in which the association is located within 10 business days after receipt by the board or its designee of a written request from the parcel owner. This subsection may be complied with by having a copy of the official records available for inspection or copying in the community or by making the records available to a parcel owner electronically via the Internet or by allowing the records to be viewed in electronic format on a computer screen and printed upon request. If the association has a photocopy machine available where the records are maintained, it must provide parcel owners with copies on request during the inspection if the entire request is limited to no more than 25 pages. An association shall allow a member or his or her authorized representative to use a portable device, including a smartphone, tablet, portable scanner, or any other technology capable of scanning or taking photographs, to make an electronic copy of the official records in lieu of the association's providing the member or his or her authorized representative with a copy of such records. The association may not charge a fee to a member or his or her authorized representative for the use of a portable device. (b) The failure of an association to provide access to the records within 10 business days after receipt of a written request submitted

by certified mail, return receipt requested, creates a rebuttable presumption that the association willfully failed to comply with this subsection. (c) A member denied access to official records is entitled to the actual damages or minimum damages for the association's willful failure to comply with this subsection. The minimum damages are to be $50 per calendar day up to 10 days, the calculation to begin on the 11th business day after receipt of the written request. (d) Any director or member of the board or association or a community association manager who knowingly, willfully, and repeatedly violates paragraph (a), with the intent of causing harm to the association or one or more of its members, commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. For purposes of this paragraph, the term "repeatedly" means two or more violations within a 12-month period. (e) Any person who knowingly and intentionally defaces or destroys accounting records during the period in which such records are required to be maintained, or who knowingly or intentionally fails to create or maintain accounting records that are required to be created or maintained, with the intent of causing harm to the association or one or more of its members, commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. (f) Any person who willfully and knowingly refuses to release or otherwise produce association records with the intent to avoid or escape detection, arrest, trial, or punishment for the commission of a crime, or to assist another person with such avoidance or escape, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. (g) The association may adopt reasonable written rules governing the frequency, time, location, notice, records to be inspected, and manner of inspections, but may not require a parcel owner to demonstrate any proper purpose for the inspection, state any reason for the

64

inspection, or limit a parcel owner's right to inspect records to less than one 8-hour business day per month. The association may impose fees to cover the costs of providing copies of the official records, including the costs of copying and the costs required for personnel to retrieve and copy the records if the time spent retrieving and copying the records exceeds one-half hour and if the personnel costs do not exceed $20 per hour. Personnel costs may not be charged for records requests that result in the copying of 25 or fewer pages. The association may charge up to 25 cents per page for copies made on the association's photocopier. If the association does not have a photocopy machine available where the records are kept, or if the records requested to be copied exceed 25 pages in length, the association may have copies made by an outside duplicating service and may charge the actual cost of copying, as supported by the vendor invoice. The association shall maintain an adequate number of copies of the recorded governing documents, to ensure their availability to members and prospective members. . . . (6) BUDGETS.  (a) The association shall prepare an annual budget that sets out the annual operating expenses. The budget must reflect the estimated revenues and expenses for that year and the estimated surplus or deficit as of the end of the current year. The budget must set out separately all fees or charges paid for by the association for recreational amenities, whether owned by the association, the developer, or another person. The association shall provide each member with a copy of the annual budget or a written notice that a copy of the budget is available upon request at no charge to the member. The copy must be provided to the member within the time limits set forth in subsection (5). (b) In addition to annual operating expenses, the budget may include reserve accounts for capital expenditures and deferred maintenance for which the association is responsible. If reserve accounts are not

established pursuant to paragraph (d), funding of such reserves is limited to the extent that the governing documents limit increases in assessments, including reserves. If the budget of the association includes reserve accounts established pursuant to paragraph (d), such reserves shall be determined, maintained, and waived in the manner provided in this subsection. Once an association provides for reserve accounts pursuant to paragraph (d), the association shall thereafter determine, maintain, and waive reserves in compliance with this subsection. This section does not preclude the termination of a reserve account established pursuant to this paragraph upon approval of a majority of the total voting interests of the association. Upon such approval, the terminating reserve account shall be removed from the budget. . . . (7)    FINANCIAL REPORTING.—Within 90 days after the end of the fiscal year, or annually on the date provided in the bylaws, the association shall prepare and complete, or contract with a third party for the preparation and completion of, a financial report for the preceding fiscal year. Within 21 days after the final financial report is completed by the association or received from the third party, but not later than 120 days after the end of the fiscal year or other date as provided in the bylaws, the association shall, within the time limits set forth in subsection (5), provide each member with a copy of the annual financial report or a written notice that a copy of the financial report is available upon request at no charge to the member. Financial reports shall be prepared as follows: (a) An association that meets the criteria of this paragraph shall prepare or cause to be prepared a complete set of financial statements in accordance with generally accepted accounting principles as adopted by the Board of Accountancy. The financial statements shall be based upon the association's total annual revenues, as follows: . . . 2.   An association with total annual revenues of at least

66

$300,000, but less than $500,000, shall prepare reviewed financial statements. . . . (c) If 20 percent of the parcel owners petition the board for a level of financial reporting higher than that required by this section, the association shall duly notice and hold a meeting of members within 30 days of receipt of the petition for the purpose of voting on raising the level of reporting for that fiscal year. Upon approval of a majority of the total voting interests of the parcel owners, the association shall prepare or cause to be prepared, shall amend the budget or adopt a special assessment to pay for the financial report regardless of any provision to the contrary in the governing documents, and shall provide within 90 days of the meeting or the end of the fiscal year, whichever occurs later: 1. Compiled, reviewed, or audited financial statements, if the association is otherwise required to prepare a report of cash receipts and expenditures; 2. Reviewed or audited financial statements, if the association is otherwise required to prepare compiled financial statements; or 3. Audited financial statements if the association is otherwise required to prepare reviewed financial statements. (d) If approved by a majority of the voting interests present at a properly called meeting of the association, an association may prepare or cause to be prepared: 1. A report of cash receipts and expenditures in lieu of a compiled, reviewed, or audited financial statement; 2. A report of cash receipts and expenditures or a compiled financial statement in lieu of a reviewed or audited financial statement; or 3. A report of cash receipts and expenditures, a compiled financial statement, or a reviewed financial statement in lieu of an audited financial statement. An association may not prepare a financial statement pursuant to this paragraph for consecutive fiscal years. . . .  (10) RECALL OF DIRECTORS. . . (b)1. Board directors may be recalled by an agreement in writing or by written ballot without a membership meeting. The

agreement in writing or the written ballots, or a copy thereof, shall be served on the association by certified mail or by personal service in the manner authorized by chapter 48 and the Florida Rules of Civil Procedure. 2.The board shall duly notice and hold a meeting of the board within 5 full business days after receipt of the agreement in writing or written ballots. At the meeting, the board shall either certify the written ballots or written agreement to recall a director or directors of the board, in which case such director or directors shall be recalled effective immediately and shall turn over to the board within 5 full business days any and all records and property of the association in their possession, or proceed as described in paragraph (d). 3.When it is determined by the department pursuant to binding arbitration proceedings or the court in an action filed in a court of competent jurisdiction that an initial recall effort was defective, written recall agreements or written ballots used in the first recall effort and not found to be defective may be reused in one subsequent recall effort. However, in no event is a written agreement or written ballot valid for more than 120 days after it has been signed by the member. 4. Any rescission or revocation of a member's written recall ballot or agreement must be in writing and, in order to be effective, must be delivered to the association before the association is served with the written recall agreements or ballots. 5. The agreement in writing or ballot shall list at least as many possible replacement directors as there are directors subject to the recall, when at least a majority of the board is sought to be recalled; the person executing the recall instrument may vote for as many replacement candidates as there are directors subject to the recall. (c)1. If the declaration, articles of incorporation, or bylaws specifically provide, the members may also recall and remove a board director or directors by a vote taken at a meeting. If so provided in the governing

documents, a special meeting of the members to recall a director or directors of the board of administration may be called by 10 percent of the voting interests giving notice of the meeting as required for a meeting of members, and the notice shall state the purpose of the meeting. Electronic transmission may not be used as a method of giving notice of a meeting called in whole or in part for this purpose. 2. The board shall duly notice and hold a board meeting within 5 full business days after the adjournment of the member meeting to recall one or more directors. At the meeting, the board shall certify the recall, in which case such member or members shall be recalled effective immediately and shall turn over to the board within 5 full business days any and all records and property of the association in their possession, or shall proceed as set forth in paragraph (d). (d) If the board determines not to certify the written agreement or written ballots to recall a director or directors of the board or does not certify the recall by a vote at a meeting, the board shall, within 5 full business days after the meeting, file an action with a court of competent jurisdiction or file with the department a petition for binding arbitration under the applicable procedures in ss. 718.112(2)(l) and 718.1255 and the rules adopted thereunder. For the purposes of this section, the members who voted at the meeting or who executed the agreement in writing shall constitute one party under the petition for arbitration or in a court action. If the arbitrator or court certifies the recall as to any director or directors of the board, the recall will be effective upon the final order of the court or the mailing of the final order of arbitration to the association. The director or directors so recalled shall deliver to the board any and all records of the association in their possession within 5 full business days after the effective date of the recall. (e) If a vacancy occurs on the board as a result of a recall and less than a majority of the board directors are removed, the

vacancy may be filled by the affirmative vote of a majority of the remaining directors, notwithstanding any provision to the contrary contained in this subsection or in the association documents. If vacancies occur on the board as a result of a recall and a majority or more of the board directors are removed, the vacancies shall be filled by members voting in favor of the recall; if removal is at a meeting, any vacancies shall be filled by the members at the meeting. If the recall occurred by agreement in writing or by written ballot, members may vote for replacement directors in the same instrument in accordance with procedural rules adopted by the division, which rules need not be consistent with this subsection. (f) If the board fails to duly notice and hold a board meeting within 5 full business days after service of an agreement in writing or within 5 full business days after the adjournment of the member recall meeting, the recall shall be deemed effective and the board directors so recalled shall immediately turn over to the board all records and property of the association. (g) If the board fails to duly notice and hold the required meeting or fails to file the required petition or action, the parcel owner representative may file a petition or a court action under s. 718.1255 challenging the board's failure to act. The petition or action must be filed within 60 days after the expiration of the applicable 5-full-business-day period. The review of a petition or action under this paragraph is limited to the sufficiency of service on the board and the facial validity of the written agreement or ballots filed. (h) If a director who is removed fails to relinquish his or her office or turn over records as required under this section, the circuit court in the county where the association maintains its principal office may, upon the petition of the association, summarily order the director to relinquish his or her office and turn over all association records upon application of the association. (i) The minutes of the

70

board meeting at which the board decides whether to certify the recall are an official association record. The minutes must record the date and time of the meeting, the decision of the board, and the vote count taken on each board member subject to the recall. In addition, when the board decides not to certify the recall, as to each vote rejected, the minutes must identify the parcel number and the specific reason for each such rejection. (j) When the recall of more than one board director is sought, the written agreement, ballot, or vote at a meeting shall provide for a separate vote for each board director sought to be recalled. . . . (14) REQUIREMENT TO PROVIDE AN ACCOUNTING.—A parcel owner may make a written request to the board for a detailed accounting of any amounts he or she owes to the association related to the parcel, and the board shall provide such information within 15 business days after receipt of the written request. After a parcel owner makes such written request to the board, he or she may not request another detailed accounting for at least 90 calendar days. Failure by the board to respond within 15 business days to a written request for a detailed accounting constitutes a complete waiver of any outstanding fines of the person who requested such accounting which are more than 30 days past due and for which the association has not given prior written notice of the imposition of the fines. (15)   REQUIREMENT TO PROVIDE COPIES OF RULES AND COVENANTS.—  (a) Before October 1, 2024, an association shall provide a physical or digital copy of the association's rules and covenants to every member of the association. (b) An association shall provide a physical or digital copy of the association's rules and covenants to every new member of the association. (c) If an association's rules or covenants are amended, the association must provide every member of the association with an updated copy of the amended rules or covenants. An association may adopt

71

rules establishing standards for the manner of distribution and timeframe for providing copies of updated rules or covenants. (d) The requirements of this subsection may be met by posting a complete copy of the association's rules and covenants, or a direct link thereto, on the homepage of the association's website if such website is accessible to the members of the association and the association sends notice to each member of the association of its intent to utilize the website for this purpose. Such notice must be sent in both of the following ways: 1. By electronic mail to any member of the association who has consented to receive notices by electronic transmission and provided an electronic mailing address to the association for that purpose. 2.By mail to all other members of the association at the address identified as the member's mailing address in the official records of the association.

140. Defendants set forth in this CAUSE OF ACTION breached their Fiduciary Duties by violating Florida Statute 718.3025 which requires that: "(1) No written contract between a party contracting to provide maintenance or management services and an association which contract provides for operation, maintenance, or management of a condominium association or property serving the unit owners of a condominium shall be valid or enforceable unless the contract: . . (f) Discloses any financial or ownership interest a board member or any party providing maintenance or management services to the association holds with the contracting party. (2) In any case in which the party contracting to provide maintenance or management services fails to provide such services in accordance

72

with the contract, the association is authorized to procure such services from some

other party and shall be entitled to collect any fees or charges paid for service

performed by another party from the party contracting to provide maintenance or

management services. (3) Any services or obligations not stated on the face of the

contract shall be unenforceable.


Wherefore, the Plaintiff demands that a judgment be entered against the

Defendant, JOSEPHINE MANNING, for compensatory as well as punitive

damages, attorney's fees and costs.


## COUNT 2

### DECLARATORY RELIEF AGAINST THE DRAKE CONDOMINIUM ASSOCIATION, INC.

141. The Plaintiff re-alleges and incorporates by reference the allegations

asserted inparagraphs one (1) through (140) above as though fully set forth

herein.

141.     The $1.2 Million amounts sought by the Association includes illegal

charges since they are not collectible pursuant to Florida Statute §718.116 and

not properly passed pursuant to Florida Statute §718.112 and Article VII 2(D)

of the Association's By-Laws. Specifically, the Association on October 29,

2024 levied special assessments in the amount of $1.2 million that were never properly passed or noticed and of which are illegally being attempted to be collected against the Plaintiff.

142. Additionally, the Association is attempting to collect amounts that were never properly approved pursuant to Section 10(c) of the Association's Declaration, since any material alterations or substantial additions to the Common Elements exceeding $10,000.00 must be approved by a vote of the owners/members of the Association.

143. Plaintiff and the Association have an actual, present, adverse and antagonistic interest in the subject matter hereof, either in fact or law. The antagonistic and adverse interests are, or will be, before the Court by proper process. The relief sought herein is not merely the giving of legal advice by the Court or the answers to questions propounded from curiosity. Plaintiff seeks attorney's fees and costs for pursuing this action pursuant to the Section 30 of the Association's Declaration, Florida Statute §718.116 and Florida Statute §718.303(1) and that this Court enter a judgment declaring:

i. That the October 29, 2024 Special assessment of $1.2 million assessed including Plaintiff's portion allegedly passed on October 29, 2024 are unenforceable since they were not validly passed pursuant to Florida Statute §718.112 , Article VII Section 2(D)of the Association's By-Laws or Section

10(c) of the Association's Declaration.

ii.  That Plaintiff is only liable for regular assessments and validly passed special assessments since obtaining title.

iii. That the Court set off the amount Plaintiff owes the Association for assessments with damages that Plaintiff has suffered as a result of the Association deliberately refusing to provide verification of the charges in violation of Florida Statute §718.

b.  That this Court award the Plaintiff reasonable attorney's fees and costs any such otherand further relief as the Court deems just and proper.

## COUNT 3

## INJUNCTIVE RELIEF AGAINST THE DRAKE CONDOMINIUM ASSOCIATION, INC.

144.      Plaintiff re-alleges and re-avers herein the same allegations set forth fully above in paragraphs (1) through(144) .

145.      This is an action for injunctive relief pursuant to Florida Statute §718.303(1).

146.      Plaintiff is liable for validly passed regular assessments and special assessments.

147.      Plaintiff requires a Court Order invalidating the special assessments not

properly passed pursuant to Florida Statute §718.112, Article VII 2(D) of the Association's By-Laws orSection 10(c) of the Association's Declaration.

148.    Plaintiff has no adequate remedy at law.

149.    Plaintiff has a substantial likelihood of success on the merits of these claims.

150.    A mandatory injunction will serve the public interest by requiring the Association toprovide an estoppel consistent with Plaintiff's rights under Florida Statute §718.116 and by preventing the Association from collecting illegal amounts.

151.    Pursuant to Section 30 of the Association's Declaration of the Condominium and Florida Statute §718.303(1), Plaintiff is entitled to recover attorney's fees and costs for bringing this action and that:

That this Court enter a mandatory injunction against the Association:

i.  Determining the amounts due consistent with the determination in Count I of thisComplaint,

ii. Awarding Plaintiff its reasonable attorney's fees and costs, and, for such other relief this Court deems just and proper.

**COUNT 4**

FDCPA AGAINST THE MANAGEMENT COMPANY

76

152.　　Plaintiff re-alleges and re-avers herein the same allegations set forth fully above in paragraphs (1) through (152).

153.　　ROYAL MANAGEMENT is a debt collector within the meaning of 15 U.S.C. §1692a(6).

154.　　The alleged unpaid condominium assessments on Plaintiff's ledger constitutes a debt within the meaning of 15 U.S.C. §1692a(6).

155.　　ROYAL MANAGEMENT'S violations of the FDCPA with regard to the Plaintiff, include but are not limited to the following:

a. The false representation of the character, amount, or legal status of the debt, in violation of 15 U.S.C. §1692e(2)(A) by knowingly collecting the wrong amounts onthe ledger up until the date of this lawsuit;

b. The threat to take any action that cannot legally be taken or that is not intended to be taken, in violation of 15 U.S.C. §1692e(5), as Defendant ROYAL MANAGEMENT knows there is no legal basis to collect the invalid amounts on the ledger, including but not limited to the invalidly passed special assessments.

c. The use of any false representation or deceptive means in an attempt to collect a debt,in violation of 15 U.S.C. §1692e(10), as ROYAL MANAGEMENT knows there is no legal basis to collect the invalid amounts on the ledger,

including but not limited to the invalidly passed special assessments.

d. The failure to state the correct amount of the alleged debt, in violation of 15 U.S.C. §1692(g)(a)(1) up until the date of this lawsuit;

e. The failure to validate the debt in violation of 15 U.S.C. §1692(g)(a), up and through the last attempt to validate the debt made by Plaintiff

WHEREFORE, Plaintiff demands judgment against Defendant, ROYAL MANAGEMENT GROUP, LLC; its owner DAVID RAPOSO and the DRAKE Property Manager JOE CEPSIDES in an amount equivalent to Plaintiff's actual damages, statutory damages, and payment of Plaintiff's attorney's fees and costs.

## COUNT 5
### FDCPA AGAINST ROYAL MANGEMENT; DAVID RAPOSO;  JOE CEPSIDES

156.  Plaintiff alleges and sets forth the allegations of (1) through (156) above incorporated fully herein by this reference.

157.  is "person" who performs certain prohibited acts while collecting consumer debts under Florida Statute §559.72. *Wright v. Ross*, 2008 WL 190466 (M.D. Fla. 2008).

158.  The alleged unpaid condominium assessments on Plaintiff's ledger constitutes a debt within the meaning of Florida Statute §559.55.

159. Defendant ROYAL MANGEMENT; DAVID RAPOSO it's owner; and JOE CEPSIDES the DRAKE Property Manager violations of the FCCPA include, but are not limited to, the following:

a. Disclose to a person other than the debtor or her or his family information affecting the debtor's reputation, whether or not for credit worthiness, with knowledge or reason to know that the other person does not have a legitimate business need for the information or that the information is false, in violation of Fla. Stat. §559.72(5). The financial ledgers are official records of the Association and disclosed to all owners within the Association, while the Management Company maintains those records with knowledge that there is no legal basis to collect the invalid amounts.

b. Disclose information concerning the existence of a debt known to be reasonably disputed by the debtor without disclosing that fact. If a disclosure is made before such dispute has been asserted and written notice is received from the debtor that any part of the debt is disputed, and if such dispute is reasonable, the person who made the original disclosure must reveal upon the request of the debtor within 30 days the details of the dispute to each person to whom disclosure of the debt without notice of the dispute was made within the preceding 90 days, in violation of Fla. Stat. §559.72(6). This includes up and through the last attempt to validate the debt made by Plaintiff on or around

April 2019 and May 2019.

c. Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when suchperson knows that the right does not exist, in violation of Fla. Stat. §559.72(9).

WHEREFORE, Plaintiff demands judgment against Defendant, ROYAL MANAGEMENT GROUP, LLC; DAVID RAPOSO it's owner; and JOE CEPSIDES the DRAKE Property Manager in an amount equivalent to Plaintiff's actual damages, statutory damages, and payment of Plaintiff's attorney's fees and costs.

## COUNT 6

NEGLIGENCE AGAINST JOSEPHNE MANNING; MARIA ARENCIBIA; DAVID RAPOSO; JOE CEPSIDES; ROYAL MANAGEMENT GROUP. LLC and the DRAKE CONDOMINIUM ASSOCIATION, INC.

160.   The Plaintiff re-alleges and incorporates by reference the allegations asserted inparagraphs (1) through (160) above, as fully set forth herein.

161.   The Defendants herein breached their Duties of Care as set forth in the above incorporated facts by violating Florida Statute 718.111(1)(a).

162.   At all times material herein, the above named Defendants owed the Plaintiff a Duty of Care. At all times material herein, upon breach of their duty of care which was owed to the Plaintiff which, in in addition to the allegations

80

provided above, include, but are not limited to the duties set forth in Count 1 above incorporated herein.

163.   At all times material hereto, the above named Defendants in this CAUSE OF ACTION had the duty and obligation  to maintain, repair or replace the common elements as provided for in the Governing Documents and to pass special assessments in compliance with the Governing Documents and to operate the ASSOCIATION in compliance with the Governing Documents and Florida statutory law.

164.     Defendants JOSEPHNE MANNING; MARIA ARENCIBIA; DAVID RAPOSO; JOE CEPSIDES; ROYAL MANAGEMENT GROUP. LLC and the DRAKE CONDOMINIUM ASSOCIATION, INC. violated Fla. Stat. 617.0830" failing to adhere to the following: (1) A director shall discharge his or her duties as a director, including his or her duties as a member of a committee: (a) In good faith; (b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) In a manner he or she reasonably believes to be in the best interests of the corporation. (2) In discharging his or her duties, a director may rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by: (a) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent

in the matters presented; (b) Legal counsel, public accountants, or other persons as to matters the director reasonably believes are within the persons' professional or expert competence; or (c) A committee of the board of directors of which he or she is not a member if the director reasonably believes the committee merits confidence. (3) A director is not acting in good faith if he or she has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (2) unwarranted. (4) A director is not liable for any action taken as a director, or any failure to take any action, if he or she performed the duties of his or her office in compliance with this section. The Association breached their duties and breached the requirements of the Governing Documents and statutory law as follows: (a) failing to repair the leak above and within Plaintiff's unit; (b) by failing to stop the flow of water caused by the leak in a timely manner, causing damage to the Plaintiff's unit; (c) failing to repair the damage to Plaintiff's unit caused by the leaking roof; (d) failing to validly pass the special assessments properly and (e) failing to comply with Section 10(c) of the Association's Declaration for passing material alterations or substantial additions in excess of $10,000.00 for any calendar year without owner approval; (f) failure to hire competent contractors to repair the water damage to the building as an ongoing issue; (g) failure to obtain reasonable arm's length insurance policies to insure the DRAKE

82

CONDOMINIUM ASSOCIATION; (h) failure to require workers

compensation for legitimate employees and employing non-citizens; (i) failure

to obtain proper competitive bids for work and repairs to be addressed at the

building; (j) failure to provide adequate substantive notice for assessments

according to the Governing Documents; (k) failure to disburse, allocate and

pay out the assessment monies according to the Assessment. As a direct and

proximate cause of the aforesaid breaches, the Plaintiff has suffered damages.


WHEREFORE, the Plaintiff demands a judgment be entered against the

Defendants JOSEPHNE MANNING; MARIA ARENCIBIA; DAVID RAPOSO;

JOE CEPSIDES; ROYAL MANAGEMENT GROUP. LLC and the DRAKE

CONDOMINIUM ASSOCIATION, INC.  for damages, attorney's fees and costs.


## COUNT 7

GROSS NEGLIGENCE AGAINST JOSEPHNE MANNING MARIA
ARENCIBIA; DAVID RAPOSO; JOE CEPSIDES and the DRAKE
CONDOMINIUM ASSOCIATION, INC.

165.    The Plaintiff re-alleges and incorporates by reference the allegations

asserted inparagraphs (1) through (165)  above, as fully set forth herein.

166.   At all times material hereto, Defendants JOSEPHINE MANNING; MARIA

ARENCIBIA; DAVID RAPOSO; ROYAL MANANGEMENT GROUP LLC;

JOE CEPSIDES and the DRAKE CONDOMINIUM ASSOCIATION, INC.

all had the duty and obligation  to maintain, repair or replace the common

elements as provided for in the Governing Documents and to pass special

assessments in compliance with the Governing Documents and Florida

statutory law and to operate the ASSOCIATION in compliance with the

Governing Documents and Florida statutory law.

167.   The Defendants breached their duties and breached the requirements of the

Governing Documents and Florida statutory law as follows: (a) failing to repair

the leak above and within Plaintiff's unit; (b) by failing to stop the flow of

water caused by the leak in a timely manner, causing damage to the Plaintiff's

unit; (c) failing to repair the damage to Plaintiff's unit caused by the leaking

roof; (d) failing to validly pass the special assessments properly and (e) failing

to comply with Section 10(c) of the Association's Declaration for passing

material alterations or substantial additions in excess of $10,000.00 for any

calendar year without owner approval; (f) failure to hire competent contractors

to repair the water damage to the building as an ongoing issue; (g) failure to

obtain reasonable arm's length insurance policies to insure the DRAKE

CONDOMINIUM ASSOCIATION; (h) failure to require workers

compensation for legitimate employees and employing non-citizens; (i) failure to obtain proper competitive bids for work and repairs to be addressed at the building; (j) failure to provide adequate substantive notice for assessments and official act of the Board according to the Governing Documents and Florida statutory law; (k) failure to disburse, allocate and pay out the assessment monies according to the Assessment.

168.   The Defendants acted with reckless indifference and/or willfulness with regard to their duty.

169.   As a direct and proximate cause of the aforesaid breaches, the Plaintiff has suffered damages.

WHEREFORE, the Plaintiff demands a judgment be entered against the Defendants JOSEPHINE MANNING; MARIA ARENCIBIA; DAVID RAPOSO; ROYAL MANANGEMENT GROUP LLC; JOE CEPSIDES and the DRAKE CONDOMINIUM ASSOCIATION, INC. for damages, attorney's fees and costs.

**COUNT 8**

FRAUD AGAINST ALL DEFENDANTS JOSEPHINE MANNING; MARIA ARENCIBIA; DAVID RAPOSO; ROYAL MANANGEMENT GROUP LLC; JOE CEPSIDES; MELISSA RAPOSO and the DRAKE CONDOMINIUM ASSOCIATION, INC.

170.    The Plaintiff re-alleges and incorporates by reference the allegations asserted inparagraphs (1) through (170) above, as fully set forth herein.

171.    Defendants perpetrated a Fraud upon the Plaintiff and Homeowners as set forth above in the incorporated facts by violating Fla. Stat. 468.4335 Conflicts of interest.— which states that "(1) A community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, must disclose to the board of a community association any activity that may reasonably be construed to be a conflict of interest. A rebuttable presumption of a conflict of interest exists if any of the following occurs without prior notice:

(a)    A community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, enters into a contract for goods or services with the association.

(b)    A community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, holds an interest in or receives compensation or any thing of value from a corporation, limited liability corporation, partnership, limited liability partnership, or other business entity that conducts business with the association or proposes to enter into a contract or other transaction with the association.

(2)    If the association receives and considers a bid that exceeds $2,500 to provide a good or service, other than community association management services, from a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, the association must solicit multiple bids from other third-party providers of such goods or services.

(3)    If a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, proposes to engage in an activity that is a conflict of interest as described in subsection (1), the proposed activity must be listed on, and all contracts and transactional documents related to the proposed activity must be attached to, the meeting agenda of the next board of administration meeting. The disclosures of a possible conflict of interest must be entered into the written minutes of the meeting. Approval of the contract, including a management contract between the community association and the community association manager or community association management firm, or other transaction requires an affirmative vote of two-thirds of all directors present. At the next regular or special meeting of the members, the existence of the conflict of interest and the contract or other transaction must be disclosed to the members. If a community association manager or community association management firm has previously disclosed a conflict of interest in an existing management contract entered into between the board of directors and the community association manager or community association management firm, the conflict of interest does not need to be additionally noticed and voted on

87

during the term of such management contract, but, upon renewal, must be noticed and voted on in accordance with this subsection.

(4)    If the board finds that a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, has violated this section, the association may cancel its community association management contract with the community association manager or the community association management firm. If the contract is canceled, the association is liable only for the reasonable value of the management services provided up to the time of cancellation and is not liable for any termination fees, liquidated damages, or other form of penalty for such cancellation.

(5)    If an association enters into a contract with a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, which is a party to or has an interest in an activity that is a possible conflict of interest as described in subsection (1) and such activity has not been properly disclosed as a conflict of interest or potential conflict of interest as required by this section, the contract is voidable and terminates upon the association filing a written notice terminating the contract with its board of directors which contains the consent of at least 20 percent of the voting interests of the association.

(6)    As used in this section, the term "relative" means a relative within the third degree of consanguinity by blood or marriage.

172.   At all times material hereto, the Association had the duty and obligation  to

maintain, repair or replace the common elements as provided for in the

Governing Documents and to pass special assessments and official acts and

Notice all acts in compliance with the Governing Documents and to operate the

ASSOCIATION in compliance with Florida statutory law.

173.   The Association intentionally breached their duties and breached the

requirements of the Governing Documents to enrich their collective "family

group" and otherwise as follows: (a) failing to repair the leak above and within

Plaintiff's unit; (b) by failing to stop the flow of water caused by the leak in a

timely manner, causing damage to the Plaintiff's unit; (c) failing to repair the

damage to Plaintiff's unit caused by the leaking roof; (d) failing to validly pass

the special assessments properly and (e) failing to comply with Section 10(c) of

the Association's Declaration for passing material alterations or substantial

additions in excess of $10,000.00 for any calendar year without owner

approval; (f) failure to hire competent contractors to repair the water damage to

the building as an ongoing issue; (g) failure to obtain reasonable arm's length

insurance policies to insure the DRAKE CONDOMINIUM ASSOCIATION;

(h) failure to require workers compensation for legitimate employees and

employing non-citizens; (i) failure to obtain proper competitive bids for work

and repairs to be addressed at the building; (j) failure to provide adequate

89

substantive notice for assessments according to the Governing Documents; (k)

failure to disburse, allocate and pay out the assessment monies according to the

Assessment.

174.    The Defendants acted purposefully and intentionally with regard to the

above facts and in order to misuse and cover up the misuse of the Homeowners'

funds.

175.      As a direct and proximate cause of the aforesaid breaches, the Plaintiff

has suffered damages.


WHEREFORE, the Plaintiff demands a judgment be entered against the

Collective Defendants THE DRAKE CONDOMINIUM ASSOCIATION, INC.;

JOSEPHINE MANNING; MARIA ARENCIBIA; DOE 1 - 10; ROYAL

MANAGEMENT GROUP, LLC; DAVID RAPOSO; MELISSA RAPOSO;

EDGAR RAMIREZ; and TAMK for compensatory, as well as punitive damages to

punish the past wrongful acts of the Collective Defendants and deter Defendants

from future wrongful acts, attorney's fees and costs and any other order this Court

may find just.

# COUNT 9

### RACKETEERING AGAINST ALL DEFENDANTS JOSEPHINE MANNING; MARIA ARENCIBIA; DAVID RAPOSO; ROYAL MANANGEMENT GROUP LLC; JOE CEPSIDES; MELISSA RAPOSO and the DRAKE CONDOMINIUM ASSOCIATION, INC.; EDGAR RAMIREZ; TAMK.

176.   The Plaintiff re-alleges and incorporates by reference the allegations asserted inparagraphs (1) through (176) above, as fully set forth herein.

177.   The acts and facts set forth above and incorporated herein fully amounts to the Conduct of each Defendant included in this Count.

178.   The Conduct of the Defendants were interrelated and constituted an enterprise in which the acts were carried out.

179.   The acts and conduct of the defendants as set forth herein constituting the enterprise was pursued through a pattern of activity.

180.   The pattern of activity constituted Racketeering activity in which the predicate acts were sufficiently continuous as set forth previously in this Complaint and incorporated herein.

181.   Defendants' acts as set forth herein violated the Federal RICO Statutes - 18 U.S.C. Sect. 1961-68.

182.   The acts of the Defendants damaged Plaintiff as set forth and incorporated above and as s result Plaintiff prays as follows:

WHEREFORE, the Plaintiff demands a judgment be entered against the Collective Defendants THE DRAKE CONDOMINIUM ASSOCIATION, INC.; JOSEPHINE MANNING; MARIA ARENCIBIA; DOE 1 - 10; ROYAL MANAGEMENT GROUP, LLC; DAVID RAPOSO; MELISSA RAPOSO; EDGAR RAMIREZ; and TAMK for compensatory, as well as punitive damages to punish the past wrongful acts of the Collective Defendants and deter Defendants from future wrongful acts, attorney's fees and costs and any other order this Court may find just.

## COUNT 10

<u>AIDING AND ABETTING, ACTING IN CONCERT AGAINST ALL DEFENDANTS JOSEPHINE MANNING; MARIA ARENCIBIA; DAVID RAPOSO; ROYAL MANANGEMENT GROUP LLC; JOE CEPSIDES; MELISSA RAPOSO and the DRAKE CONDOMINIUM ASSOCIATION, INC.; EDGAR RAMIREZ; TAMK.</u>

183. The Plaintiff re-alleges and incorporates by reference the allegations asserted inparagraphs (1) through (182) above, as fully set forth herein.

184. DEFENDANTS JOSEPHINE MANNING; MARIA ARENCIBIA; DAVID RAPOSO; ROYAL MANANGEMENT GROUP LLC; JOE CEPSIDES; MELISSA RAPOSO and the DRAKE CONDOMINIUM ASSOCIATION, INC.; EDGAR RAMIREZ; TAMK all acted in concert aiding and abetting each other as incorporated above herein damaging Plaintiff.

WHEREFORE, the Plaintiff demands a judgment be entered against the

Collective Defendants THE DRAKE CONDOMINIUM ASSOCIATION, INC.;

JOSEPHINE MANNING; MARIA ARENCIBIA; DOE 1 - 10; ROYAL

MANAGEMENT GROUP, LLC; DAVID RAPOSO; MELISSA RAPOSO;

EDGAR RAMIREZ; and TAMK for compensatory, as well as punitive damages

to punish the past wrongful acts of the Collective Defendants and deter

Defendants from future wrongful acts, attorney's fees and costs and any other

order this Court may find just.


DATED this _15th_ day of January 2025.


Plaintiff Michael Taraska
In Pro Per


DRAKE C 1 7 25

EXHIBIT "1"

1/7/25, 6:30 AM                                      Gmail - proposed special assessment meeting

 **Gmail**                                                    Mike Taraska <taraska@gmail.com>

---

**proposed special assessment meeting**

Greg <docgt1@charter.net>                                                Tue, Oct 22, 2024 at 1:08 PM
To: Mike Taraska <taraska@gmail.com>


Sent from my iPad

Begin forwarded message:


> **From:** Joe <joe@theroyalgroup.net>
> **Date:** October 22, 2024 at 3:48:38 PM EDT
> **To:** docgt1@charter.net
> **Cc:** taraska@gmail.com
> **Subject: Re: proposed special assessment meeting**


[Quoted text hidden]

---

📄 **DRAKE CONDO DOCS 12.22.22.pdf**
5940K

# EXHIBIT "2"

## SETTLEMENT AGREEMENT AND RELEASE

### I.   **PARTIES**

This Settlement Agreement and Mutual Release ("Agreement") is made and entered into between:

A.    Plaintiff, KEITH GOULD, and his respective past, present and future principals, agents, employees, members, partners, representatives, officers, directors, managers, shareholders, parent and affiliated entities, subsidiaries, divisions, joint ventures, predecessors, transferees, successors and assigns (the "Plaintiff").

B.    Defendants, THE DRAKE CONDOMINIUM, ROYAL MANAGEMENT GROUP, LLC, JOSEPHINE MANNING, DAVID RAPOSO and SANDY FRUCHER and their respective past, present and future principals, agents, employees, members, partners, representatives, officers, directors, managers, shareholders, parent and affiliated entities, subsidiaries, divisions, joint ventures, predecessors, transferees, insurers, successors and assigns (the "Defendants")

C.    KATIUSKA GOULD her respective past, present and future principals, agents, employees, members, partners, representatives, officers, directors, managers, shareholders, parent and affiliated entities, subsidiaries, divisions, joint ventures, predecessors, transferees, successors and assigns.

The Plaintiff, KATIUSKA GOULD and Defendants shall be collectively referred to as the "Settling Parties," or individually referred to as a "Settling Party."

### II.   **FACTUAL RECITALS**

WHEREAS, Plaintiff and KATIUSKA GOULD are the joint-owners of real property located at 1460 Ocean Drive, #207, Miami Beach, Florida, 33139 (the "Property").

WHEREAS, Defendants operate the condominium association pursuant to the Declaration of Condominium relating to the Property.

WHEREAS, the Plaintiff filed a lawsuit against Defendants in the Circuit Court of the 11th Judicial Circuit Court, in and for Miami-Dade County, Florida styled *KEITH GOULD v. THE DRAKE CONDOMINIUM ASSOCIATION, INC., ROYAL MANAGEMENT GROUP, LLC, JOSEPHINE MANNING, DAVID RAPOSO AND SANDY FRUCHER, Case No.: 2019-23764-CA-01* (the "Lawsuit");

WHEREAS, the Settling Parties desire to settle and resolve the Lawsuit, including all claims and issues raised in, asserted in, and/or contemplated in the Lawsuit, and all other claims, actions, demands of the Plaintiff against Defendant relating to, arising out of, or in any way connected with the Property as more fully set forth in the below release; and

NOW, THEREFORE, in consideration of the mutual promises, covenants, and obligations set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Settling Parties hereby agree as follows:

**III.   TERMS**

    A.   **Settlement Payment.** Defendants shall cause to be paid to the Plaintiff the total settlement amount of THIRTY-SEVEN THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS ($37,500.00) (the "Settlement Payment"). Defendants shall pay the Plaintiff the Settlement Payment by check made payable to "LAW OFFICES OF SHAUN M. ZACIEWSKI, P.A." and delivered to LAW OFFICES OF SHAUN M. ZACIEWSKI, P.A., c/o Shaun Zaciewski, Esq. no later than thirty (30) days after the date of Defendants' receipt of this Agreement, fully executed, and W9 for payment.

        (1)   The Settlement Payment is to be split among insurance carriers as follows:

            (a)   PHILADELPHIA INDEMNITY INSURANCE COMPANIES shall cause to be paid to the Plaintiff THIRTY THOUSAND DOLLARS AND NO CENTS ($30,000.00).

            (b)   ARCH SPECIALTY INSURANCE COMPANY and ARMOUR RISK MANAGEMENT, INC. shall cause to be paid to the Plaintiff SEVEN THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS ($7,500.00).

    B.   **Dismissal with Prejudice.** No later than ten (10) days after the date of clearance of the Settlement Payment, the Plaintiff shall file a Notice of Voluntary Dismissal with Prejudice, with each party responsible to bear its own attorney's fees and costs.

    C.   **Payment of Past Due Fees and Assessments.** Plaintiff agrees to pay the past due special assessments in the amount of FORTY-SEVEN THOUSAND ONE HUNDRED FORTY-EIGHT DOLLARS AND NO CENTS ($47,148.00) (the "Settlement Assessment Amount"). The Settlement Assessment Amount will be paid in twelve installments of THREE THOUSAND NINE HUNDRED TWENTY NINE DOLLARS AND NO CENTS ($3,929.00) with the first installment being due on January 1, 2021 and each subsequent installment being due on the first of each month thereafter.   All payments shall be submitted the same way as Plaintiff currently submits his regular assessment payments online through his bank.   Defendants agree to provide Plaintiff notice of default if the payment is not made on the 1st of the month and an opportunity to pay within five (5) days of said notice to cure the default.   Notice shall be sent both via email to Shaunz@zaciewskilaw.com and Keithgoulddo@outlook.com

    D.   **Contingent Waiver of Late Fees and Interest.** So long as the Plaintiff timely pays all of the Settlement Assessment Amount, as described in Paragraph C above, Defendants shall waive all alleged late fees and interest presently accrued and owing to Defendant for all arrears

and maintenance fees accrued as of October 6, 2020 – which amounts to FIVE THOUSAND EIGHT HUNDRED NINETY TWO DOLLARS AND NINETY CENTS ($5,892.90) in late fees and SEVEN THOUSAND THREE HUNDRED SIXTY TWO DOLLARS AND NO CENTS ($7,362.00) in interest.  This Contingent waiver of late fees and interest shall not apply to any maintenance fees, arrears, and/or assessments accrued after October 6, 2020. All maintenance fees, arrears, and/or assessments accrued after October 6, 2020 shall continue to accrue interest at their regular rate and shall not be affected by this Agreement.

      E.    **City Violation**.  JOSEPHINE MANNING agrees to not communicate with the City of Miami Beach any further regarding Plaintiff's Property and Plaintiff agrees not to file any complaint with the City or any other agency regarding Manning's previous alleged reporting. Settling Parties agree that they are not aware of any actual violations or other communications made to the City of Miami Beach regarding Plaintiff's Property other than what was produced in this Lawsuit, however, Plaintiff agrees that existing City violations within Plaintiff's Property, if any, will be the responsibility of Plaintiff.

      F.    **Release.** Settling Parties hereby release and forever discharge each other and their respective past, present and future principals, agents, employees, members, partners, representatives, officers, directors, managers, shareholders, parent and affiliated entities, subsidiaries, divisions, joint ventures, predecessors, transferees, successors, assigns, owners, managers, heirs, attorneys, qualifying agents, conditioned upon the payments referenced in Section A above and clearance of funds, hereby release, remise, acquit, and forever discharge each other and their respective past, present and future principals, agents, employees, members, partners, representatives, officers, directors, managers, shareholders, parent and affiliated entities, subsidiaries, divisions, joint ventures, predecessors, transferees, successors, assigns, owners, managers, heirs, attorneys, qualifying agents, insurers (including PHILADELPHIA INDEMNITY INSURANCE COMPANIES, ARCH SPECIALTY INSURANCE COMPANY and ARMOUR RISK MANAGEMENT, INC. – and their respective reinsurers), sureties, and trustees (none of whom admit any liability to each other but all expressly deny any liability from any and all claims – including Additional Insured claims) from all from and against any and all past, present, and future demands, damages, attorney's fees, costs, debts, injuries, actions, counts and causes of action or suits of any kind or nature whatsoever on account of all damages, including compensatory, economic, non-economic, punitive, and all other damages, known and unknown, both to person and property of and from any and all rights, claims, liabilities, demands, sums of money, accounts, reckonings, bonds, bills, covenants, contracts (oral or written), warranties, controversies, agreements, promises, claims misrepresentations, fraud, concealment, failure to communicate, disclosure, failure to disclose, negligence, act, omission, deceit, representations, rights of restitution, rights of rescission, breach of the duty to defend, breach of the duty to indemnify, claims of bad faith, additional insured rights/status, reservation of rights, confession of judgment, contractual claims, unfair claims handling or any other insurer misconduct, breach of contract, claims for property damage, personal property, loss of use, medical expenses, personal injury, bodily injury, and for any tort, and any other losses, damages or demands

of whatsoever kind or nature, in law or in equity, actions or causes of action, suit or suits, controversies, sum or sums of money, on account of, or in any way growing out of, any known or should have been known, foreseen and unforeseen, direct or consequential, suspected loss or damage, and the consequences thereof, alleged to have arisen out of, or which have resulted, arising out of all transactions, business dealings, contracts, services or professional services, account stated, open accounts, or equitable relief expressly limited to those related solely to, or which could have been alleged or brought under the laws, codes, and statutes of any and all state, federal, foreign, local, or territorial jurisdictions, which the Settling Parties, successors, or assigns now have against each other and their respective past, present and future principals, agents, employees, members, partners, representatives, officers, directors, managers, shareholders, parent and affiliated entities, subsidiaries, divisions, joint venturers, predecessors, transferees, successors, assigns, owners, managers, heirs, attorneys, qualifying agents, insurers (including PHILADELPHIA INDEMNITY INSURANCE COMPANIES, ARCH SPECIALTY INSURANCE COMPANY and ARMOUR RISK MANAGEMENT, INC. – and their respective reinsurers), sureties, and trustees hereto arising out of or related to the Lawsuit.

This paragraph releases only those claims addressed in this Agreement; all other provisions remain in full force and effect, including Plaintiff's maintenance and special assessment obligations.

## IV.   ADDITIONAL TERMS AND MISCELLANEOUS PROVISIONS.

A.   **Acknowledgment.** The Settling Parties acknowledge that the facts from which this Agreement arises are uncertain, and each of them assumes the risk that the damage as alleged by the Plaintiff in the Lawsuit may worsen in the future; or that the damage may not be as severe as alleged in the Lawsuit. The Settling Parties acknowledge that their information regarding the facts alleged in the Lawsuit is sufficient to enter this Agreement; and therefore each party accepts and assumes all risk and acknowledge that this Agreement shall be and remain in all respects effective and not subject to termination or rescission by virtue of any mistake, change, or difference in facts.

B.   **Effective Date.** This Agreement shall be effective as of the date of the Plaintiff's signature.

C.   **No Admission of Liability.** Defendant, and its insurers, deny any and all liability or insurance coverage for the claims asserted in the Lawsuit and further state that the payment of the Settlement Payment was made solely in compromise and settlement of disputed claims, and such payment is not to be regarded as admission of liability, confession of judgment, admission of insurance coverage or fault by any Settling Party or their insurers. The Settling Parties acknowledge that all actions taken and statements made by the Settling Parties in connection with this Agreement relate to this Lawsuit only and are without prejudice or value as precedent, and shall not be taken as a course of performance or a standard by which other matters may be judged.

E.    **Interpretation.** Wherever possible, each portion of this Agreement shall be interpreted in such a manner as to be valid, effective and enforceable under applicable law. The Parties agree that this Agreement was jointly drafted and negotiated by them and cannot be construed against any Party as the drafter thereof.

F.    **Severability.** Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance, or regulation contrary to which the Settling Parties have no legal right to contract, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. To the extent the offending provision cannot be curtailed or limited, it shall be fully severable, and the remainder of this Agreement shall remain in full force.

G.    **Representation by Counsel.**  Each Settling Party is represented by counsel and has consulted with its counsel regarding the terms and legal meaning of this Agreement.  Each of the Settling Parties shall bear its own costs, attorney's fees, and expenses in connection with the negotiations for and preparation of this Agreement.

H.    **No Transfer of Claims.**   The Settling Parties represent and warrant that each has not previously assigned any substantive right (e.g., rights, claims, or defenses) at issue under this Agreement.

I.    **Entire Agreement.**   Except as otherwise provided herein, this Agreement constitutes the entire agreement among the Settling Parties and all terms cited or referenced in this document are contractually binding, not mere recitals. This Agreement supersedes any prior oral or written agreements or communications on the subject matter addressed herein.

J.    **Counterparts.**  This Agreement may be executed in counterparts, including counterparts transmitted by facsimile or electronic mail, each counterpart constituting an original.

K.    **Warranty of Capacity to Execute**. The Parties hereto declare, covenant, and warrant that they and/or their undersigned representatives are over the age of eighteen (18) years, and that they are not suffering from any legal, mental, or physical disabilities which would impair or disable them from executing this Agreement and that there has been no representations and/or statements made by any of the Parties hereto or any other of the Parties' agents, insurers, employees, or representatives to influence them in making or executing this Agreement.

L.    **Complete Agreement.** This Agreement constitutes and represents the entire agreement and supersedes all prior and contemporaneous agreements, negotiations, representations, warranties and understandings of the Settling Parties with regard to the subject matter set forth herein. While it is the intention of the Settling Parties to exchange original executed settlement papers, a facsimile or emailed signature and/or signed copy of this Agreement shall be sufficient for all purposes, including enforcement. Additionally, it is agreed that this Agreement may be signed in counterpart.

M.    **Authority.**  Each individual approving the form and content of this Agreement on behalf of a Settling Party represents and warrants that the Settling Party agrees to be and is bound by all terms and conditions in this Agreement, including all payment and performance obligations.

N.    **Enforcement Fees**. If any action or proceeding is instituted seeking to enforce the Settlement Agreement, the prevailing party in such action or proceeding shall be entitled to its reasonable attorney's fees and costs, whether incurred at the trial or appellate levels or both, and including fees and costs incurred in establishing the amount of fees and costs to be awarded after entitlement thereto has already been determined.

O.    **Further Assurances**.  Each Settling Party warrants that the individual executing Agreement on behalf of such Settling Party has the authority to approve and bind the respective party to all terms, conditions, and obligations of this Agreement.

P.    **Confidentiality.**  All matters relating to the existence, terms and negotiations of this Agreement shall remain confidential between the Settling Parties and shall be disclosed only as required by law or order of court, to other insurers or reinsurers of the Settling Parties, as required in the ordinary course of business by any party for such purposes as audits and preparation of financial and/or accounting reports, as required by any federal or state governmental entity or regulatory agency and by the Settling Parties in the context of attorney-client communications. Any Settling Party contemplating a disclosure, except as described above, shall provide written notice of intent to disclose at least thirty (30) days prior to such disclosure (unless such disclosure is required by law or order of court at an earlier time) setting forth all information which it proposes to disclose, the identity of each person or entity to whom the information is to be disclosed, the stipulation of confidentiality governing the disclosure, and the circumstances pursuant to which disclosure is proposed to be made.

Q.    **No Oral Modification.** No change, modification or waiver of any provision of this Agreement shall be valid or binding unless it is in writing and signed by all Parties to this Agreement.  This provision cannot be waived by subsequent oral agreement and/or actions or conduct of the Parties hereto.

R.    **Headings**. Each of the Parties hereto agree that the section headings contained herein are included for convenience only and are not to be deemed part of this Agreement.

S.    **Governing Law**. This Agreement shall be deemed to have been executed and delivered within the State of Florida, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with, and governed by, the substantive and procedural laws of the State of Florida, and where applicable, federal law, without regard to the conflicts of law principles thereof.  Any dispute regarding this Agreement shall be brought in Miami-Dade County, Florida.

T.    **Cooperation**. The Settling Parties shall cooperate in effectuating the provisions and intent of this Agreement at all times after the execution and delivery of same, including, without limitation, taking such other actions and entering into such agreements, releases,

stipulations, and any other documents reasonably necessary or required to carry out the Parties' intent and the agreements herein contained. Each party hereto agrees to execute and deliver such other and further documents as may be required to carry out the terms of this Agreement.

U.   **Construction**. In giving meaning to this Agreement, the singular shall be held to include the plural, the plural shall be held to include the singular, and the use of any gender shall be held to include every other and all genders.

Each party is signing this Agreement on the date stated opposite their respective signatures.

**KEITH GOULD**

Dated: 10 - 16 - 2020

**KATIUSKA GOULD**

Dated: 10 - 16 - 2020

**JOSEPHINE MANNING**

Dated: 10/20/20

**SANDY FRUCHER**

Dated 10/22/2020.

**DAVID RAPOSO**

Dated 10/20/20

**THE DRAKE CONDOMINIUM**

By: _Josephine Manning_   Dated: _10/20/20_

Its: _____

ROYAL MANAGEMENT GROUP, LLC

By: _DAVID RAPULO_   Dated: _10/20/20_

Its: _D. R._

# EXHIBIT "3"

1/6/25, 7:01 AM                              Gmail - DRAKE Unit #207 - Taraska

 Gmail                                          Mike Taraska <taraska@gmail.com>

---

**DRAKE Unit #207 - Taraska**

**Mike Taraska** <taraska@gmail.com>                          Mon, Jul 1, 2024 at 3:08 PM
To: lfarinas@beckerlawyers.com
Cc: Joe <Joe@theroyalgroup.net>

    Please see attached letter dated July 1, 2024, your postmarked envelope and the DRAKE EMAILS.

      Mike Taraska

---

**3 attachments**


**IMG_1679 (1).jpg**
89K


**DRAKE LTR 7 1 24.docx**
34K


**DRAKE LTR Emails 7 1 24.docx**
45K

1/6/25, 7:01 AM                                    IMG_1679 (1).jpg



# MIKE TARASKA  J.D., LLM
## 1460 Ocean Drive, #207   Miami Beach, FL 33139

Ph. (602) 400-5885    taraska@gmail.com

July 1, 2024

Lilliana M. Farinas-Sabogal (Esq.?)
Beckler & Poliakoff
2525 Ponce de Leon Blvd., Suite 825
Coral Gables, FL 22134

**SENT BY EMAIL ONLY**
lfarinas@beckerlawyers.com

**Re: DRAKE – "Window frames in your unit #207"**

Hi Lilliana,

   Are you a lawyer? Please respond to this email as soon as you are able so I can make sure you receive it timely given the apparent eight-day "urgency" set forth in your letter dated June 20, 2024 which has already passed due to your firm's error in mailing.

   Your letter dated June 20, 2024 asks to "Please send Management an email confirming whether [we] will be hiring [our] own contractor or would like the contractor the Association contracted to perform work by **no later than Friday June 28, 2024 at 5:00 p.m.**" and that "**REGARDLESS OF [OUR] CHOICE OF CONTRACTORS, PLEASE REMEMBER THE WORK MUST BE COMPLETED BY JULY 12, 2024**". I am copying this letter to the management company cc: Joe Cepsides.

   First issue I have is that your letter was sent to Unit "202", not my Unit which is Unit #207 and I just received it today, July 1, 2024, in my mailbox. Either someone else received it and set it out at a later date for the postman to drop in my box or it was otherwise somehow delayed due to the incorrect address or you just mailed it out later than dated/in-house postmarked. I am attaching a copy of the post-marked envelope with the wrong address. Second, I have never been apprised as set forth in your letter that "the matter is time sensitive **due to the pending violations by the City of Miami Beach** and [to a lesser extent] the rainy hurricane season weather". What are the "pending violations"? Please provide me with the Notices from the City of Miami Beach. Third, I had a discussion several months ago with a "window contractor" who came to

1

my Unit unannounced representing that he was going to provide bids for any Units that wanted to participate in an overall window installation project, the theory being that the more Units that participated, the cheaper the cost. I never heard back from the guy since then and he apparently never followed-up.

Given the dilatory demand now being made with the attendant time deadlines, there's no way I can make a fully informed decision whether to use my own contractor or whomever the Association is proposing, or whether I even need to install new upgraded windows due to the possibility that my windows may or may not be in compliance with whatever City Code may be at issue by July 12, 2024 and considering the extended July 4th 4-day holiday which starts in 48 hours..

When I purchased Unit #207 approximately 2 ½ years ago I never received the "Declaration of Condominium for the Drake Condominium" which you refer to in your letter. Please email me the **full** Declaration with any updated Amendments so I can determine my course of action. I also have asked Royal Management for a copy but never heard back.

Please provide me with the report that determined that "framework is rotted around [my] windows" because I had it examined by my current contractors who are doing permitted bathroom upgrades who determined it was not.

Please make available forthwith, whomever it is that the "Association has inquired on [my] behalf with an acceptable licensed vendor who is willing and able to complete the work in [my] unit (provided [I] have installed impact glass)".

In addition, I am attaching selected emails reflective of water damage which occurred shortly before February 7, 2024 to my Unit that caused ceiling drywall and carpet damage. The drywall was replaced about a month ago but the carpet was not. Let me know whether while you're dealing with the window "issue" you will also arrange to have my stairway carpet replaced or have me have it replaced and reimbursed by the Association. It's been 5 months since my initial email that I have been without carpet on my stairways that my 2 year-old and 3 1-2 year old daughters traverse up and down all day long. I had to personally pull out the hundred or so carpet nails, which were sticking up from the wooden stairways when I removed the mildewed carpet myself to keep my daughters, as well as myself and wife from getting stuck. I want you to **consider** its been 5 months since my issue hasn't been resolved by the DRAKE, despite my written communications as well as phone calls and personal discussions, but you want me to "jump" on a few days notice???

I doubt any attorney's time you spend on the "carpet" issue could be economically justified given I believe the 10 stairways carpet to be replaced should only probably be in the $500 - $700 range. I haven't researched the cost to replace. I believe a quick resolve facilitates all parties.

I look forward to your anticipated cooperation and prompt attention to this matter especially given the "urgency" reflected in your letter of June 20, 2024. Please email me any future correspondence rather than contacting me by "snail mail". This way we can both be sure when we receive notices, particularly when you are setting expeditious time deadlines with ultimatums.

/ s /

_____

Michael Taraska

DRAKE LTR 7 1 24

3

DRAKE EMAILS

From: **Mike Taraska** <taraska@gmail.com>
Date: Wed, Feb 7, 2024 at 9:09 AM
Subject: Water Damage Drake #207
To: Michael Taraska <taraska@gmail.com>

Hi Joe,

   Hope everything is good with you. We left our Unit #207 at the DRAKE on January 9th for Medellin, Colombia. I returned today at 5:30 a.m and noticed a foul smell in my Unit. I went to sleep and when I woke up I noticed the ceiling was damaged above the stairwell. Upon closer examination, the stair carpeting were wet and mildewed. Apparently, the Unit above had another water leak similar to the one that damaged my ceiling at that same location about a year and a half ago which their Insurance Company compensated me for the re[airs. Can you come here to verify the mildew and damage? I'm leaving for Vegas for Super Bowl in two hours and won't return until February 20th.

   Attached are a picture and video confirming what I have described.

   Please get back to me at your earliest convenience.

   Thank you,

   (602) 400-5885

   Mike Taraska

**One attachment** · Scanned by Gmail

_____

Mike Taraska <taraska@gmail.com>                    Feb 23, 2024,
                                                     11:07 AM

to mattiaprian, Joe

Hi Joe,

   I'm copying Matia who lives in Unit #307 above me on this email. I returned from Las Vegas to the DRAKE Wednesday morning and left yesterday for Chicago to visit my 85 year-old

Mother. I was able to meet with Mattia in Unit #307 Wednesday in regards to your email to me stating that "Mike, I was just corrected; unit 407 is not above yours; it is 307, and they do not have roof issues. I will come to your unit anyway, and if you want, I will ask the handyperson to open the ceiling and see where the problem is originating. This goes back to what I originally said, if it is an issue between you and 307, you guys would have to settle it. It may also be your own AC as it happened before. I will let you know". I previously had emailed you stating "I authorize the Drake to tear out the stairway carpet which has mildewed and the drywall that was water damaged above that which in the judgment of a contractor is necessary to take out". That wasn't done and when I got back on Wednesday, February 21, there was a significant water leak in the hallways which I was informed had occurred the previous Saturday and the fire Marshall had come out. The hallway carpet was mildewed even as I left Thursday for Chicago after five (5) days of alleged "drying" with blowers one of which were placed outside my door. I actually gagged due to the smell outside my Unit. The hallway carpet probably should be replaced.

When I returned on Wednesday, I noticed that there was additional ceiling damage in my Unit by the front door. Possibly from the new leak since the Saturday leak came from the same ceiling level or maybe I just didn't see it before. When I met with Mattia in #307, he showed me water damage that had come down his wall from the roof which apparently came down to my Unit just above where my water damage was. There never has been any damage due to "my AC" as you state in your previous email and I'm not sure where you got that information. Please provide me with that source. Mattia admitted to me that my prior damage approximately 1 1/2 years ago was due to his sink overflowing but assured me that didn't happen this time. I believe, based on my observation of the damage in Mattia's Unit that my current damage came from the roof and went down Mattia's walls and into my Unit. Either way, it's not my problem but a problem between Unit #307 and the Association and **I want to make a claim to get my Unit repaired**. It's for the two insurance companies to figure it out, not me.

I have City permits that were just issued about two weeks ago to address the code violations that existed when I purchased the condominium several years back. It took me almost three years to get the approved permits due to the incompetence of my architect/engineer Miami Permits, Inc. I am ready to start the compliance work and also have a hearing scheduled before the Special Magistrate at the Miami Beach Building Department on April 11th and I intend to have the work completed and the compliance satisfied by the April 11th Court date. I don't want the water damage to result in additional issues with my Permit getting finalized. Before I left for Vegas, my lights worked where the water damage to the ceiling occurred. Now the lights don't work and part of my permit is for electrical compliance and is subject to inspection which I won't pass if the inspector sees that the lights don't work.

I have attached pictures of the carpet that I just removed that you said you would have removed that mildewed further because it wasn't removed.

Please email me on how we should proceed. I am copying this email and the previous ones which are now part of this string email to Mattia so he can see the entire process.

I think you need to turn the claim into the DRAKE'S insurance company and have them contact Mattia's insurance company. Anyhow, that is where we are at presently.

Let me know by reply email.

Thanks, again.

2

Michael Taraska

**3 Attachments · Scanned by Gmail**

---

oe <Joe@theroyalgroup.net>                                    Wed, Apr 3,
                                                              9:28 AM

to me, Karine, David, Rabi, DRAKE, Louise

Dear Mr. Taraska,
Please be aware that not providing the insurance carrier information was not intentional.  It was
an oversight on my part. The association has agreed to fix the damage above the stairs, so I
thought the insurance information was not necessary. I believe I communicated that to you over
the phone while you were in Colombia. Yes, there are concerns with filing frivolous claims to the
insurance company as the Drake is borderline insurable due to numerous claims, that I do
believe were questionable claims.  Juan Raposo, father of David Raposo,  he is not an onsite
maintenance man. He helps me and David with the overflow and he does not get compensation
from the Drake. The Drake is insured by Great Florida Insurance agency that is owned by
Melissa Raposo the wife of David Raposo. If you need information about the courier, you may
call 305 400 9088, they should be able to help you.  We, meaning the management company
and the building association, are not refusing to deal with the water damage in your unit.  Please
remember there was water damage in that exact place before and it was caused by your own
AC unit. Mr. Taraska, it seems like you are threatening a lawsuit with your own agenda. Be
advised that is your privilege to do so if you deem it to be necessary. A lawsuit threat will not
does not change our protocol in handling any matter. Please let me know how you would like to
proceed.

Joe Cespedes
Property manager

Sent from my iPhone

---

Mike Taraska <taraska@gmail.com>                             Apr 3, 2024,
                                                             11:11 AM

to Joe, Karine, David, Rabi, DRAKE, Louise

Joe,

Thank you for your response. First, there has never been any " water damage in that exact place before and it was caused by your own AC unit" since I have occupied Unit #207 over the last four years. There was water damage approximately 1 1/2 - 2 years ago in that exact same spot resulting from an overflow situation emanating from Unit #307 which was remedied and resolved **immediately**, courteously, without any stress and amicably by Unit #307's Insurance carrier for the cost to repair which as I recall was only $1,200 (one thousand two-hundred dollars).

All I want is to have my ceiling put back into the condition it was before the water damage and to replace the small 14 steps of rotted carpet on the stairways which in my estimate, without the necessity for any mold analysis or otherwise should cost around the $1,200 for the ceiling per the previous repair and maybe $500 for the carpet.

I agree to resolve this de minimis matter at your convenience in the manner set forth in your email stating that "The association has agreed to fix the damage above the stairs, so I thought the insurance information was not necessary" as long as you let me know with your best estimate when that will take place. You never "communicated that to [me] over the phone while [I was] in Colombia" per your email, hence my emails. Also, I have not received any information about replacing my carpet. If that is not included or authorized, thenI will contact the insurance company you provided or have it replaced myself and we can resolve that bill separately.

Thank you for addressing this.

Mike Taraska - Unit #207.

---

Joe <Joe@theroyalgroup.net>

Wed, Apr 3,
6:17 PM

to me

Mike, I had a family issue and had to leave town quickly. I will be back on Monday and will address the issue. Please forgive me, but I can swear that I told you over the phone, that's why it is always best to have it in writing. I will call you next week and will send you an email so you can have in writing.

Thanks,
Sent from my iPhone

---

4

Mike Taraska <taraska@gmail.com>

Apr 3, 2024,
7:16 PM

to Joe

Ok. I understand.

Thanks, Mike Taraska

DRAKE LTR Emails 7 1 24

EXHIBIT "4"



Lilliana M. Farinas-Sabogal
Shareholder
Board Certified Specialist, Condominium and
Planned Development Law
Phone: 305.351.1077  Fax: 305.442.2232
lfarinas@beckerlawyers.com

Becker & Poliakoff
2525 Ponce de Leon Blvd, Suite 825
Coral Gables, FL 33134

June 20, 2024

**Via Certified Mail #9414814903378949022326**
**Return Receipt Requested**
**And Via US Mail**

Gregory John and Marlene Taraska
1460 Ocean Drive, #207
Miami Beach, FL 33139

Re:     Window frames in your unit #207

Dear Mr. and Mrs. Taraska:

This law firm represents the Drake Condominium Association, Inc. (the "Association"). As you know, the Association has been undergoing major concrete and structural work throughout the condominium building. Its inspections have involved chipping portions of the building to inspect and repair damaged areas throughout.

As part of this inspection, it was discovered that the wood box framing around your unit's windows are rotted and damaged. Not only does this present a danger to the structure of the window, but also it will allow for weaknesses throughout the area and permit additional penetration of water into the newly completed repairs to the building. It is important and time sensitive that these frames be removed and replaced with new frames and supports.

Article 3(b) of the Declaration of Condominium for the Drake Condominium (the "Declaration") states that the unit boundaries extend to include the windows and sliding doors and all of their framework and castings. This would include the framework that is rotted around your windows. Further, Article 10 of the Declaration states that unit owners are responsible for the maintenance, repair and replacement required to these areas. As a result, this issue must be repaired at each unit owner's expense.

You may make arrangements for this repair with the contractor of your choice to complete this required work. In order to assist in the process, the Association has inquired on your behalf with an acceptable licensed vendor who is willing and able to complete the work for your unit

Gregory John and Marlene Taraska
June 20, 2024
Page 2

(provided you have installed impact glass).  Whether you wish to use this contractor or another contractor is your choice, but you must act quickly.

Please send Management an email confirming whether you will be hiring your own contractor or would like the contractor the Association contacted to perform the work by **no later than Friday June 28, 2024 at 5:00 p.m.**

Again, the matter is time sensitive due to the pending violations by the City of Miami Beach and the rainy hurricane season weather.

<u>REGARDLESS OF YOUR CHOICE OF CONTRACTOR, PLEASE REMEMBER THE WORK MUST BE COMPLETED BY JULY 12, 2024</u>.  If the work is not complete by this time, the Association may exercise the legal rights available to it in the Declaration to perform the work itself and assess the unit for the cost.  It would prefer to coordinate with you to resolve this amicably and quickly.

Sincerely,

Lilliana M. Fariñas-Sabogal
For the Firm

LMF/as

cc:   Unit Occupant

25195683v.1

EXHIBIT "5"

1/7/25, 6:08 AM                           Gmail - Fwd: 2024 Approved budget and breakdown of payment for all units

 Gmail                                                          Mike Taraska <taraska@gmail.com>

**Fwd: 2024 Approved budget and breakdown of payment for all units**

Thu, Mar 21, 2024 at 5:09 PM

**Jorge Ceballos** <jorgecb54@hotmail.com>
To: "taraska@gmail.com" <taraska@gmail.com>

Get Outlook for iOS

**From:** Joe <Joe@theroyalgroup.net>
**Sent:** Tuesday, March 19, 2024 3:20:27 PM
**Subject:** 2024 Approved budget and breakdown of payment for all units

Dear unit owners,

We have received feedback from some of you that you have not received the new budgeted payments for 2024. For your convenience, we have attached a copy of the unit's payment breakdown and a copy of the notice. If you did not get the notice prior to your February and March payments, please make up the deficit with your April payment.

Thank you.

Joe Cespedes
Property Manager

**3 attachments**

📄 **Notice of Approved Budget 2024.pdf**
   10K

📄 **Drake 2024 Approved  budget.pdf**
   22K

📄 **Drake 2024 Approved  budget II.pdf**
   26K

EXHIBIT "6"

1/7/25, 6:25 AM                          Gmail - Drake Condominium - Units affected by the recent water leak - IMPORTANT NOTICE

 Gmail                                                    Mike Taraska <taraska@gmail.com>

**Drake Condominium - Units affected by the recent water leak - IMPORTANT NOTICE**

Fri, Mar 15, 2024 at 1:31 PM

**Joe** <Joe@theroyalgroup.net>
Cc: David Raposo <david@theroyalgroup.net>

Attention all occupants of units 201, 202, 203, 204, 205, 206, and 207 on the 2nd floor. If you have experienced damage to your sheetrock due to the recent leak, please be informed that the company responsible for the repair work will commence operations on Tuesday, March 19th. Please ensure that you are present to provide access to the repair personnel. If you have any inquiries, please feel free to reply to this email or call 305 535 3575 ext 111.

The Administration.

# EXHIBIT "7"

# THE DRAKE CONDOMINIUM ASSOCIATION

### c/o Royal Management Group
### 1235 Alton Road. Suite A
### Miami Beach, FL 33139
### Phone: (305) 535-3575 x111

## NOTICE OF APPROVED BUDGET FOR 2024

Dear members of The Drake Condominium Association,

We are reaching out to inform you that the Annual 2024 Budget Meeting took place on Thursday, January 25th, 2024, in the building lobby area at 3 PM.

We are enclosing a copy of the Approved 2024 budget, which includes each unit's monthly payment starting February 1, 2024. Please review the budget and let us know if you have any questions or concerns.

Thank you for your attention to this matter.

Sincerely,

Joe Cespedes - LCAM
Royal Management Group

# EXHIBIT "8"

| | | THE DRAKE CONDOMINIUM ASSOCIATION | | |
| | | 2024 Approved Budget Allocation Per Unit Type | | |
| Unit | Unit | 2024 Proposed | | 2023 Approved |
| # | % | Rounded | | Rounded |
| 201 | 0.03566 | $1,000 | | $523 |
| 202 | 0.04681 | $1,312 | | $686 |
| 203 | 0.03975 | $1,114 | | $583 |
| 204 | 0.03959 | $1,110 | | $580 |
| 205 | 0.03975 | $1,114 | | $583 |
| 206 | 0.04512 | $1,265 | | $661 |
| 207 | 0.03975 | $1,114 | | $583 |
| 208 | 0.03916 | $1,098 | | $574 |
| 209 | 0.02002 | $561 | | $293 |
| 210 | 0.02613 | $732 | | $383 |
| 301 | 0.03128 | $877 | | $458 |
| 302 | 0.03091 | $866 | | $453 |
| 303 | 0.03275 | $918 | | $480 |
| 304 | 0.02208 | $619 | | $324 |
| 305 | 0.02980 | $835 | | $437 |
| 306 | 0.01980 | $555 | | $290 |
| 307 | 0.02981 | $836 | | $437 |
| 308 | 0.02311 | $648 | | $339 |
| 309 | 0.01957 | $549 | | $287 |
| 310 | 0.02120 | $594 | | $311 |
| 311 | 0.02613 | $732 | | $383 |
| 401 | 0.03128 | $877 | | $458 |
| 402 | 0.03091 | $866 | | $453 |
| 403 | 0.03275 | $918 | | $480 |
| 404 | 0.02208 | $619 | | $324 |
| 405 | 0.02981 | $836 | | $437 |
| 406 | 0.04814 | $1,349 | | $706 |
| 407 | 0.02981 | $836 | | $437 |
| 408 | 0.05665 | $1,588 | | $830 |
| 409 | 0.01957 | $549 | | $287 |
| 410 | 0.04085 | $1,145 | | $599 |

EXHIBIT "9"

## THE DRAKE CONDOMINIUM ASSOCIATION
### 2024 Approved Budget with General Partial Reserves

| | 2024 MONTHLY | 2024 ANNUAL | 2023 MONTHLY | 2023 ANNUAL |
|---|---|---|---|---|
| **INCOME:** | | | | |
| Maintenance Fees | $28,031.67 | $336,380.00 | $14,656.83 | $175,882.00 |
| Late Fees | $20.00 | $240.00 | $20.00 | $240.00 |
| Laundry Income | $183.33 | $2,200.00 | $183.33 | $2,200.00 |
| **TOTAL INCOME:** | $28,235.00 | $338,820.00 | $14,860.17 | $178,322.00 |
| **EXPENSES:** | | | | |
| **ADMINISTRATIVE** | | | | |
| Accounting Fees | $50.00 | $600.00 | $50.00 | $600.00 |
| Legal Fees | $250.00 | $3,000.00 | $125.00 | $1,500.00 |
| Management Fees | $1,250.00 | $15,000.00 | $1,150.00 | $13,800.00 |
| Insurance | $12,500.00 | $150,000.00 | $3,333.33 | $40,000.00 |
| Licenses & Permits | $83.33 | $1,000.00 | $50.00 | $600.00 |
| Postage & Printing | $83.33 | $1,000.00 | $83.33 | $1,000.00 |
| Bank Charges | $25.00 | $300.00 | $25.00 | $300.00 |
| **UTILITIES** | | | | |
| Electricity | $700.00 | $8,400.00 | $375.00 | $4,500.00 |
| Water & Sewer | $2,000.00 | $24,000.00 | $1,458.33 | $17,500.00 |
| Telephone | $366.67 | $4,400.00 | $333.33 | $4,000.00 |
| **CONTRACT SERVICES** | | | | |
| Trash Collection | $860.00 | $10,320.00 | $666.67 | $8,000.00 |
| Pest Control | $416.67 | $5,000.00 | $158.33 | $1,900.00 |
| Elevator | $500.00 | $6,000.00 | $433.33 | $5,200.00 |
| Janitorial Services | $4,750.00 | $57,000.00 | $4,443.50 | $53,322.00 |
| Cable TV | $2,400.00 | $28,800.00 | $1,666.67 | $20,000.00 |
| **REPAIRS & MAINTENANCE** | | | | |
| Building Repairs | $833.33 | $10,000.00 | $333.33 | $4,000.00 |
| Fire Prevention | $291.67 | $3,500.00 | $83.33 | $1,000.00 |
| Roof Maintenance | $833.33 | $10,000.00 | $50.00 | $600.00 |
| Supplies | $41.67 | $500.00 | $41.67 | $500.00 |
| **OTHER** | | | | |
| **TOTAL EXPENSES** | $28,235.00 | $338,820.00 | $14,860.17 | $178,322.00 |
| **RESERVES** | | | | |
| General Partial Reserves | $0.00 | $0.00 | $0.00 | $0.00 |
| **TOTAL RESERVES** | $0.00 | | $0.00 | |
| **TOTAL EXPENSES & RESERVES** | $28,235.00 | $338,820.00 | $14,860.17 | $178,322.00 |
| **LESS OTHER INCOME** | $203.33 | ($2,440.00) | $203.33 | ($2,440.00) |
| **TOTAL MAINTENANCE FEES** | $28,031.67 | $336,380.00 | $14,656.83 | $175,882.00 |

EXHIBIT "10"

LEFT INTENTIONALLY BLANK

EXHIBIT "11"

1/6/25, 7:02 AM                                Gmail - Drake Unit #207 - Taraska

 **Gmail**                                                            Mike Taraska <taraska@gmail.com>

---

**Drake Unit #207 - Taraska**

                                                                              Tue, Jul 2, 2024 at 1:06 PM
**Joe** <Joe@theroyalgroup.net>
To: "taraska@gmail.com" <taraska@gmail.com>
Cc: "LFarinas@beckerlawyers.com" <LFarinas@beckerlawyers.com>, David Raposo <david@theroyalgroup.net>, "adibono.firstlooksolutionspm.com"
<adibono@firstlooksolutionspm.com>, "dbrown firstlooksolutionspm.com" <dbrown@firstlooksolutionspm.com>

Hello Mr. Taraska,

I've received your email response to Lilliana Farinas with Becker & Poliakoff. There are a few things I need to clarify regarding the
window and carpet issues.

First, the association did not hire a contractor to work on the windows. Its intention was to make it easier and more cost-effective
for all unit owners to have the windows replaced or repaired. The priority for the association is to prevent any potential water
damage from leaking windows.

Secondly, the carpet issue is unrelated to the window problem. It resulted from a burst pipe earlier this year, which damaged
several units, including yours. Initially, the building's insurance was expected to cover the cost of replacing the carpet on your
stairs, but unfortunately, the insurance company declined the claim. Please send me a copy of the quote received, and I will work
with the association to address the payment for the replacement.

I am forwarding a copy of the quote for your window so that you can make an informed decision on whether to proceed with the
provided contractor or select someone else. Your prompt attention to these matters is crucial and greatly appreciated in order to
maintain the integrity of the building.


Joe Cespedes
Property Manager
The Royal Management Group

---

📄 Drake - unit 207.pdf
   669K

Proposal Page 1 of 1
Quoted: 3/15/2024

# DREAM OF FIELDS GROUP, INC

| Customer Information | |
|---|---|
| Company : | |
| Address : | |
| City/Zip : | |
| Contact : | |
| Phone : | |
| Email : | |

| Project Information | |
|---|---|
| Name : | 1460 Building |
| Address : | Apartment #207 |
| City/Zip : | |
| Phone/Email : | |

| Glass & Frame | |
|---|---|
| Glass Type : | Laminated Monolithic |
| Glass Color : | Clear |
| Energy Film : | None |
| Insulated Space Filler : | None |
| Frame Finish : | White |

### We Are Pleased To Submit The Following Proposal:

PGT - Winguard Series

| MARK | QTY | DESCRIPTION | CONFIGURATION | FRAME SIZE WIDTH | FRAME SIZE HEIGHT | NET PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|---|---|
| Living | 4 | PGT SH7700A Single Hung Window - Muntin 1A/2D | O/X | 36 | 65 | | |
| Bedroom | 4 | PGT SH7700A Single Hung Window - Muntin 1A/2D | O/X | 36 | 65 | | |
| | 4 | Aluminum Mull w. Clips | Vertical | 1x4 | 65 | | |
| | | | | | Material & Tax : | $ | 10,500.00 |

| QTY | LABOR DESCRIPTION | CHARGES | TOTAL |
|---|---|---|---|
| | Removal & Installation | $ | 4,100.00 |
| | Wood Bucks | $ | 850.00 |
| | Liquid Flashing | $ | 910.00 |
| | Labor Total : | $ | 5,860.00 |

| | PROFESSIONAL SERVICES | CHARGES | TOTAL |
|---|---|---|---|
| | Engineering & Wind Load Design Pressure Calculations | $ | 2,000.00 |
| | Permit Package Preperation & Expediting | $ | 500.00 |
| | Cost of Window and/or Door Municipal Permit | | TBD |
| | Allowance for Professional Services : | $ | 2,500.00 |
| | Grand Total : | $ | 18,860.00 |

### SCOPE OF WORK INCLUSIONS :
1. PRODUCT REMOVAL & INSTALLATION.
2. UNLOAD AND DISTRIBUTE UNITS TO REQUIRED LOCATION.
3. SET AND SHIM UNITS PLUMB, LEVEL AND SQUARE IN OPENINGS
4. ANCHOR UNITS IN ACCORDANCE WITH TESTED PROTOCOLS AND FLORIDA BUILDING CODE.
5. BUCKS & EXTERIOR CAULKING BEFORE STUCCO.
6. LIQUID FLASHING OF ENTIRE OPENINGS

### SCOPE OF WORK EXCLUSIONS:
1. INTERIOR CASING OR INTERIOR MULLIONS COVERS OF ANY KIND. (UNLESS OTHERWISE SPECIFIED)
2. INTERIOR PRIMING OR PAINTING. (UNLESS OTHERWISE SPECIFIED)
3. ANY ROUGH BLOCKING OR BUCKS. (UNLESS OTHERWISE SPECIFIED)
4. ANY STUCCO OR PATCHING.
5. ANY DRYWALL OR PLASTER PATCHING.
6. FINAL CAULKING AFTER STUCCO AND/OR PAINT.
7. WINDOW WASHING OR FINAL CLEANING.
8. WINDOW AND DOOR MARKS THAT ARE EXCLUDED FROM OR NOT LISTED ON PROPOSAL.
9. STRUCTURAL STEEL THAT IS REQUIRED TO INSTALL THE GLAZING SYSTEM BUT IS NOT PART OF THE STRUCTURE.
10. RENTAL EQUIPMENT FOR HOISTING.
11. PROTECTION OF WINDOWS AT JOBSITE AGAINST VANDALISM, FIRE, THEFT OR DAMAGE BY OTHER TRADES.
12. MATERIAL & APPLICATION OF BLUE MAX PROTECTIVE FILM TO EXTERIOR & INTERIOR OF WINDOWS AND DOORS
13. ANY COLUMN COVERS / BREAKMETAL.

### DISCLAIMER:
1. LEAD TIME: 8-10 WEEKS FROM DATE OF SIGNED CONTRACT, SIGNED SHOP DRAWINGS & RECEIPT OF DEPOSIT.
2. ALL WIND LOADS HAVE NOT BEEN REVIEWED AND ARE NOT FOUND TO BE IN COMPLIANCE.
3. ALL NFRC "ENERGY" REQUIREMENTS HAVE NOT BEEN REVIEWED AND ARE NOT FOUND TO BE IN COMPLIANCE.
4. ALL UNITS QUOTED TO CLOSEST STANDARD MANUFACTURER SIZES.
5. PROPOSAL IS PROVIDED USING OUR STANDARD INSTALLATION TECHNIQUES WHICH MEET OR EXCEED THE FLORIDA BUILDING CODE.
6. EXISTENING OPENINGS WHERE WORK IS TO BE PERFORMED ARE ASSUMED TO BE STRUCTURAL MASONRY OPENINGS, (POURED CONCRETE OR CONCRETE BLOCK AROUND THE PERIMETER OF EACH OPENING).
7. LAMINATED GLASS, ESPECIALLY HEAT TREATED OR TEMPERED, IS SUBJECT TO VISUAL DISTORTION OF VARIOUS TYPES SUCH AS BUT NOT LIMITED TO WAVE, GASEOUS INCLUSIONS, SCRATCHES, RUBS AND BLEMISHES.
8. PRICES QUOTED ARE FIRM FOR (30) THIRTY DAYS AND ARE BASED ON OUR INTERPRETATION OF PLANS, SKETCHES, SPECIFICATIONS AND INFORMATION PROVIDED BY YOU. THESE PRICES ARE SUBJECT TO CHANGE IF SOURCE MATERIAL IS CHANGED IN ANY WAY OR IF FIELD VERIFICATION OF SIZES DIFFERES FROM PLANS.

EXHIBIT "12"

1/6/25, 6:55 AM                                   Gmail - Drake Unit #207 - Taraska

 **Gmail**
                                                                    Mike Taraska <taraska@gmail.com>

## Drake Unit #207 - Taraska

_____

                                                                    Wed, Jul 3, 2024 at 10:02 AM
**Mike Taraska** <taraska@gmail.com>
To: Joe <Joe@theroyalgroup.net>
Cc: "LFarinas@beckerlawyers.com" <LFarinas@beckerlawyers.com>, David Raposo <david@theroyalgroup.net>, "adibono firstlooksolutionspm.com"
<adibono@firstlooksolutionspm.com>, "dbrown firstlooksolutionspm.com" <dbrown@firstlooksolutionspm.com>

Joe,

Without causing a problem - that bid is abusive, outrageous, meant to fleece homeowners and obviously must have some ulterior motive. No thanks.

I asked for several things in my previous email which were not addressed.

1. - Can you email me a copy of the "pending" City Citations/Violations specific to my windows/alleged rotted wood;

2. - Can you email me a copy of any DRAKE "Report" relative to any inspection regarding my four window wells;

3. - Can you email me a copy of the Declaration and any Amendments thereto.

I appreciate your resolution of the carpet issue and will "send [you] a copy of the quote received, and [that you] will work with the association to address the payment for the replacement". The more issues we resolve, the less of a problem we are going to have.

Also, please email me the DRAKE Condominium **formal** acts under the Declaration, I'm assuming they have been passed and preserved in written form under the Declaration, that is demanding action by Unit #207 as set forth in the Becker Law Firm letter dated June 20, 2024 (which as a result of their mailing error was not received by me until July 1, 2024) pursuant to 'Article 3(b)', notwithstanding that I don't have the Declaration to cite, but which I believe is a common Condominium practice and requirement under CC&R's and Declarations.

This email is being copied to the Becker Law Firm as an additional follow up to my emailed July 1, 2024 response to their written letter of June 20th, 2024.

As a side note, you might want to have the current Association take a look at this new recently enacted 2024 Florida Condo Law (HB 1021), **effective July 1, 2024** as set forth below. I want to make sure that the DRAKE fully complies and adhere to this new law in all upcoming processes. I am going to become active in the application.

Michael Taraska, J.D., LLM

**\*\*\*DO NOT REPLY\*\*\***



# NEW FLORIDA CONDO LAW EFFECTIVE JULY 1ST

Dear Clients and Friends,

We are excited to share important updates from Perez Mayoral, P.A. regarding the recently enacted 2024 Florida Condo Law (HB 1021), effective July 1, 2024. Here's a summary of the key changes and how they might impact you:

## New Board Member Education Requirements:

- Newly elected or appointed directors must certify their understanding of the association's governing documents and complete a four-hour educational curriculum within 90 days.
- Ongoing annual education on recent legal updates is required for all board members.

**Enhanced Meeting Requirements:**
- Boards must meet quarterly, with opportunities for unit owners to ask questions.
- Annual meeting notices must be sent 14 days in advance and posted conspicuously on the property.

**Access to Records:**
- Associations must maintain detailed and organized official records, including all financial transactions, board member education certificates, and building permits.
- Records can be inspected through a website or app, and failure to provide access can result in significant penalties.

**Stricter Penalties for Misconduct:**
- Kickbacks, conflicts of interest, and fraudulent activities by board members are subject to severe penalties, including felony charges and removal from office.
- Anti-SLAPP (Strategic Lawsuits Against Public Participation) protections have been strengthened to prevent associations from retaliating against unit owners who exercise their rights.

**Hurricane Protection:**
- The law clarifies responsibilities for installing, maintaining, and repairing hurricane protection measures, ensuring that costsand responsibilities are clearly defined between the association and unit owners.
- For a detailed analysis and the full text of the bill, please visit HB 1021 Full Text. If you have any questions or need assistance navigating these changes, please contact our office.

**About Perez Mayoral, P.A.** We specialize in representing homeowners in disputes and litigation against condominium and homeowners associations. Our dedicated team is here to protect your rights and ensure fair treatment under the law.

1/6/25, 6:55 AM                                          Gmail - Drake Unit #207 - Taraska

Best regards,

The Team at Perez Mayoral, P.A.

You chose your home for many reasons, but fighting
with your HOA wasn't one of them. Let us deal with
your HOA so you can let home be home.

Contact our law firm today for a case review!

# (305) 928-1077
# www.yourHOAattorneys.com

  

Copyright (C) 2024 Perez Mayoral, P.A.. All rights reserved.
You are receiving this email because you opted in via our website.

[Quoted text hidden]

# EXHIBIT "13"

1/13/25, 2:11 PM

Gmail - DRAKE NOTICE OF SPECIAL ASSESSMENT 2024

 Gmail

Mike Taraska <taraska@gmail.com>

**DRAKE NOTICE OF SPECIAL ASSESSMENT 2024**
1 message

Mon, Oct 21, 2024 at 8:24 AM

**Mike Taraska** <taraska@gmail.com>
To: Michael Taraska <taraska@gmail.com>

Sent from my iPhone

**2 attachments**



75115176880__F39F9EC1-7CBE-4311-B68A-770D6A14A2F4.jpg
112K



75115179413__0536236F-848D-4B67-9764-15925C7CD332.jpg
143K

1/13/25, 2:12 PM                          75115176880__F39F9EC1-7CBE-4311-B68A-770D6A14A2F4.jpg

**The Drake Condominium Association, Inc.**
c/o Royal Management Group
1225 Alton Road, Miami Beach, FL 33139
305-535-3575 ext.113
info@royalmgmtgrp.us.net

October 15, 2024

**NOTICE OF BOARD OF DIRECTOR'S MEETING FOR**
**PROPOSED SPECIAL ASSESSMENT**

The special assessment meeting of the Board of Directors of the Drake Condominium Association will be held on Tuesday, October 29th, 2024 at 3 PM in Royal Management office located at address above. Space is extremely limited and we encourage attendance via Zoom.

MEETING ID: 850 9231 8288
PASSCODE: 847623

The Agenda will be as follows:

1. Call meeting to Order
2. Quorum/Proof of notice
3. Provide update on concrete restoration project
4. Consider and vote on levying Special Assessment in the total amount of $1,200,000.00 for the following purposes:

| CATEGORY | ASSESSMENT AMOUNT |
|---|---|
| Concrete Restoration (contract value) (URS07142) | |
| Structural/final architectural drawing fees | |
| Engineering | |
| Staff Labor | |
| Milestone Inspection (SIRS) | |
| Emergency Repairs | |
| Balcony/Railing Restoration | |
| Interior Corridor Restoration | |
| Dryer Vents | |
| Repair reserves loan | |
| Facility Charge | |
| Accounting and Contingency | |
| **TOTAL:** | **$1,200,000.00** |

5. Establish due dates and payment details for special assessment. Proposed payments per unit and options are attached hereto.
6. Adjournment

If you have any questions regarding this matter, please feel free to call our main office at 305-

1/13/25, 2:12 PM

75115179413__0536236F-848D-4B67-9764-15925C7CD332.jpg

**THE DRAKE CONDOMINIUM ASSOCIATION**
**2024 Proposed SPA Allocation Per Unit Type**

| Unit # | Unit % | TOTAL PER UNIT Rounded | Due Dec. 1st 2024 Rounded | Due Jan. 1st 2025 Rounded | Due Feb. 1st 2025 Rounded | Due Mar. 1st 2025 Rounded | Due Apr. 1st 2025 Rounded | Due May. 1st 2025 Rounded |
|---|---|---|---|---|---|---|---|---|
| 201 | 0.03560 | $42,792 | $ 7,132 | $ 7,132 | $ 7,132 | $ 7,132 | $ 7,132 | $ 7,132 |
| [illegible] | [illegible] | [illegible] | $ 9,362 | $ 9,362 | $ 9,362 | $ 9,362 | $ 9,362 | $ 9,362 |
| 203 | 0.03975 | $47,700 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 |
| [illegible] | [illegible] | [illegible] | $ 7,918 | $ 7,918 | $ 7,918 | $ 7,918 | $ 7,918 | $ 7,918 |
| 205 | 0.03975 | $47,700 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 |
| [illegible] | [illegible] | [illegible] | $ 9,024 | $ 9,024 | $ 9,024 | $ 9,024 | $ 9,024 | $ 9,024 |
| 207 | 0.03976 | $47,700 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 | $ 7,950 |
| [illegible] | [illegible] | [illegible] | $ 7,832 | $ 7,832 | $ 7,832 | $ 7,832 | $ 7,832 | $ 7,832 |
| 209 | 0.02002 | $24,024 | $ 4,004 | $ 4,004 | $ 4,004 | $ 4,004 | $ 4,004 | $ 4,004 |
| [illegible] | [illegible] | [illegible] | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 |
| 301 | 0.03128 | [illegible] | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 |
| [illegible] | [illegible] | [illegible] | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 |
| 303 | 0.03275 | [illegible] | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 |
| [illegible] | [illegible] | [illegible] | $ 4,416 | $ 4,416 | $ 4,416 | $ 4,416 | $ 4,416 | $ 4,416 |
| 305 | 0.02980 | [illegible] | $ 5,960 | $ 5,960 | $ 5,960 | $ 5,960 | $ 5,960 | $ 5,960 |
| [illegible] | [illegible] | [illegible] | $ 3,960 | $ 3,960 | $ 3,960 | $ 3,960 | $ 3,960 | $ 3,960 |
| 307 | 0.02981 | $34,772 | $ 5,962 | $ 5,962 | $ 5,962 | $ 5,962 | $ 5,962 | $ 5,962 |
| [illegible] | [illegible] | [illegible] | $ 4,622 | $ 4,622 | $ 4,622 | $ 4,622 | $ 4,622 | $ 4,622 |
| 309 | 0.01957 | [illegible] | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 |
| [illegible] | [illegible] | [illegible] | $ 4,240 | $ 4,240 | $ 4,240 | [illegible] | $ 4,240 | $ 4,240 |
| 311 | 0.02613 | [illegible] | [illegible] | $ 5,226 | $ 5,226 | [illegible] | $ 5,226 | $ 5,226 |
| [illegible] | [illegible] | [illegible] | [illegible] | $ 6,256 | $ 6,256 | [illegible] | $ 6,256 | $ 6,256 |
| 402 | [illegible] | [illegible] | [illegible] | $ 8,182 | $ 8,182 | [illegible] | $ 8,182 | $ 8,182 |
| [illegible] | [illegible] | [illegible] | [illegible] | $ 6,550 | $ 6,550 | [illegible] | $ 6,550 | $ 6,550 |
| [illegible] | [illegible] | [illegible] | [illegible] | $ 4,416 | $ 4,416 | [illegible] | $ 4,416 | $ 4,416 |
| [illegible] | [illegible] | [illegible] | [illegible] | $ 5,982 | $ 5,982 | [illegible] | $ 5,982 | $ 5,982 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ 9,828 | [illegible] | $ 9,828 | $ 9,828 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ 5,982 | [illegible] | $ 5,982 | $ 5,982 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ 11,330 | $ 11,330 | $ 11,330 | $ 11,330 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $ 8,170 | $ 8,170 | $ 8,170 | $ 8,170 |



EXHIBIT "14"

# MIKE TARASKA  J.D., LLM
## 1460 Ocean Drive, #207   Miami Beach, FL 33139

Ph. (602) 400-5885    taraska@gmail.com

October 25, 2024

ROYAL MANAGEMENT GROUP
1235 Alton Road, Suite A
Miami Beach, FL 33139

**SENT BY EMAIL ONLY**
Att: Joe Cepsides
joe@theroyalgroup.net
cc: David Raposo
david@theroyalgroup.net
Joe Manning

**Re: DRAKE – ILLEGAL BOARD MEETING AND ALLEGED ASSESSMENT SET FOR OCTOBER 29, 2024**

**[PLEASE CONFIRM IMMEDIATELY BY EMAIL THAT THIS LETTER WAS RECEIVED]**

Joe,

   Please excuse any errors in syntax, misspellings, etc... reflected in the attached initial draft of the VERIFIED COMPAINT OF MICHAEL TARASKA. I just received the NOTICE OF THE BOARD OF DIRECTOR'S MEETING FOR PROPOSED SPECIAL ASSESSMENT five days ago from my brother Gregory Taraska, M.D. and his wife Marlene which reflects it was mailed to them on October 15, 2024 which they received on Saturday, October 19th and I have had to scramble working with attorneys to get this out before close of business today given the expediency of the proposed Board Meeting this Tuesday, October 29th.

   A more thorough copy of the VERIFIED COMPLAINT will be provided to you, the Board and the individual Board Members upon the event of filing and service of process.

1

I contacted five DRAKE Homeowners as set forth in the Complaint. Only one had any knowledge of the BOARD MEETING on Tuesday October 29th and the Proposed Special Assessment. I find it curious that only one out of the five people I personally know from the DRAKE knew about this significant event. I believe NOTICE is not being given to many of the other 26 Homeowners which we will find out during the course of the lawsuit if I am forced to pursue litigation.

I have the backing of the five Homeowners I have contacted and they are all receiving a copy of this letter and the COMPLAINT and have expressed their willingness and desire to support my claims and requests. I am sure many more Homeowners will provide support upon properly being informed. I can obtain proxies for 6 of the 32 Homeowners as of today's date which is 18.75% of the 32 Units at DRAKE which provides my represented group, without even contacting the other 26 Homeowners, certain powers under the ARTICLES. See Article IX.B.

Here are my starting requests:

1. VACATE THE HEARING DATE of October 29, 2024 so that I can ensure that ALL DRAKE Homeowners receive adequate knowledge of the proposals set forth by the Board in the October 15th, 2024 NOTICE;

2. Provide me with the emails for all 32 Homeowners so that I can email them this information;

3. Provide me with a <u>line-item</u> summary and bid from the Contractor that is allegedly going to perform the $1.2 million of repairs, upgrades, etc… vaguely reflected in the October 15th, 2024 NOTICE so that I can perform my due diligence and seek comparative and cost effective bids;

4. Provide me with a copy of all current Insurance Policies costing and budgeted for $150,000 (one-hundred fifty thousand dollars) so that I can perform my due diligence and seek comparative and cost effective bids;

5. Provide me with timely access to all of the books and records of the ASSOCIATION for the last five years since the almost $2 Million in Assessments were levied since 2017 – 2019 for the most recent building project which to date isn't even completed.

6. Provide me with the names and contact information of the current Biard Members of the DRAKE ASSOCIATION and any and all PROXIES held by any of these three Board members;

7. Copies of all Fidelity Bonds "of all persons who control or disburse funds of the Association" – DECLARATION at page DC-22, item j.

8. The Workers Compensation policy. DECLARATION page DC-22, item i.

9. Please provide me with the email for President and Board Member Josephine Manning so that I can email this letter and the VERIFIED COMPLAINT to her today.

10. Please provide me with the names of the two other of the three current Board members in addition to Josephine Manning so the lawyers can fill in the blanks of the VERIFIED COMPLAINT adding them as Defendants in place of the DOE 1 and DOE 2 references.

11. Please email me back **immediately** that you received this letter and the VERIFIED COMPLAINT to ensure that the BOARD has proper NOTICE from me before proceeding on October 29, 2024 and to avoid a "rushed" filing with the Court.

Joe and the Board, this is NOT an Emergency Assessment. **There is no basis to rush this matter forward without providing all Homeowners with proper NOTICE in order to provide adequate time to perform their due diligence.** Any refusal, will add to the already presented causes of action set forth in the VERIFIED COMPLAINT.

It's time for TRANSPARENCY at the DRAKE. I believe that a new BOARD needs to be elected and that a new Management Company needs to be hired.

I have the confirmation that VISTA CONSTRUCTION, a well respected General Contractor and Management Company which is willing to submit a competitive bid for the $1.2 Million in work to be performed as proposed in the Board's October 15th Notice of Meeting for Special Assessment.

I am not going to re-iterate my reasons for taking this action. You can understand it from the forty-one (41) page VERIFIED COMPLAINT attached to the email attaching this letter.

I am willing to withhold the filing of any lawsuit upon an agreement received in writing forthwith, from the BOARD and the ASSOCIATION **Vacating the October 29, 2024 Meeting** to a later date to allow Homeowners to investigate the information presented and be able to perform proper due diligence in making a decision on the matters presented in the October 15th, 2024 NOTICE.

3

For your reference, please see the following:

DECLARATION OF CONDOMINIUM OF THE DRAKE, A CONDOMINIUM ("DECLARATION"); BYLAWS OF THE DRAKE CONDOMINIUM ASSOCIATION, INC. ("BYLAWS"); ARTICLES OF INCORPORATION OF THE DRAKE ASSOCIATION, INC. ("ARTICLES").

DECLARATION: 9e; 9f.; 10.a.; 10.c.; 10.f.; 11; 13a. – f.; 20.i.; 20.j.; 30.a. and b.;

BYLAWS: 2.; Article V; Article V.4.A. and E.; Article V.5.; Article VII at page BL-7 through BL-10; Article IX.5.; Article X. paragraphs 3.4.5.6.; Article XII.

ARTICLES: Article VI.B.; Article IX,B; Article X.

/ s /
_____
Michael Taraska

DRAKE LTR 10 25 24

4

1/3/25, 6:20 AM                    Gmail - DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

 Gmail                                                    Mike Taraska <taraska@gmail.com>

---

**DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024**

Fri, Oct 25, 2024 at 10:48 AM

**Mike Taraska <taraska@gmail.com>**
To: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>
Cc: Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>, Louise Rabi Adhikari <TheAdhikaris@gmail.com>, DRAKE Mattia Prian
<mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, misobal@comcast.net, jorgecb54@hotmail.com

Please find attached the following:

1. Letter dated October 25, 2024 from Michael Taraska;

2. VERIFIED COMPLAINT OF MICHAEL TARASKA.


      Michael Taraska, Unit #207 (602) 400-5885

---

**2 attachments**

 **DRAKE LTR 10 25 24.docx**
36K

 **DRAKE C 10 24 24 E.docx**
105K

# EXHIBIT "15"

 **Gmail**

Mike Taraska <taraska@gmail.com>

---

## DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

**Mike Taraska** <taraska@gmail.com>                                                    Fri, Oct 25, 2024 at 2:15 PM
To: "jomanning1940@gmail.com" <jomanning1940@gmail.com>

Hi Jo,

Let me know by response email as soon as practicable if this is your correct email address.

Thank you, Michael Taraska.   DRAKE #207 (602) 400-
[Quoted text hidden]

# EXHIBIT "16"

1/2/25, 7:19 AM                                Gmail - DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

 **Gmail**                                                                                    Mike Taraska <taraska@gmail.com

---

**DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024**

---

**Jorge Ceballos** <jorgecb54@hotmail.com>                                                          Sat, Oct 26, 2024 at 11:02 AM
To: Lou Rab Moo Adhikari <theadhikaris@gmail.com>, Mike Taraska <taraska@gmail.com>
Cc: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>, DRAKE
Mattia Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, "misobal@comcast.net" <misobal@comcast.net>

Hi good afternoon to everybody we need this action in the proper way follow the rules is why there to protect I am  request for visibility and transparency in this
matter

Get Outlook for iOS

---

**From:** Lou Rab Moo Adhikari <theadhikaris@gmail.com>
**Sent:** Friday, October 25, 2024 3:21:26 PM
**To:** Mike Taraska <taraska@gmail.com>
**Cc:** Joe <Joe@theroyalgroup.net>; David Raposo <david@theroyalgroup.net>; Greg Taraska <docgt1@charter.net>; Marlene
<mtaraska@charter.net>; DRAKE Mattia Prian <mattiaprian@yahoo.com>; Rabi Adhikari <rabiadhikari@hotmail.com>; misobal@comcast.net
<misobal@comcast.net>; jorgecb54@hotmail.com <jorgecb54@hotmail.com>
**Subject:** Re: DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

I can confirm that the Adhikaris have not received any notification of a Board meeting to be held next week, nor of any Special Assessment and support Mr
Taraska's request for visibility and transparency into this action.

I would also ask you to confirm if there is a proxy on file for the Adhikari's voting rights for HOA matters, and if so, that it be canceled immediately to ensure that
we have adequate access to submit voting directly for all future votes. If there is a formal process to do this, then please advise.

Louise & Rabi Adhikari

On Fri, Oct 25, 2024 at 12:48 PM Mike Taraska <taraska@gmail.com> wrote:
   Please find attached the following:

   1. Letter dated October 25, 2024 from Michael Taraska;

   2. VERIFIED COMPLAINT OF MICHAEL TARASKA.


        Michael Taraska, Unit #207 (602) 400-5885

# EXHIBIT "17"

 **Gmail**                                                                                      Mike Taraska <taraska@gmail.com>

---

**DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024**

---

**Mike Taraska** <taraska@gmail.com>                                                              Thu, Oct 31, 2024 at 10:35 AM
To: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, lfarinas@beckerlawyers.com
Cc: Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>, Louise Rabi Adhikari <TheAdhikaris@gmail.com>, DRAKE Mattia Prian
<mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, misobal@comcast.net, jorgecb54@hotmail.com

Lilliana,

   I am forwarding the email with my letter dated October 25th and the Draft Complaint, both attached hereto, which I sent to all on October 25, 2024 at 10:48
a.m. which, at the October 29, 2024 SPECIAL MEETING OF BOARD MEMBERS, David Raposa and Jo Manning said they never received despite the email
confirmations to them and Joe Cepsedes and the subsequent text message and voicemail left by me on Monday, October 28th for Joe Cepsedes.

   I am also attaching hereto, a scanned copy of my signed letter to you of today and the updated Draft Complaint to reflect the information I received during
my attendance of the ZOOM Board Meeting on October 29th, 2024.

   I am also attaching portions of the recorded meeting referred to in my October 32, 2024 letter to you.

   I'm available to discuss the matter. (602) 400-5885.

   Michael Taraska

  IMG_3111.MOV

  IMG_3108.MOV

[Quoted text hidden]

---

**2 attachments**

 **DRAKE ATTY LTR 10 30 24.docx**
38K

 **DRAKE C 10 31 24 .docx**
110K

# EXHIBIT "18"

# MIKE TARASKA  J.D., LLM
## 1460 Ocean Drive, #207   Miami Beach, FL 33139

Ph. (602) 400-5885    taraska@gmail.com

October 31, 2024

Lilliana M. Farinas-Sabogal, Esq. (?)
Beckler & Poliakoff
2525 Ponce de Leon Blvd., Suite 825
Coral Gables, FL 22134

**SENT BY EMAIL ONLY**
lfarinas@beckerlawyers.com

**Re: DRAKE – 10/29/24 BOARD MEETING**

Lilliana,

I emailed you on July 1, 2024 on the "window matter" stating "Are you a lawyer? Please respond to this email as soon as you are able so I can make sure you receive it timely given the apparent eight-day 'urgency' set forth in your letter dated June 20, 2024 which has already passed due to your firm's error in mailing".

It's four months later and I never received a response to the "window matter" instigated by your firm, which the former owner of Unit #207 Dr. Keith Gould told me was the modus operandi for Becker/Poliakoff in conjunction with ROYAL MANAGEMENT GROUP (the "ROYAL GROUP") regarding anything having to do with issues on behalf of a homeowner at the DRAKE.

I have news for you – That is not going to work with me and my situation as an owner of Unit #207. The failure of your firm to respond to my July 1, 2024 letter regarding the false assertions, ultimatums and claims with respect to my windows set the tenor on how I will be forced to deal with you, your firm, the ROYAL GROUP and the DRAKE Board on the issues discussed yesterday at the BOARD Meeting. On a side note, Joe Cepsides, ROYAL'S designated Manager for the DRAKE, told me that the letter sent by you regarding my windows was not a true recitation of the facts and that there was "no requirement by the City to replace my windows and that it was only a request by the BOARD to make sure all of the stucco work that had recently been done on the building was kept safe from future deterioration over the next 20 years" in the hallway outside my Unit several days after I informed him a few months ago that I had a video of **another** water leak pouring into the hall way carpet in front of my 2nd Floor Unit,

1

Turning to the BOARD Meeting of yesterday I am attaching a few snip-it's of the recording I made to make sure you understand that what you represent now and potentially in the future when litigation ensues will be measured against what you and the BOARD through David Raposa stated yesterday before you dropped me from the meeting at 2:41 p.m. because you didn't want the Homeowner's in attendance to hear the truth about the illegal attempt to assess $1.2 Million as set forth in the NOTICE OF BOARD OF DIRECTORS MEETING FOR PROPOSED SPECIAL ASSESSMENT ("NOTICE OF BOARD MEETING") and as further reflected in the draft Complaint and cover letter which were sent on Friday, October 25th, 2024 to the ROYAL GROUP (both Joe Cepsides and David Raposa) as well as President Jo Manning, all of whom during the Board Meeting denied receiving it. I also left a phone message on Joe's personal voicemail and sent another email on Monday, October 28th with respect to the receipt of the October 25th email, which of course was also not responded to. In addition, I have third party email confirmation, in addition to my email "sent" verifications, that Joe Cepsides did in fact receive the October 25th, 2024 email. I asked you at the October 29th BOARD MEETING whether you were aware of the draft Complaint, and to my astonishment, you being the lawyer representing the Board and Management Company at the meeting, said you were not. I will be sending the newly edited Complaint to you, ROYAL and Jo Manning by certified mail when I return to Miami in the next two weeks pursuant to the Bylaws, Art. XII since all involved DRAKE actors seem to collectively deny receiving my emails and phone messages.

I listed a number of applicable sections of the DRAKE "Governing Documents" in my October 25, 2024 letter in which the BY-LAWS, DECLARATION and ARTICLES were violated with respect to the substance reflected in the NOTICE OF BOARD OF DIRECTORS MEETING. Obviously, given the admissions made by you and David Raposa on behalf of the BOARD and the ROYAL GROUP during the first thirty or so minutes I attended the meeting before the administrator dropped me, there is a BIG PROBLEM. A judge will see the absolute lack of knowledge and notice Homeowners had of the "past work completed and $750k represented as owed to the Contractor Edgar Ramirez" by the Homeowners' Association by simply comparing my date confirmed email and draft Complaint attached thereto with the statements made by the Board, the ROYAL GROUP and you.

I am attaching an "updated" version of the draft Complaint based on the admissions and information I was shocked to hear at yesterday's meeting. **THE $1.2 MILLION ASSESSMENT including the "$750k for past work" <u>completely and unequivocally violates, among other legal grounds, Section 10.c. of the DECLARATION OF CONDOMINIUM</u>**. I am not going to argue the substance with you in a letter campaign. I am reaching out to you to see if there is a way to "short-circuit" the situation in an attempt to avoid what is surely going to be protracted and contentious litigation, especially given the seriousness of the allegations that I will be bringing based on my information already in my possession. It literally can lead to criminal charges being investigated and filed against the ROYAL GROUP and the Board Members. Based upon what Dr. Gould told me and my experiences in the last three years with the

DRAKE'S Management and Jo Manning, I doubt attempts at a quick resolution will be fruitful but I am willing to give it a try.

To be able to resolve the issues, it will require **COMPLETE TRANSPARENCY BY THE BOARD AND ABSOLUTE ACCESS TO ALL DOCUMENTS REQUESTED.** I want to be able to assure the Homeowners with whom I have discussed this matter and who likewise are now insisting on FULL TRANSPARENCY that all of the action taken by the Board can and will be explained and supported without obstruction. This will necessarily include the following:

1. Providing me with the email address for all 32 Homeowners so that I can email them to ensure that all Homeowners receive Notice of the issues;

2. Providing me with the bid, the <u>line-item</u> summary of all work to-be and/or which was, performed comprising the $750k allegedly owed to the Contractor and all invoices submitted thereto [DECLARATION 9.b.(3); 9.(e)];

3. Providing me with full copies of all current Insurance Policies for the last three years, including the one budgeted for $150,000 (one-hundred fifty thousand dollars) as reflected in the NOTICE OF APPROVED BUDGET FOR 2024 authored by Joe Céspedes – LCAM (ROYAL) allegedly sent to "The members of the Drake Condominium Association" (undated but referring to "inform [all] that the Annual 2024 Budget Meeting took place on Thursday, January 25th".

4. Providing me with timely access to all of the books and records of the ASSOCIATION for the last seven years which reflects the disbursement of the almost $2 Million in Assessments levied in 2017 – 2019 [Bylaws, Art. X4. at page BL-12];

5. Providing me with the names and contact information of the current Board Members of the DRAKE ASSOCIATION and any and all PROXIES held at any time by any of these three Board members for the past seven years to date;

6. Providing me with copies of all Fidelity Bonds "of all persons who control or disburse funds of the Association" – [DECLARATION at page DC-22, item j.; Bylaws, Art. X3. Page BL-12] covering the last seven years to date;

7. Providing me access to review and copy any and all minutes of meetings, roll calls, assessments and any other correspondence to/from the BOARD, Association and the Royal Management Group for the last seven years to date [Bylaws, Art. V4.A. page BL-5];

8. Providing me with access to review and copy all Workers Compensation policies for the last seven years to date.[ DECLARATION page DC-22, item i].

I currently have the support of SIX UNITS of DRAKE Homeowners which are all of the Homeowner's I know personally and whom I contacted which consists of 18.75% (eighteen and three-quarters percent) of the 32 Units which enables us to call a Special Meeting of Members pursuant to Article VII1.B. of the Bylaws stating that "It **shall be the duty** of the President to call a special meeting of the Association . . . upon a petition signed by ten percent (10%) of the members having presented to the Secretary". We intend to hold that meeting expeditiously in compliance with the 14 day Notice Period prior to the alleged December 1, 2024 first "payment date" of the $1.2 Million Assessment to stop those payments. I will need the email addresses of all 32 Homeowners referred to in #1 above to ensure substantive Notice and adequate "Participation" being made available to such Homeowners  after I am able to provide them with the information contained herein.

In my review, I highlighted a myriad of violations by the BOARD of the DECLARATION, BYLAWS and ARTICLES not including all of the Florida Statutory Law which will be inserted into the attached edited Complaint when we file it with the Court. After hearing the rhetoric which I tape recorded yesterday while I attended the BOARD Meeting, I am not going to provide you with a complete legal roadmap that the BOARD and Management Company can respond to with manufactured false evidence in an attempt to avoid liability. It is clear that what has taken place is serious and irrefutable and they know what they did and you do too. You have enough evidence and facts to make your legal determination and advice at this time.

Please be advised and verify that you informed the current BOARD Members in accordance with the DECLARATION ARTICLE X – INDEMNIFICATION, at page AI-5 that they will not be covered under the INDEMNIFCATION provisions "wherein the director or officer is adjudged guilty of willful misfeasance or malfeasance in the performance of the director's or officer's duty" and that I will be seeking punitive as well as compensatory damages **personally** against **all BOARD** members involved in the improper and illegal activity, including attempts to "cover it up".

I look forward to you anticipated mutual cooperation and prompt attention to this matter especially given the December 1, 2024 scheduled first payment date of the illegal $1.2 million Special Assessment and the timeline to submit the Petition to the Secretary to call the meeting of Members on 14 days' Notice.

Michael Taraska
Owner – Unit #207

DRAKE ATTY LTR 10 30 24

4

EXHIBIT "19"

1/2/25, 7:13 AM                                Gmail - DRAKE #207

 Gmail                                    Mike Taraska <taraska@gmail.com>

**DRAKE #207**
1 message

**Mike Taraska** <taraska@gmail.com>                         Fri, Nov 1, 2024 at 9:17 AM
To: lfarinas@beckerlawyers.com
Cc: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>

Lilliana, Joe Cepsedes, David Raposa, Josephine Manning:

To ensure proper notice, please confirm by reply email that you received my email of yesterday.

Michael Taraska

# EXHIBIT "20"

1/7/25, 6:31 AM                              Gmail - DRAKE CONDOMINIUM - APPROVED SPECIAL ASSESMENT NOTICE.

 Gmail                                                          Mike Taraska <taraska@gmail.com>

**DRAKE CONDOMINIUM - APPROVED SPECIAL ASSESMENT NOTICE.**

Joe <Joe@theroyalgroup.net>                                            Fri, Nov 1, 2024 at 11:53 AM
Cc: David Raposo <david@theroyalgroup.net>

NOTICE OF APPROVAL OF BOARD OF DIRECTORS MEETING FOR SPECIAL ASSESSMENT

The special assessment meeting of the Drake Condominium Association's Board of Directors took place on Tuesday, October 29, 2024, at 3 PM. The meeting was held at the Royal Management office located at 1235 Alton Road, Suite A, Miami Beach, FL, and conducted via Zoom as indicated in the notice sent to all members via mail 14 days before the meeting as per Florida Condominium Law requirement. Below, you will find the items associated with the assessment.

CATEGORY ASSESSMENT AMOUNT
*Concrete Restoration (addresses violation (US2017-01413)
*Replacement of main underground plumbing line
*Landscaping
*Roof decks
*Hallway carpeting
*New lobby windows
*Downspouts for roof drainage
*New security access system and cameras
*Interior elevator cab improvements
*Drywall repairs
*Repair terrazzo floors
*Safety railings
*Accounting and Contingency
TOTAL $1,200,000.00

The Board approved the $1,200,000.00 assessment, which will be collected in six consecutive payments. The payment schedule is as follows: the first payment is due on December 1, 2024, and the final payment is due May 1, 2025. Please refer to the attached breakdown to identify your specific portion.
Similar to your regular maintenance payments, you can make your payments online by registering on the Alliance Bank website or by mail to:
THE DRAKE CONDOMINIUM
C/O The Royal Management Group
P.O. Box 620513
Orlando, FL 32862-0513

If you have any questions regarding this notice, please contact our main office at 305-535-3575, Ext. 111.

---

📄 **APPROVED 2024 SPECIAL ASESSMENT 10.29.2024.xlsx**
38K

## THE DRAKE CONDOMINIUM ASSOCIATION
### 2019 Approved Budget with General Partial Reserves

| | 2019 MONTHLY | 2019 ANNUAL | 2018 ANNUAL |
|---|---|---|---|
| **INCOME:** | | | |
| Maintenance Fees | $14,240.17 | $170,882.00 | $166,171.00 |
| Late Fees | $20.00 | $240.00 | $240.00 |
| Laundry Income | $183.33 | $2,200.00 | $2,200.00 |
| Budget Surplus | $0.00 | $0.00 | $3,000.00 |
| **TOTAL INCOME:** | $14,443.50 | **$173,322.00** | $171,611.00 |
| **EXPENSES:** | | | |
| **ADMINISTRATIVE** | | | |
| Accounting Fees | $50.00 | $600.00 | $600.00 |
| Legal Fees | $250.00 | $3,000.00 | $3,000.00 |
| Management Fees | $1,050.00 | $12,600.00 | $12,600.00 |
| Insurance -Liability | $3,591.67 | $43,100.00 | $45,520.00 |
| Licenses & Permits | $50.00 | $600.00 | $600.00 |
| Condominium Filing Fees | $10.33 | $124.00 | $124.00 |
| Division of Corporations | $5.17 | $62.00 | $62.00 |
| Postage & Printing | $83.33 | $1,000.00 | $1,000.00 |
| Bank Charges | $25.00 | $300.00 | $300.00 |
| **UTILITIES** | | | |
| Electricity | $375.00 | $4,500.00 | $4,500.00 |
| Water & Sewer | $1,458.33 | $17,500.00 | $15,000.00 |
| Telephone | $366.67 | $4,400.00 | $3,000.00 |
| **CONTRACT SERVICES** | | | |
| Trash Collection | $860.00 | $10,320.00 | $10,000.00 |
| Pest Control | $158.33 | $1,900.00 | $2,000.00 |
| Elevator | $433.33 | $5,200.00 | $5,689.00 |
| Janitorial Services | $3,493.00 | $41,916.00 | $41,916.00 |
| Cable TV | $1,666.67 | $20,000.00 | $15,500.00 |
| **REPAIRS & MAINTENANCE** | | | |
| Building Repairs | $333.33 | $4,000.00 | $6,000.00 |
| Fire Prevention | $83.33 | $1,000.00 | $3,000.00 |
| Roof Maintenance | $50.00 | $600.00 | $600.00 |
| Janitorial Supplies | $25.00 | $300.00 | $300.00 |
| Lobby & Courtyard | $25.00 | $300.00 | $300.00 |
| **OTHER** | | | |
| **TOTAL EXPENSES** | $14,443.50 | **$173,322.00** | **$171,611.00** |
| **RESERVES** | | | |
| General Partial Reserves | $416.67 | $5,000.00 | $10,000.00 |
| **TOTAL RESERVES** | $416.67 | | |
| **TOTAL EXPENSES & RESERVES** | $14,443.50 | **$173,322.00** | **$171,611.00** |
| **LESS OTHER INCOME** | **$203.33** | **($2,440.00)** | **($5,440.00)** |
| **TOTAL MAINTENANCE FEES** | **$14,240.17** | **$170,882.00** | **$166,171.00** |

RENT FOR RECREATIONAL & OTHER COMMONLY USED FACILITIES

TAXES UPON ASSOCIATION PROPERTY

TAXES UPON LEASED AREA

EXPENSES FOR A UNIT OWNER:

A. RENT FOR THE UNIT, IF SUBJECT TO LEASE

B. RENT PAYABLE BY THE UNIT OWNER DIRECTLY

   UNDER ANY RECREATIONAL LEASE FOR THE USE

   OF COMMONLY USED FACILITIES, WHICH USE &

   PAYMENT IS MANDATORY CONDITIONS OF OWNERSHIP

   & IS NOT INCLUDED IN THE COMMON EXPENSES OF

| Unit # | Unit % | TOTAL PER UNIT Rounded |
|---|---|---|
| 201 | 0.03566 | $42,792 |
| 202 | 0.04681 | $56,172 |
| 203 | 0.03975 | $47,700 |
| 204 | 0.03959 | $47,508 |
| 205 | 0.03975 | $47,700 |
| 206 | 0.04512 | $54,144 |
| 207 | 0.03975 | $47,700 |
| 208 | 0.03916 | $46,992 |
| 209 | 0.02002 | $24,024 |
| 210 | 0.02613 | $31,356 |
| 301 | 0.03128 | $37,536 |
| 302 | 0.03091 | $37,092 |
| 303 | 0.03275 | $39,300 |
| 304 | 0.02208 | $26,496 |
| 305 | 0.02980 | $35,760 |
| 306 | 0.01980 | $23,760 |
| 307 | 0.02981 | $35,772 |
| 308 | 0.02311 | $27,732 |
| 309 | 0.01957 | $23,484 |
| 310 | 0.02120 | $25,440 |
| 311 | 0.02613 | $31,356 |
| 401 | 0.03128 | $37,536 |
| 402 | 0.03091 | $37,092 |
| 403 | 0.03275 | $39,300 |
| 404 | 0.02208 | $26,496 |
| 405 | 0.02981 | $35,772 |

### THE DRAKE CONDOMINIUM
### 2024 APPROVED SPA Allocati

| Due Dec. 1st 2024 Rounded | | Due Jan. 1st 2025 Rounded | |
|---|---|---|---|
| $ | 7,132 | $ | 7,132 |
| $ | 9,362 | $ | 9,362 |
| $ | 7,950 | $ | 7,950 |
| $ | 7,918 | $ | 7,918 |
| $ | 7,950 | $ | 7,950 |
| $ | 9,024 | $ | 9,024 |
| $ | 7,950 | $ | 7,950 |
| $ | 7,832 | $ | 7,832 |
| $ | 4,004 | $ | 4,004 |
| $ | 5,226 | $ | 5,226 |
| $ | 6,256 | $ | 6,256 |
| $ | 6,182 | $ | 6,182 |
| $ | 6,550 | $ | 6,550 |
| $ | 4,416 | $ | 4,416 |
| $ | 5,960 | $ | 5,960 |
| $ | 3,960 | $ | 3,960 |
| $ | 5,962 | $ | 5,962 |
| $ | 4,622 | $ | 4,622 |
| $ | 3,914 | $ | 3,914 |
| $ | 4,240 | $ | 4,240 |
| $ | 5,226 | $ | 5,226 |
| $ | 6,256 | $ | 6,256 |
| $ | 6,182 | $ | 6,182 |
| $ | 6,550 | $ | 6,550 |
| $ | 4,416 | $ | 4,416 |
| $ | 5,962 | $ | 5,962 |

## ⌐ ASSOCIATION
### ⌐on Per Unit Type

| Due Feb. 1st 2025 Rounded | Due Mar. 1st 2025 Rounded | Due Apr. 1st 2025 Rounded |
|---|---|---|
| $ 7,132 | $ 7,132 | $ 7,132 |
| $ 9,362 | $ 9,362 | $ 9,362 |
| $ 7,950 | $ 7,950 | $ 7,950 |
| $ 7,918 | $ 7,918 | $ 7,918 |
| $ 7,950 | $ 7,950 | $ 7,950 |
| $ 9,024 | $ 9,024 | $ 9,024 |
| $ 7,950 | $ 7,950 | $ 7,950 |
| $ 7,832 | $ 7,832 | $ 7,832 |
| $ 4,004 | $ 4,004 | $ 4,004 |
| $ 5,226 | $ 5,226 | $ 5,226 |
| $ 6,256 | $ 6,256 | $ 6,256 |
| $ 6,182 | $ 6,182 | $ 6,182 |
| $ 6,550 | $ 6,550 | $ 6,550 |
| $ 4,416 | $ 4,416 | $ 4,416 |
| $ 5,960 | $ 5,960 | $ 5,960 |
| $ 3,960 | $ 3,960 | $ 3,960 |
| $ 5,962 | $ 5,962 | $ 5,962 |
| $ 4,622 | $ 4,622 | $ 4,622 |
| $ 3,914 | $ 3,914 | $ 3,914 |
| $ 4,240 | $ 4,240 | $ 4,240 |
| $ 5,226 | $ 5,226 | $ 5,226 |
| $ 6,256 | $ 6,256 | $ 6,256 |
| $ 6,182 | $ 6,182 | $ 6,182 |
| $ 6,550 | $ 6,550 | $ 6,550 |
| $ 4,416 | $ 4,416 | $ 4,416 |
| $ 5,962 | $ 5,962 | $ 5,962 |

| Due May. 1st 2025 Rounded |
|---|
| $ 7,132 |
| $ 9,362 |
| $ 7,950 |
| $ 7,918 |
| $ 7,950 |
| $ 9,024 |
| $ 7,950 |
| $ 7,832 |
| $ 4,004 |
| $ 5,226 |
| $ 6,256 |
| $ 6,182 |
| $ 6,550 |
| $ 4,416 |
| $ 5,960 |
| $ 3,960 |
| $ 5,962 |
| $ 4,622 |
| $ 3,914 |
| $ 4,240 |
| $ 5,226 |
| $ 6,256 |
| $ 6,182 |
| $ 6,550 |
| $ 4,416 |
| $ 5,962 |

| | | |
|---|---|---|
| 406 | 0.04814 | **$57,768** |
| 407 | 0.02981 | **$35,772** |
| 408 | 0.05665 | **$67,980** |
| 409 | 0.01957 | **$23,484** |
| 410 | 0.04085 | **$49,020** |
| | 1.0000 | **$1,200,000** |

| | | | |
|---|---|---|---|
| $ | 9,628 | $ | 9,628 |
| $ | 5,962 | $ | 5,962 |
| $ | 11,330 | $ | 11,330 |
| $ | 3,914 | $ | 3,914 |
| $ | 8,170 | $ | 8,170 |
| **$** | **200,006** | **$** | **200,006** |

| | | | | | |
|---|---|---|---|---|---|
| $ | 9,628 | $ | 9,628 | $ | 9,628 |
| $ | 5,962 | $ | 5,962 | $ | 5,962 |
| $ | 11,330 | $ | 11,330 | $ | 11,330 |
| $ | 3,914 | $ | 3,914 | $ | 3,914 |
| $ | 8,170 | $ | 8,170 | $ | 8,170 |
| $ | **200,006** | $ | **200,006** | $ | **200,006** |

| | |
|---|---:|
| $ | 9,628 |
| $ | 5,962 |
| $ | 11,330 |
| $ | 3,914 |
| $ | 8,170 |
| **$** | **200,006** |

EXHIBIT "21"

1/3/25, 6:40 AM                          Gmail - DRAKE CONDOMINIUM - APPROVED SPECIAL ASSESMENT NOTICE.

Mike Taraska <taraska@gmail.com>

 Gmail

---

## DRAKE CONDOMINIUM - APPROVED SPECIAL ASSESMENT NOTICE.

Fri, Nov 1, 2024 at 12:06 PM

**Mike Taraska** <taraska@gmail.com>
To: Joe <Joe@theroyalgroup.net>
Cc: David Raposo <david@theroyalgroup.net>, jomanning1940@gmail.com

Joe,

   Your email that I am now responding to and David's email address reflected in your email are the same email addresses that I have been sending the letters and draft Legal Complaints before and after the Board Meeting on October 25th, 28th and 31st. I have asked numerous times for you, David and Jo Manning to confirm receipt of the emils.

   All of you have refused to acknowledge receipt and stated at the Board Meeting that none of you received my October 25th email.

   It appears you are purposely refusing to acknowledge receipt in order to claim "ignorance" prior to the actions of the Board on October 28th.

   This will be addressed in the legal filing.

   Please acknowledge receipt of this Reply to your email hereto.

   Mike Taraska, #297
[Quoted text hidden]

EXHIBIT "22"

1/2/25, 7:15 AM                              Gmail - Drake Condominium - Mike Taraska - Drake construction work documents request

 Gmail                                                                    Mike Taraska <taraska@gmail.com>

**Drake Condominium - Mike Taraska - Drake construction work documents request**

Fri, Nov 22, 2024 at 3:01 PM

**Joe** <Joe@theroyalgroup.net>
To: Mike Taraska <taraska@gmail.com>
Cc: David Raposo <david@theroyalgroup.net>, "Farinas-Sabogel, Lilliana" <LFarinas@beckerlawyers.com>, Jo Manning <jom19401962@gmail.com>, Meyer
Frucher <sandy@frucher.com>, Maria Arencibia <marencibia@mail.com>

Mr. Taraska,

Mr. Raposo asked me to send you this link with the information you requested about the construction work at the Drake Condominium. He
also mentioned that he will get in touch with you later next week.

https://www.dropbox.com/scl/fo/62sef828n3zycfloix2c4/AE89XpZVAQveNE4p1I_Vw64?rlkey=66z750l3gjy2pjk4wet8dp3rn&dl=0

https://www.dropbox.com/scl/fo/5472npctov8vvkz3bvbk6/AL9U8NONuMew7D4AMIZNPn4?rlkey=
380x0eo95x6nc14ncor1zw0so&dl=0

https://www.dropbox.com/scl/fo/luy7tes2hgz4xf15bz9u4/AFaoE9kwb6xJfu-UB2s_VXw?rlkey=
eahwbu1tkov5xwczo5vmexpub&dl=0

Joe Cespedes
Property Manager
The Royal Management Group
c/o The Drake Condominium

EXHIBIT "23"

 **Gmail**                                                                                                      Mike Taraska <taraska@gmail.com:

## DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

**Mike Taraska** <taraska@gmail.com>                                                                         Thu, Nov 21, 2024 at 10:06 AM
To: "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>
Cc: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>,
jomanning1940@gmail.com, jorgecb54@hotmail.com, DRAKE Mattia Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise
Adhikari <louise.adhikari@gmail.com>

Lilliana and the Board,

I emailed you six days ago on November 15, 2024 providing you with the two Notarized General Powers of Attorney executed by my brother Gregory
Taraska, M.D. and his wife Marlene Taraska asking for access to DRAKE condo information and you have FAILED to respond.

In that email I stated that:

"I currently reside in Medellin, Colombia with my three young children and wife **but am willing to fly to Miami Beach forthwith to review all of the
documents that are made available to me for inspection as well as copying.** PLEASE GIVE ME A DATE AND TIME FOR ME TO PERFORM MY
INSPECTION".

I also informed that:

"**Any delay,** obstruction or impediments that you or the Board may decide to initiate **to not comply and provide me with the requested
documents/information expeditiously** will be raised as an issue and made part of the Complaint that will be filed with the Court forthwith" and to  "email me
back as soon as practicable as I have explained in previous emails, time is of the essence given the Board's short notice and the upcoming illegal December 1,
2024 'pay date'".

THE BYLAWS OF THE DRAKE CONDOMINIUM ASSOCIATION ("BYLAWS") mandate at Article X, section 4. at page BL-12 that:

"The Association records **shall** be open to inspection by any Association member, **the authorized representative of such member** or by holders,
insurers and guarantors of first mortgages that are secured by a Unit in the project. These records **shall** be available <u>within 5 working days after receipt of a
written request by the Board or its designees</u>.

Under the DECLARATION OF CONDOMINIUM OF THE DRAKE, A CONDOMINIUM ("Declaration") at section 9.b.(3) at page DC-8 the Association through
its Board has a "**duty** to <u>maintain accounting records according to good accounting practices, which shall be open to inspection by Unit Owners at a
reasonable time during normal business hours</u>".

I demanded access to these records six days ago on November 15, 2024 per my email. YOU HAVE FAILED TO RESPOND AND ARE DELAYING THESE
PROCEEDINGS AND DENYING RIGHTS UNDER THE BYLAWS AND DECLARATION.

At Section 9.e. page DC-9 of the Declaration "The Association or its designees **shall** maintain such records as required by Section 7118.111, Florida
Statutes [or its successors]".

Section 9.f. of the Declaration **requires** that "In any legal action in which the Association may be exposed to liability in excess of insurance coverage
protecting it and the Unit Owners, the Association **shall give notice of the exposure** within a reasonable time to **all Unit Owners** who ay be exposed to the
liability, so that such Unit Owners **shall have the right to intervene and defend**". It is **required** that the Board or its Designees give all Unit Owners notice
immediately of the filing deadline of the draft Complaint that was previously emailed by me.

President Josephine Manning and Royal Management are purposely hiding the exposure and potential liability set forth in the communications from Unit
#207 from the other thirty (30) homeowners. I have specifically asked in previous emails for the Board to:

"1. Provid[e] me (**IMMEDIATELY**) with the email address for all 32 Homeowners so that I can email
them to ensure that all Homeowners receive Notice of the issues".

This requested information is to inform all homeowners of the serious nature of the Board, Management Company and their lawyers' Torts and enormous
potential liability that can possibly be avoided prior to the filing of the Complaint upon proper notice. You are purposely refusing to respond to keep the other
thirty homeowners from taking appropriate action against the Board. This is a further breach of fiduciary duty if not outright fraud (material omission) in violation
of the governing documents.

**PLEASE RESPOND TO ME** <u>IMMEDIATELY</u> **BY EMAIL WHY YOU ARE REFUSING TO COMPLY WITH THE DICTATES OF THE
GOVERNING DOCUMENTS. I need a record of these acts.**

Michael Taraska, authorized agent of Unit #207 via Powers of Attorney.

[Quoted text hidden]

# EXHIBIT "24"

1/2/25, 7:24 AM                    Gmail - DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

 Gmail                                           Mike Taraska <taraska@gmail.com>

## DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

Mon, Nov 25, 2024 at 2:17 PM

**Farinas-Sabogal, Lilliana** <LFarinas@beckerlawyers.com>
To: Mike Taraska <taraska@gmail.com>
Cc: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>,
"jomanning1940@gmail.com" <jomanning1940@gmail.com>, "Suarez, Ana" <ASuarez@beckerlawyers.com>

Good afternoon Mr. Taraska –

Unfortunately, your emails to me were caught in my spam filter for some reason, so I am only now receiving them.  No one is ignoring your emails.  If fact, it is my understanding that the Association already provided you a link to many of the documents you requested.

The By Laws of the Association indicate that the Association is subject to the Florida Condominium Act, which states that the official records of the association shall be made available to a unit owner within 45 miles of the condominium property or within the county in which the condominium property is located within 10 working days after receipt of a written request by the board or its designee.

As your request is dated November 15, 2024, the Association must make the requested official records available to you within 45 miles of the condominium property within 10 working days.  The 10th working day (which excludes Saturdays, Sundays and holidays – in this case, Thanksgiving and the Friday after Thanksgiving) is December 3, 2024.  As noted above, the Association has provided you directly with a number of the requested documents. Your request was very expansive.  While the Association official records are available for review at the Association management office during business hours, to make it more convenient, the Association is working to pull the requested documents for your review. It proposes to provide these to you December 16, 2024 at my offices, located at the address in my signature block below. Please advise what time you would like to review them.

As for your demands that your questions be answered, please note that neither the Association, its management nor I are obligated by the Association's Governing Documents or the Florida Condominium Act to respond to your questions in the manner and timeline you have demanded.  The Florida Condominium Act provides a vehicle for unit owners to have the Association respond to inquiries.  Once the procedure is complied with, the Association will surely timely respond accordingly.

[Quoted text hidden]

Lilliana and the Board,

[Quoted text hidden]


[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

Shareholder
Board Certified Attorney, Condominium and Planned Development Law



Becker & Poliakoff

2525 Ponce de Leon Blvd, Suite 825

Coral Gables, FL 33134

📞 305.351.1077

📠 305.442.2232

✉️ LFarinas@beckerlawyers.com

🌐 www.beckerlawyers.com

in Connect with me on LinkedIn



CONDOMINIUM
AND PLANNED
DEVELOPMENT LAW

Follow Becker on...



**Confidentiality Note**: This message, together with any attachments, may contain privileged and confidential information. If the reader of this message is not the intended recipient, you are hereby notified that any examination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us by reply e-mail and permanently delete the original message, along with any attachments. Thank you.

[Quoted text hidden]

[Quoted text hidden]

📎 IMG_3108.MOV

[Quoted text hidden]

EXHIBIT "25"

1/2/25, 7:28 AM                                     Gmail - Relationship of Contractor Edgar Ramirez

 Gmail                                                    Mike Taraska <taraska@gmail.com>

---

**Relationship of Contractor Edgar Ramirez**

**Mike Taraska** <taraska@gmail.com>                                         Fri, Nov 22, 2024 at 8:44 AM
To: "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>, "cc: Joe" <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska
<docgt1@charter.net>, Marlene <mtaraska@charter.net>, jomanning1940@gmail.com, jorgecb54@hotmail.com, DRAKE Mattia Prian <mattiaprian@yahoo.com>,
Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari <louise.adhikari@gmail.com>

To: David Raposo (Royal Group Management); Lilliana Farinas-Sabogal; The DRAKE Board;

   It's apartment you are ignoring my emails, demands for information and inquiries in violation of the Governing Documents.

Please answer a simple question:

   IS THERE **ANY** FAMILIAL OR BLOOD RELATIONSHIP BETWEEN EDGAR RAMIREZ WHO IS THE CONTRACTOR OR HIS BUSINESS THAT
SUPPOSEDLY PERFORMED $750K OF WORK THAT WAS NOT PAID FOR IN 2024 AND DAVID RAPOSO; "JAUN";  and/or MELISSA REPOSO AND
WHAT IS THAT RELATIONSHIP?

Please answer this simple question **by reply email, immediately.**

Thank you,

Mike Taraska, Unit #207

# EXHIBIT "26"

1/2/25, 7:28 AM          Gmail - Relationship of Contractor Edgar Ramirez

 Gmail                                Mike Taraska <taraska@gmail.com>

## Relationship of Contractor Edgar Ramirez

Mon, Dec 2, 2024 at 12:39 P

**Mike Taraska** <taraska@gmail.com>
To: "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>, "cc: Joe" <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>, jomanning1940@gmail.com, jorgecb54@hotmail.com, DRAKE Mattia Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari <louise.adhikari@gmail.com>
Bcc: hwhoover@hotmail.com, misobal@comcast.net

Lilianna,

Your refusal to provide me as a Homeowner/POA with the answer to this simple question is in violation of the DRAKE Governing Documents. How can you refuse to answer this question asked by a Homeowner wanting to know if there is a conflict of interest between the Contractor that allegedly is owed $750k of monies for work done, for the Homeowner's benefit and assessed (illegally) by the Board for the Homeowner to partially pay? Statutory Florida Law creates a presumption of conflict in this case.

PLEASE ANSWER THE QUESTION. Your failure to answer the question is a clear admission that an improper relationship exists as disclosed previously ad nauseam, which your firm is covering up.

I am hereby putting you on written notice that your firm has a CONFLICT OF INTEREST in representing the Board, Royal Management Company, David Raposo and Edgar Ramirez and his construction company collectively that is allegedly owed $750k from the DRAKE Association and the Board's and Royal Management Companies acts facilitating the wrongful attempts to legitimize the claims of monies allegedly owed to Mr. Ramirez' company which is a clear conflict of interest violative of the Florida law protecting against "insider" transactions between the Board, the Management Company and Service Providers of Condominium Associations.

If you don't immediately de-couple from the interests of Mr. Ramirez' and/or Royal Management which are at odds with the DRAKE Homeowners Association, I will be filing a Bar Complaint against you and your firm for the objectively demonstrated ethical violations.

See Florida Statutes: 718.3027; 718.3025;718.3026.

The Legislative Intent to regulate rogue and corrupt Boards and Management Companies Acts can be found in the Legislative Bill Summaries which includes the following:

### Community Association Managers

The bill requires community association managers (CAMs) and CAM firms to return all community association records in their possession within 20 business days of termination of a services agreement or a written request whichever occurs first, with license suspension and civil penalties for noncompliance, except that the time frames applicable to timeshare plans apply to the records of a timeshare plan.

**The bill provides conflict of interest disclosure requirements and a process for associations to follow when approving contracts with CAMs and CAM firms, or a relative, that may present a conflict of interest.** The requirements are similar to the conflicts of interest provisions for condominium associations and their officers and directors, including:

- Providing that, if the association receives and considers a bid to provide a good or service that exceeds $2,500, other than community association management services, from a CAM or CAM firm, <u>including directors, officers, persons with a financial interest in a CAM firm, or a relative of such persons, the association must also solicit multiple bids from other third-party providers of such good or service.</u>
- <u>Requiring that the proposed activity that may be a conflict of interest must be listed on, and all contracts and transactional documents related to the proposed activity must be attached to, the board's meeting agenda and entered into the meeting minutes.</u>
- <u>Requiring the board must approve the contracts with a potential conflict of interest, and all management contracts, by an affirmative vote of two-thirds of all directors present.</u>

### Milestone Inspections

Currently, single-family, two-family, and three-family dwellings are exempt from the milestone inspection requirements. The bill exempts four-family dwellings with three or fewer habitable stories above ground.

### Official Records – Condominiums

Regarding access to the official records of a condominium association, the bill:

- Provides that, if records are lost or destroyed, there is a good faith obligation to obtain and recover the records as is reasonably possible.
- **Allows e-mail addresses and facsimile numbers to be accessible to unit owners if consent to receive notice by electronic transmission has been provided.**
- Prohibits the sale or sharing of such personal information to third parties.
- Effective January 1, 2026, decreases from 150 units to 25 units the threshold requirement for an association to maintain specified records available on the association's website or on a mobile device.
- Requires official records to be provided to the unit owner at no charge if the Division of Condominium, Timeshares, and Mobile Homes (division) within the Department of Business and Professional Regulation (DBPR) subpoenas records an association has failed to timely provide in response to a unit owner's written request.
- Requires associations to maintain additional financial records (e.g., invoices and other documentation that substantiates any receipt or expenditure).
- Requires associations to respond to a records request with a checklist of all records provided.
- Authorizes the division to request access to an association's website to investigate complaints related to unit owner access to official records on such website.

### Criminal Violations – Condominiums

The bill provides the following criminal penalties related to condominium associations, and the official records of the association:

- **Second degree misdemeanor** for any director or member of the board or association to knowingly, willfully, and repeatedly violate (two or more violations within a 12-month period) any specified requirements relating to inspection and copying of official records of an association;
- **First degree misdemeanor** for knowingly and intentionally defacing or destroying required accounting records, or failing to create or maintain required accounting records, with the intent of causing harm to the association or

- **Third degree felony to willfully and knowingly refuse to release or produce association records, with the intent to avoid or escape detection, arrest, trial, or punishment for the commission of a crime, or to assist another person with such avoidance or escape;**
- **Third degree felony for an officer, director, or manager of a condominium association to knowingly solicit, offer to accept, or accept a kickback; and**
- **First degree misdemeanor for engaging in specified fraudulent voting activity, and knowingly aiding, abetting, or advising a person in the commission of a fraudulent voting activity related to association elections.**

**The bill provides that officers and directors charged with a criminal violation under ch. 718, F.S., are deemed removed from office and a vacancy declared.**

*Director Education – Condominiums*

The bill provides education requirements for the officers and directors of condominium associations to require:

- Newly elected or appointed directors to submit both the written certification that they have read the association's governing documents, will work to uphold the documents to the best of their ability and faithfully discharge their duties, and submit a certificate of completion of an approved condominium education course;
- Four hours of training which includes instruction on milestone inspections, SIRS, elections, recordkeeping, financial literacy and transparency, levying of fines, and meeting requirements;
- Directors to annually complete at least one hour of continuing education about recent changes to the condominium laws and rules during the past year; and
- Association directors, excluding directors for a timeshare condominium, to certify, on a form provided by the division, that all directors have completed the required written certification and educational certificate requirements.

The bill expands the division's post-turnover jurisdiction to include:

- Procedures and records related to financial issues, including annual financial reporting, assessments for common expenses, fines, and commingling funds;
- Elections, including election and voting requirements, and recall of board members;
- The maintenance of and unit owner access to association records;
- The procedural aspects of meetings, such as unit owner meetings, quorums, voting requirements, proxies, board of administration meetings, and budget meetings;
- Disclosure of conflicts of interest;
- Removal of a board director or officer under ch. 718, F.S.;
- The procedural completion of structural integrity reserve studies; and
- Any written inquiries by unit owners to the association.

In addition, the bill:

- **Requires that the division must refer to local law enforcement authorities any person it believes has engaged any criminal activity.**
- Provides that the division and the office of the condominium ombudsman may attend and observe any meeting of the board or any unit owner meeting, for the purpose of performing the duties of the division or the office of the ombudsman.

The division must submit findings by January 1, 2025, to the Governor, the President of the Senate, and the Speaker of the House of Representatives, of its review and recommendations of the website or application requirements for official records.

The above provisions took effect July 1, 2024.

*Vote: Senate 40-0; House 111-0*

These provisions will be incorporated in the to-be-filed Federal Lawsuit which I have previously disclosed to you.

YOU HAVE FAILED TO RESPOND TO MY DEMAND THAT THE BOOKS, RECORDS AND DOCUMENTS BE MADE AVAILABLE TO ME ON DECEMBER 3, 2024 WHICH YOU IN PREVIOUS CORRESPONDENCE IS REQUIRED,

**PLEASE RESPOND TO THIS EMAIL FORTHWITH.** I need to make appropriate plane reservations. I am still here in Medellin, Colombia awaiting your response and compliance with the State Laws and DRAKE Governing Documents.

Michael Taraska

[Quoted text hidden]

EXHIBIT "27"

1/2/25, 7:42 AM
Gmail - Fw: Drake Condo - records request

 **Gmail**

Mike Taraska <taraska@gmail.com>

**Fw: Drake Condo - records request**

Wed, Dec 4, 2024 at 1:57 PM

Joe <Joe@theroyalgroup.net>
To: Mike Taraska <taraska@gmail.com>
Cc: "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>

Mr. Taraska,

Please see the link below for the insurance policies you requested.

📄 **2018-2024 - Drake Condo.7z**

**Joe Cespedes**
**Property Manager**

Good morning,

We hope you are doing well!

Please refer to the following link for the 2018-2024 summaries and policies for **The Drake Condo.**

📄 **2018-2024 - Drake Condo.7z**

Do not hesitate to contact our office if you have any questions.

Thank you

Regards,



Luisa Contreras De León
GreatFlorida Insurance in Miami Shores, FL



**Get a Quote**



**Address** : 8730 NE 2 AVE, El Portal, FL. 33138
**Email** : nmb1@greatflorida.com
**Phone** : (305) 400-9088
**Web** : https://miamishores.greatflorida.com





_**Please note our Holiday Hours:**_
~~Wednesday, November 27th - Open 9am-2pm~~

1/2/25, 7:42 AM                           Gmail - Fw: Drake Condo - records request

**Office Closures:**
**Thursday and Friday, November 28-29th - Closed**
**Wednesday, December, 25th & January 1st - Closed**

*Ask us how we can assist you in saving $$$ on your Auto Insurance with Progressive Insurance.*

You cannot bind, alter or cancel coverage without speaking to an authorized representative of Raposo Insurance Group, A GreatFlorida Agency. Coverage cannot be assumed to be bound without confirmation from an authorized representative of Raposo Insurance Group, A GreatFlorida Agency.

WARNING! WIRE FRAUD ADVISORY

Wire fraud and email hacking/phishing attacks are on the rise. If you receive an email from our office containing Wire Transfer Instructions, call our office using previously known contact information and not information provided in the email, to verify the wire instructions prior to sending funds.

NOTICE: This e-mail is from Raposo Insurance Group, A GreatFlorida Agency and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you have received this e-mail in error, please notify the sender immediately at (305) 400-9088, delete the e-mail from your computer and do not copy or disclose it to any other person.

---

**From:** Melissa Raposo <melissa.raposo@greatflorida.com>
**Sent:** Wednesday, November 27, 2024 8:16 AM
**To:** GreatFlorida Insurance - Miami Shores <nmb1@greatflorida.com>
**Cc:** David Raposo <david@theroyalgroup.net>; Grether Garcia <Grether.Garcia@greatflorida.com>; Gloria Llerena <gloria.llerena@greatflorida.com>
**Subject:** Drake Condo - records request

Hi Luisa,

We need to send David copies of all insurance policies from 2017-2024.

Also please send a summary of insurance for each year. Let me know if you have any questions. Thank you.


Regards,

Melissa Raposo

GreatFlorida Insurance Agent | Owner in Miami Shores, FL

  

**Address** : 8730 NE 2 AVE, MIAMI, FL. 33138
**Email** : melissa.raposo@greatflorida.com
**Phone** : (305) 400-9088
**Web** : https://miamishores.greatflorida.com

# EXHIBIT "28"

1/2/25, 7:43 AM                                    Gmail - Fw: Drake Condo - records request

 Gmail                                                    Mike Taraska <taraska@gmail.com>

---

## Fw: Drake Condo - records request

Thu, Dec 5, 2024 at 7:17 AM

**Mike Taraska** <taraska@gmail.com>
To: Joe <Joe@theroyalgroup.net>, "Farinas-Sabogal, Lilliana" <lfarinas@beckerlawyers.com>, jomanning1940@gmail.com
Cc: Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>, jorgecb54@hotmail.com, DRAKE Mattia Prian <mattiaprian@yahoo.com>, Rabi
Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari <louise.adhikari@gmail.com>, "decocigar@gmail.com" <decocigar@gmail.com>
Bcc: misobal@comcast.net, hwhoover@hotmail.com

Joe Cepsides (ROYAL MANAGEMENT GROUP),

     Thank you for the requested Insurance Policies. As explained in my previous emails and letters dating back to my October 25th and 29th, 2024 dated and
emailed to the Board (Jo Manning - President) and Royal Management (to its owner David Raposo and you) as well as to the DRAKE'S Lawyers Becker &
Poliakoff (attorney Farinas-Sabogal) on October 31, 2024 **I HAVE ONLY BEEN PROVIDED WITH 1/4th (2 out of 8 categories) OF THE REQUESTED
DOCUMENTATION.**

     As explained in my email sent on November 26, 2024, the DRAKE Board, Royal Management Group and the lawyers Becker & Poliakoff are in violation of
the Florida Statutes by failing to provide me with all of the documentation requested.

     By way of example, Royal Management's owner David Raposo who presided over the October 29, 2024 $1.2 Million Illegal Board Special Assessment held
up the DECLARATION OF MAILING reflecting NOTICE for that meeting and said he had it right there when I asked for it. You will recall that I emailed you
thereafter, several portions of the tape-recording I made from the meeting. I asked you and David Raposo for that DECLARATION and you said you would get it
to me. In my letter dated October 31st, 2024 I wrote:

     "To be able to resolve the issues, it will require **COMPLETE TRANSPARENCY BY THE BOARD AND ABSOLUTE ACCESS
TO ALL DOCUMENTS REQUESTED.** I want to be able to assure the Homeowners with whom I have discussed this matter and
who likewise are now insisting on FULL TRANSPARENCY that all of the action taken by the Board can and will be explained and
supported without obstruction. This will necessarily include the following:

     1.  Providing me with the email address for all 32 Homeowners so that I can email them to ensure that all Homeowners
     receive Notice of the issues; NOT PROVIDED.

     2.  Providing me with the bid, the line-item summary of all work to-be and/or which was, performed comprising the $750k
     allegedly owed to the Contractor and all invoices submitted thereto [DECLARATION 9.b.(3); 9.(e)]; PROVIDED.

     3.  Providing me with full copies of all current Insurance Policies for the last three years, including the one budgeted for
     $150,000 (one-hundred fifty thousand dollars) as reflected in the NOTICE OF APPROVED BUDGET FOR 2024 authored
     by Joe Céspedes – LCAM (ROYAL) allegedly sent to "The members of the Drake Condominium Association" (undated but
     referring to "inform [all] that the Annual 2024 Budget Meeting took place on Thursday, January 25th". PROVIDED.

     4.  Providing me with timely access to all of the books and records of the ASSOCIATION for the last seven years which
     reflects the disbursement of the almost $2 Million in Assessments levied in 2017 – 2019 [Bylaws, Art. X4. at page BL-12];
     REFUSED TO COMPLY WITH THE STATUTORY TIME PERIODS.

     5.  Providing me with the names and contact information of the current Board Members of the DRAKE ASSOCIATION and
     any and all PROXIES held at any time by any of these three Board members for the past seven years to date; NOT
     PROVIDED.

     6.  Providing me with copies of all Fidelity Bonds "of all persons who control or disburse funds of the Association" –
     [DECLARATION at page DC-22, item j.; Bylaws, Art. X3. Page BL-12] covering the last seven years to date;
     NOT PROVIDED.

     7.   Providing me access to review and copy any and all minutes of meetings, roll calls, assessments and any other
     correspondence to/from the BOARD, Association and the Royal Management Group for the last seven years to date
     [Bylaws, Art. V4.A. page BL-5]; NOT PROVIDED - INCLUDING THE DECLARATION OF MAILING NOTICE.

     8.   Providing me with access to review and copy all Workers Compensation policies for the last seven years to date.[
     DECLARATION page DC-22, item i]. NOT PROVIDED."

     The Board, Royal Management Group and its lawyers Becker & Poliakoff are continuing to violate my contractual,
statutory and constitutional rights by obstructing, delaying and failing to provide me with the required and demanded
documents in violation of, but not limited to, the Florida Statutory citations in my email to all dated November 26, 2024
including the Board, Royal Management Group, Becker & Polaikoff and their principals facing criminal repercussions.

     PLEASE BE PUT ON NOTICE THAT the delay, failure to provide documentation and obstruction is a **continuation of**

**also create new actionable claims that will be added to my soon to-be-filed edited Federal Complaint.**

Given that the Board has decided per the SECOND NOTICE OF ANNUAL MEETING to "move up" the Budget Meeting and Annual Meeting by several months (the last one was held on January 25th, 2024) obviously as a result of my NOTICED CLAIMS in an effort by the Board to try to quickly "push through" otherwise non-beneficial to homeowners dictates, IT IS IMPERATIVE THAT I RECEIVE THE DECLARATION OF NOTICE OF MAILING which I requested during the October 29th, 2024 $1.2 Million Illegal Special Assessment Meeting **as well as the DECLARATION OF NOTICE OF THE FIRST AND NOW SECOND NOTICE OF ANNUAL MEETING OF THE DRAKE CONDOMINIUM ASSOCIATION, INC.** The "SECOND NOTICE" setting the Meeting for December 12, 2024 provides less than the required time to NOTICE the meeting. **I am demanding that I receive THE DECLARATION OF NOTICES FORTHWITH. Please email them to me immediately along with the DECLARATION OF NOTICE held up by David Raposo at the October 29th, 2024 meeting.** There is NO EXCUSE for you to not email those to me IMMEDIATELY.

I have reviewed the INSURANCE POLICY documentation (Item #3) as well as all of the LINE-ITEM DOCUMENTATION (Item #2) that was provided.

To make it clear, your attempts to act as though you are complying with the Statutory Requirements by providing two of the eight categories of items fails under the Statutes. I know what you're doing and this letter is confirming that so it will be before the Judge in writing when we get into the litigation. The LINE-ITEM documentation is essentially irrelevant to the **MAIN ISSUES** that all of the statutory requirements regarding NOTICE required and the procedures mandated to be taken thereto and in the Governing Documents to address services provided **have failed the mandates and in my opinion as set forth in the Complaint was willfully planned out.** The LINE-ITEMS and the flow of money owed therefrom may in fact become paramount in analyzing the criminal ramifications once I "follow the money" but for right now, the failures to follow the mandated procedures are the issues.

I am attaching my hand-written summary of the last two years of the Yearly Insurance Premiums under the policies provided to me yesterday by link access. I'm not understanding the totals of the cost of the coverage. maybe the files you sent me are incomplete. PLEASE EDUCATE ME, I'M PROBABLY MISSING SOMETHING. The NOTICE OF APPROVED BUDGET FOR 2024 which "took place on January 25th, 2024, in the building lobby area at 3 PM" which by Joe Cepsides stated in his email of March 19, 2024 reflects that "We have received feedback from some of you that you have not received the new budgeted payments for 2024 " and that as such "We have attached a copy of the unit's payment breakdown and a copy of the notice" reflects a cost of "2023 Annual Insurance - $40,000" and in "2024 Annual Insurance - $150,000". **PLEASE EXPLAIN TO ME HOW THE $150,000 AND THE $40,000 RECONCILES WITH THE INSURANCE POLICY PREMIUMS REFLECTED IN THE POLICIES YOU PROVIDED TO ME YESTERDAY AND SUMMARIZED IN MY HAND-WRITTEN NOTE REFLECTING $59,075 COVERING VARIOUS DATES STARTING AT 5/18/22 THROUGH 9/16/23 AND $34,490 COVERING DATES 6/14/24 THROUGH 6/14/25.** In addition, please explain how, as reflected in the just received SECOND NOTICE OF ANNUAL MEETING which includes "THE DRAKE CONDOMINIUM ASSOCIATION 2025 Proposed Budget with General Partial Reserves" which reflects "2025 ANNUAL Insurance - $150,000" is comprised.

PROVIDE ME WITH THE REMAINING ITEMS - #'s 1; 4; 5; 6; 7 and 8 so that I can properly participate at the December 12, 2024 Meeting.

I look forward to your anticipated cooperation and mutual consideration.

Michael Taraska, Unit #207

[Quoted text hidden]



DRAKE INSURANCE POLICY BREAKDOWN NOTES (1).jpg
64K

1/2/25, 7:44 AM                                                0 (504×640)

2024 - 2024

Assurant Flood — 753⁰⁰
Philadelphia — 450⁰⁰
Nationwide — 23,286.¹
Travelers — 2,141.
D+O
Kinsale Ins. — 6,159
34,490

Insurance  9/16/22 – 9/15/23    7,566
            5/15/22 – 5/15/23    333
            5/8/22 – 5/8/23      24,664
            5/2/22 – 5/2/23      20,627     (Burich)
            6/15/23 – 6/14/23    5615
            59,075

# EXHIBIT "29"

1/2/25, 7:45 AM                                          Gmail - Fw: Drake Condo - records request

 Gmail                                                          Mike Taraska <taraska@gmail.com>

**Fw: Drake Condo - records request**

**Steven Hurry** <steveshurry@gmail.com>                                          Sat, Dec 7, 2024 at 8:39 AM
To: Mike Taraska <taraska@gmail.com>

Hi Mike,

You are correct; the numbers do not add up. All the insurance companies are legit. If you want to find out if those policies were actually issued, you should
contact the Insurance company directly and track down using the policy number and find out the following: Type of policy issued, coverages, premium, and who
is the broker or agent.  I have had clients bring me in papers from their agent and they turned out to be completely bullshit. You can do a lot with a computer
these days.

The $110,000 difference is alarming and should be called into audit.  She is an independent agent and with a decent reputation on the web.

You may want to track down the actual replacement cost of the building.  It is only insured for 2.2 million.  It seems like it would cost more than that to replace
the entire structure.
Did the HOA get a competitive bid?

I do not see a workers compensation policy. Unless they do not have employees. If it is managed by a property management company. I would find out about
that relationship and expenses.

You are right, the bottom line there is $110,000 unaccounted as an insurance expense  according to what you showed me. It's time to call for an audit.

The commission earned on the $42,000 premium is about $4,000 - $4,500.

I hope this helps,

Let me know if you need anything else.

Steve

[Quoted text hidden]

--
Steve Hurry
Steveshurry@gmail.com
310-497-7254
**Linked** in

EXHIBIT "30"

M Gmail                                                                    Mike Taraska <taraska@gmail.com>

Fwd: Proxy for Board Vote
message

Louise Adhikari <louise.adhikari@gmail.com>                              Tue, Dec 10, 2024 at 5:15 PM
To: Mike Taraska <taraska@gmail.com>

FYI

Louise Adhikari
Cell: +1 312 898 1973
Email: louise.adhikari@gmail.com

Begin forwarded message:

> **From:** Louise Adhikari <louise.adhikari@gmail.com>
> **Date:** December 10, 2024 at 19:14:48 CST
> **To:** Joe <Joe@theroyalgroup.net>, Jo & Nick Manning <jomanning1940@gmail.com>
> **Cc:** David Raposo <david@theroyalgroup.net>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari <theadhikaris@gmail.com>, Louise
> Adhikari <Louise.Adhikari@vantagegrp.com>
> **Subject: Proxy for Board Vote**

Please see below copy of the proxy for our votes at Thursday's Board meeting. Our proxy is given to Mike Taraska.

We still wish to attend the meeting and await your confirmation on details of either board members to request the same or a call in number.

Note that I'm also forwarding this email to my work email address to ensure that it is sent and not lost in the ether as other requests have been -
and copying the only email address that I have for a Board member to ensure receipt.

<image0.jpeg>

Louise Adhikari
Cell: +1 312 898 1973
Email: louise.adhikari@gmail.com

On Dec 9, 2024, at 19:57, Louise Adhikari <louise.adhikari@gmail.com> wrote:

Joe —

Please can you share contact details for all Board members of the condo association. It is unfair that non-
resident owners are penalized for their inability to attend and that there is no option to participate virtually. I
would like to submit a formal request to the board members to make the meeting accessible to all owners,
regardless of location. I believe there are other owners making the same request.

In addition, I would also ask you to provide the same information that Bill Younkin has requested from you
in regard to the repairs. There has been a total lack of transparency around how this significant sum of
money has been spent - and I support Mr Younkin's request for the pertinent information to provide
transparency and comfort for all of us.

Per Mr Younkin's email:

1. What is the correct breakdown of the 1.2 M figure provided on the assessment notice?
   a. I understand from attendees at the meeting that 75K is payable to the contractor for work
      previously done. I request the true amounts for each of the line items on that notice including
      this debit line item.
   b. How were these amounts determined (bids, engineers estimate, royal estimate, etc.).
   c. What is the current schedule of work for each of these items (beginning and ending dates at
      least).
2. What is the total amount and breakdown of the monies received and spent so far on this restoration
   project, including the first special assessment?
   a. By breakdown I mean at least as much detail as is listed on the recent assessment notice. I am
      not requesting individual invoices at this time, just a detailed summary.

I read in today's Herald that "While large budgets are best, 'balance is 100% ... 50% of <u>owner approval</u> for any project over $50,000 or 'exceeding 115% of assessments for the preceding calendar year," according to state statute."

    a. When was the approval vote for the initial assessment and how am I recorded as having voted?
    b. I am only aware of a board vote on the recent 1.2M assessment. How is this legal under the
       current condominium law?

As Mr Younkin has offered, I am also happy to place our special assessment in an escrow account to be released when I satisfactory answers to these questions have been shared with all owners.

I appreciate your speedy response ahead of the Board Meeting.

Sent from my iPad

    On Dec 5, 2024, at 4:01 PM, Joe <joe@theroyalgroup.net> wrote:


    Hello Louise and Rabi,

    I don't know why you didn't get the notice, as it was mailed to the address we have on file. I
    checked our records and confirmed that the mailing address we have matches the one you
    provided to replace your Cortez address. Please note that the meeting will be held in the
    building lobby as requested by the Board, and there is no Zoom setup. If you wish to attend
    remotely, you may want to arrange a Zoom call with someone who will be present at the
    meeting.

    Additionally, please know that we do not use previous proxies; each year, a new proxy is
    required specifically for that meeting if needed.
    If there's anything else you need, please let me know.

    Best regards,

    BCC: The Board.


---

**From:** Louise Adhikari <louise.adhikari@gmail.com>
**Sent:** Wednesday, December 4, 2024 3:59 PM
**To:** David Raposo; Joe
**Cc:** Rabi Adhikari; Louise Adhikari
**Subject:** Drake 2025 Budget Meeting

David/Joe,

Mike Taraska shared the attached notice with me today -- and yet again, we do not appear to
have received a copy of the original. Please confirm where it was sent. I provided updated
mailing information a month back and you have email addresses, so there should be no
excuses as to why I have not received an original copy.

I want to attend the Board meeting but will be in Chicago so please provide an option to join
virtually in a manner that we will be able to hear the voices of all presenters and participants.
It's 2024 -- you should not disadvantage non-resident owners from participating by hosting a
meeting in the lobby area.

Please also note that as mentioned in an earlier email -- if there is a voting proxy associated to
our apartment, I wish to revoke whatever you have on file and vote directly. Please confirm that
this has taken place and that you can expect our vote via email.

Louise & Rabi Adhikari

# EXHIBIT "31"

# MIKE TARASKA  J.D., LLM

**1460 Ocean Drive, Ste. #207   Miami Beach, FL 33139**

Ph. (602) 400-5885     taraska@gmail.com

December 12, 2024

## SENT BY EMAIL ONLY

### Re: 12/12/24 BOARD MEETING ELECTION PROXIES PRESENTED

TO: Att: Joe Cepsides
joe@theroyalgroup.net
cc: David Raposo
david@theroyalgroup.net
Joe Manning
Jomanning1940@gmail.com

TO THE BOARD and ROYAL MANAGEMENT GROUP:

In accordance with the provision of the "VOTING BY LIMITED PROXY/MEETING BALLOT" attached to the provided SECOND NOTICE OF ANNUAL MEETING OF THE DRAKE CONDOMINIUM ASSOCIATION, INC. the attached PROXIES given to Gregory Taraska, Unit #207 are hereby being "submitted to the association **prior to the scheduled time [3:00 PM] of the meeting** . . . via email to: Joe@theroyalgroup.net".

As a precaution and to ensure proper NOTICE, the PROXIES are also being hand-delivered to the BOARD and ROYAL MANAGEMENT GROUP at, and just prior to, commencement of the Meeting.

As acknowledged in the POWER OF ATTORNEY from Gregory and Marlene Taraska, Unit #207 to Michael (Mike) Taraska, I am hereby carrying out the authority conferred in the **eight** PROXIES provide to them by GREGORY TARASKA to:

1. Have Gregory Taraska elected to the BOARD at the December 12, 2024 BOARD ELECTION MEETING by this PROXY VOTE of the **eight** PROXIES held by Gregory Taraska.

1

2. Hereby VOTE at the immediately following ORGANIZATIONAL MEETING OF THE BOARD OF DIRECTORS to elect GREGORY TARASKA himself by PROXYVOTE as the President of the BOARD of the DRAKE Homeowners Association.

3. Hereby VOTE to **reject the 2025 Proposed Budget with General Partial Reserves** and convene at a later date and time to address a revised budget.

4. Hereby VOTE to convene at a later date and time to be determined by the BOARD in the future to **address any and all other matters.**

Submitted by Michael Taraska
Power of Attorney Holder
Unit #207

cc by email:

Gregory Taraska (#207)
Louise and Rabi Adhikari (#407)
Mattia Prian (#307)
Jorge Ceballos (#203 & #205)
Bart Hoover (#311 & #210)
Steven and Cecile Katz (#402)
Julian Payoues (#308)
Giuseppe Bevilaqua (#304)
Mel and Lalaine Isobal (#202)

also:

DRAKE Ltr PROXY SUBMITTAL 12 12 24

2

**LIMITED PROXY/MEETING BALLOT**

The undersigned owner(s) or voting member of Unit No. 203 and 205 ____ in **THE DRAKE, A CONDOMINUM**, appoints (Check one):

_____ a) **Josephine Manning, President** of the Association, on behalf of the Board of Directors, or

___✓___ b) _Gregory Tavares_____ (if you check b, write in the name of your proxy) as my proxyholder*, with power of substitution, to attend the meeting of the members of **The Drake Condominium Association, Inc.** to be held **Thursday, December 12, 2024 at 3:00 PM**, in **The Building Lobby (1460 Ocean Drive, Miami Beach, FL 33139)**, and any adjournment/recess thereof. In the event I attend the meeting in person, this will act as my meeting ballot. The proxyholder named above has the authority to vote and act for me to the same extent that I would if personally present, with power of substitution, except that my proxyholder's authority is limited as indicated below:

GENERAL POWERS: By signing this proxy, your proxyholder automatically has general powers to vote on other issues that might come up at the meeting for which a limited proxy is not required. You can choose not to grant such general powers by checking the box _____ I do not grant general powers to my proxyholder.

LIMITED POWERS:  (FOR YOUR VOTE TO BE COUNTED ON THE FOLLOWING ISSUES, YOU MUST INDICATE YOUR PREFERENCE IN THE BLANK(S) PROVIDED BELOW). I SPECIFICALLY AUTHORIZE AND INSTRUCT MY PROXYHOLDER TO CAST MY VOTE IN REFERENCE TO THE FOLLOWING MATTERS AS INDICATED BELOW:

1.  Under Chapter 718, Fla Statutes, condominium associations must start funding mandatory Structural Integrity Reserves ("SIRS"). This consists of components such as roof, fireproofing and fire protection systems, plumbing, electrical systems, etc. As of the date of this mailing, the SIRS report for the condominium has not yet been completed.  However, the Association is proposing a waiver of SIRS funding for fiscal year 2025, so that this cost can be postponed to 2026.  *If you wish to approve this and avoid the SIRS increase in 2025, once the SIRS report is complete, please vote "YES" on the following  issue:*

    **Vote to Waive funding of Structural Integrity Reserves for 2025 as shown on the supporting materials?**

    ☑ YES, Waive any SIRS funding in 2025

    **WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

2   Vote to partially fund Non-Structural Integrity reserves as shown on the supporting materials.

    ☑ Yes, partially fund            ☐ No, fully fund non-structural integrity reserves

    **WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

Date: _12 - 10 - 24_____.

SIGNATURE(S) OF OWNER(S) OR VOTING MEMBER:

Signature:___*[signature]*_____ Print Name: _Jorge Ceballos_____

Signature:_____ Print Name:_____



**LIMITED PROXY/MEETING BALLOT**

The undersigned owner(s) or voting member of Unit No. **407** in THE DRAKE, A CONDOMINIUM, appoints (Check one):

___ a) Josephine Manning, President of the Association, on behalf of the Board of Directors, or

X b) **GREGORY TARABKA** (if you check it, write in the name of your proxy) as my proxyholder*, with power of substitution, to attend the meeting of the members of The Drake Condominium Association, Inc. to be held Thursday, December 12, 2024 at 5:00 PM, in The Building Lobby (1460 Ocean Drive, Miami Beach, FL 33139), and any adjournment/recess thereof. In the event I attend the meeting in person, this will act as my meeting ballot. The proxyholder named above has the authority to vote and act for me to the same extent that I would if personally present, with power of substitution, except that my proxyholder's authority is limited as indicated below:

**GENERAL POWERS:** By signing this proxy, your proxyholder automatically has general powers to vote on other issues that might come up at the meeting for which a limited proxy is not required. You can choose not to grant such general powers by checking the box _____ I do not grant general powers to my proxyholder.

**LIMITED POWERS:** (FOR YOUR VOTE TO BE COUNTED ON THE FOLLOWING ISSUES, YOU MUST INDICATE YOUR PREFERENCE IN THE BLANKS PROVIDED BELOW). I SPECIFICALLY AUTHORIZE AND INSTRUCT MY PROXYHOLDER TO CAST MY VOTE IN REFERENCE TO THE FOLLOWING MATTERS AS INDICATED BELOW:

1.  Under Chapter 718, Fla Statutes, condominium associations must start funding mandatory Structural Integrity Reserves ("SIRS"). This consists of components such as roof, fireproofing and fire protection systems, plumbing, electrical systems, etc. As at the date of this mailing, the SIRS report for the condominium has not yet been completed. However, the Association is proposing a waiver of SIRS funding for fiscal year 2025, so that this task can be postponed to 2026. If you wish to approve this and avoid the SIRS increase in 2025, once the SIRS report is complete, please vote "YES" on the following items:

Vote to Waive funding of Structural Integrity Reserves for 2025 as shown on the supporting materials?

[X] YES, Waive any SIRS funding in 2025

**WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

2.  Vote to partially fund Non-Structural Integrity reserves as shown on the supporting materials.

[X] Yes, partially fund          [ ] No, fully fund non-Structural integrity reserves

**WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

Date: 12/11/2024

SIGNATURE(S) OF OWNER(S) OR VOTING MEMBER:

Signature: _____  Print Name: LOUISE ADHIKARI

Signature: _____  Print Name: RAM ADHIKARI





LIMITED PROXY/MEETING BALLOT

The undersigned owner(s) or voting member of Unit No. **304** in THE DRAKE, A CONDOMINIUM, appoints (check one):

[ ] Josephine Manning, President of the Association, or holder of the Board of Directors, or

[✓] by **Gregory Vukasin**. If you check this box, you may give your proxyholder the right to exercise your power of substitution, to attend the meeting of the members of The Drake Condominium Association, Inc. to be held Thursday, December 12, 2024 at 3:00 P.M., in The Building lobby (1460 Ocean Drive, Miami Beach, FL 33139) and any adjournment(s) thereof. In the event a listed proxyholder cannot attend ... the substitute is my chosen party. The proxyholder named above has the authority to vote and act for me as the owner unless I would otherwise be present, with the power of substitution, except that my proxyholder may not be authorized as indicated below.

GENERAL POWERS: By signing this proxy, you may authorize your proxyholder to vote on general issues that might come up at the meeting, for which a limited proxy is not required. You may choose not to grant such general powers by checking the box _____. I do not grant general powers to my proxyholder.

LIMITED POWERS: (FOR YOUR VOTE TO BE COUNTED ON THE FOLLOWING ISSUES, YOU MUST INDICATE YOUR PREFERENCE IN THE SPACE(S) PROVIDED BELOW). I SPECIFICALLY AUTHORIZE AND INSTRUCT MY PROXYHOLDER TO CAST MY VOTE IN REFERENCE TO THE FOLLOWING MATTERS AS INDICATED BELOW:

1. Under Chapter 718, FS Statute, condominium associations must fund a Structural Integrity Reserve Reserves ("SIRS"). This consists of components such as roof, load-bearing and floor/slabs of system structural, electrical, exterior, etc. As of the date of this meeting, the SIRS report for the components has not been completed. However, the Association is proposing to waive such funding for the year 2025 until the SIRS can be performed in 2026. If any such reserves fail and members vote increases in 2025 ... the effects are in payments, in accordance with state statute 718.1.

**Vote to Waive funding of Structural Integrity Reserves for 2025 as shown on the supporting materials?**

[✓] YES, Waive any SIRS funding in 2025.

**WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

2. Vote to actually fund Non-Structural Integrity reserves as shown on the supporting materials.

[✓] Yes - partially fund. [ ] No, Do not fund - most critical reserve in partial.

**WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

Date: **12/9/2024**

SIGNATURE(S) OF OWNER(S) OR VOTING MEMBER:

Signature: _____ Print Name: **Giuseppe Bevilacqua**

Signature: _____ Print Name: _____

**LIMITED PROXY/MEETING BALLOT**

The undersigned owner(s) or voting member of Unit No. 207 in **THE DRAKE, A CONDOMINUM,** appoints (Check one):

_____ a) **Josephine Manning, President** of the Association, on behalf of the Board of Directors, or

__X__ b) Gregory Taroskn (if you check b, write in the name of your proxy) as my proxyholder*, with power of substitution, to attend the meeting of the members of **The Drake Condominium Association, Inc.** to be held **Thursday, December 12, 2024** at **3:00 PM,** in **The Building Lobby (1460 Ocean Drive, Miami Beach, FL 33139),** and any adjournment/recess thereof. In the event I attend the meeting in person, this will act as my meeting ballot. The proxyholder named above has the authority to vote and act for me to the same extent that I would if personally present, with power of substitution, except that my proxyholder's authority is limited as indicated below:

GENERAL POWERS: By signing this proxy, your proxyholder automatically has general powers to vote on other issues that might come up at the meeting for which a limited proxy is not required. You can choose not to grant such general powers by checking the box _____ I do not grant general powers to my proxyholder.

LIMITED POWERS:  (FOR YOUR VOTE TO BE COUNTED ON THE FOLLOWING ISSUES, YOU MUST INDICATE YOUR PREFERENCE IN THE BLANK(S) PROVIDED BELOW). I SPECIFICALLY AUTHORIZE AND INSTRUCT MY PROXYHOLDER TO CAST MY VOTE IN REFERENCE TO THE FOLLOWING MATTERS AS INDICATED BELOW:

1.  Under Chapter 718, Fla Statutes, condominium associations must start funding mandatory Structural Integrity Reserves ("SIRS"). This consists of components such as roof, fireproofing and fire protection systems, plumbing, electrical systems, etc. As of the date of this mailing, the SIRS report for the condominium has not yet been completed.  However, the Association is proposing a waiver of SIRS funding for fiscal year 2025, so that this cost can be postponed to 2026.  *If you wish to approve this and avoid the SIRS increase in 2025, once the SIRS report is complete, please vote "YES" on the following  issue:*

    **Vote to Waive funding of Structural Integrity Reserves for 2025 as shown on the supporting materials?**

    ☒ YES, Waive any SIRS funding in 2025

    **WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

2.  Vote to partially fund Non-Structural Integrity reserves as shown on the supporting materials.

    ☒ Yes, partially fund                    ☐ No, fully fund non-structural integrity reserves

    **WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.** I, Gregory Taroska, use all of my proxies obtained from other homeowners to cast votes to elect me as a board member at the election as

Date: 12/12/2024

SIGNATURE(S) OF OWNER(S) OR VOTING MEMBER: board member's meeting taking place on

Signature: Gregory Taroska   Print Name: Gregory Taroska      Dec. 12, 2024.

Signature: _____   Print Name: _____



Mike Taraska <taraska@gmail.com>

## SUBMITTED PROXIES FOR GREGORY TARASKA

**Mike Taraska** <taraska@gmail.com>                                         Thu, Dec 12, 2024 at 11:45 AM
To: David Raposo <david@theroyalgroup.net>, jomanning1940@gmail.com, Joe <Joe@theroyalgroup.net>


Please see attached letter dated 12/12/24 and the Executed Eight Proxies.

Michael Taraska, Power of Attorney for Gregory Taraska


📄  DRAKE EXECUTED PROXY PACKET 12 10 24.pdf

📄  **DRAKE Ltr PROXY SUBMITTAL 12 12 24 S.pdf**
    2754K

# EXHIBIT "32"

1/2/25, 7:41 AM                                        Gmail - LOSS RUNS FOR INSURANCE FOR YEARS 2019 - 2024

 **Gmail**                                                                Mike Taraska <taraska@gmail.com>

## LOSS RUNS FOR INSURANCE FOR YEARS 2019 - 2024

Mike Taraska <taraska@gmail.com>                                                          Thu, Dec 19, 2024 at 3:32 PM
To: jomanning1940@gmail.com, David Raposo <david@theroyalgroup.net>, Joe <Joe@theroyalgroup.net>, "Farinas-Sabogal, Lilliana"
<lfarinas@beckerlawyers.com>
Cc: "cc: Greg Taraska" <docg11@charter.net>, Marlene <mtaraska@charter.net>, Jorge Ceballos <jorgecb54@hotmail.com>, DRAKE Mattia Prian
<mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari <louise.adhikari@gmail.com>, "decoclgar@gmail.com"
<decoclgar@gmail.com>, jpajoues@gmail.com, cecilegiraud@hotmail.com, Steve Katz <stevenkatz80@hotmail.com>, younkin@bellsouth.net,
hwhoover@hotmail.com, mlsobal@comcast.net, "franz18miami@yahoo.com" <franz18miami@yahoo.com>

To the BOARD,

    Please provide me with the Insurance LOSS RUNS for the calendar years 2019 - 2024. I am in the process of seeking competitive bids to the one-hundred
fifty-thousand dollar ($150,000) cost of the 2025 policies apparently approved as reflected in the 2025 proposed budget to be purchased from David Raposo's
wife. In addition, I have a few questions:

    1. Why is the proposed cost of the 2025 Insurance $150,000 when the 2024 cost of the $150,000 proposed and Homeowner funded 2024 Insurance
resulted in only a cost of approximately $29,000?

    2. If as David Raposo represented at the Election of Board Members Meeting that took place on December 12, 2024 that "$70,000 of the excess cost [of
$29,000] for 2024 Insurance is still in the HOA account" why are the Homeowners getting another increase of Monthly HOA Fees of 17% (without a required
Homeowner Vote) and why aren't we using the $70,000 instead of an increase in the monthly 2025 HOA Fees as was apparently passed after the election of
Officers and Board action at the December 12, 2024 Meeting?

    3. Where is the remaining $51,000 ($150k assessed for Insurance for 2024 minus the $29,000 cost of the polices minus the $70,000 still in the Homeowners
Association Account) and what unexpected expenditures as represented by David Raposo at the December 12, 2024 Meeting were paid with our excess funds
after Insurance Costs (none of which have been disclosed to the Homeowners)?

    4. Lastly, how much did Raposo Insurance (and/or Melissa Raposo - David Raposo's wife) charge to sell the $150,000 Insurance policy to the DRAKE?

    I look forward to your unanticipated cooperation and unanticipated mutual consideration in this matter based upon your failures addressing all of my past
legal and required requests. PLEASE RESPOND TO ME FORTHWITH BY EMAIL. A number of the Homeowners copied on this email also have shown
interest in having these questions answered expeditiously. The BOARD  should be able to answer these questions easily.

    Thank you,

    Mike Taraska, Unit #207


#207

# EXHIBIT "33"

1/4/25, 1:33 PM                                    Gmail - DOCUMENTS REPRESENTED AT THE DECEMBER 12TH MEETING THAT WOULD BE PRODUCED

 Gmail                                                                           Mike Taraska <taraska@gmail.com>

## DOCUMENTS REPRESENTED AT THE DECEMBER 12TH MEETING THAT WOULD BE PRODUCED

Mike Taraska <taraska@gmail.com>                                                              Thu, Dec 19, 2024 at 4:53 AM
To: jonmanning1940@gmail.com, David Raposo <david@theroyalgroup.net>, Joe <Joe@theroyalgroup.net>, "Farinas-Sabogal, Lilliana"
<lfarinas@beckerlawyers.com>
Cc: Greg Taraska <dcogt1@charter.net>, Marlene <mtaraska@charter.net>, Jorge Ceballos <jorgecb54@hotmail.com>, DRAKE Mattia Prian
<mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari <louise.adhikari@gmail.com>, "decodgar@gmail.com"
<decodgar@gmail.com>, jpajoues@gmail.com, cecilegiraud@hotmail.com, Steve Katz <stevenkatz80@hotmail.com>, younkin@bellsouth.net,
hwhoover@hotmail.com, mlsobal@comcast.net

TO THE BOARD, ROYAL MANAGEMENT GROUP and  BECKER & POLIAKOFF

    **YOU HAVE FAILED TO PRODUCE DOCUMENTS AS AGREED AND REQUIRED BY LAW.**

    I am not attaching the five pages of handwritten notes that I took during the meeting but which reflect the following:

    At the December 12, 2024 Meeting, three Homeowners asked questions of the BOARD and ROYAL MANAGEMENT GROUP regarding the production of
DOCUMENTS I HAVE BEEN REQUESTING IN WRITING FOR OVER A MONTH AND A HALF NOW.  As you may recall from the meeting last Wednesday,
David Raposo stated that he/they "would get me the two AFFIDAVITS OF MAILINGS for both the October 29th, 2024 Special Assessment Meeting and the
December 12, 2024 BOARD ELECTION MEETING". In addition, he promised to provide me with ALL Minutes of past Meetings and Actions by the Board or
Homeowners during formal meetings or actions as is required to be kept by the Secretary of the Board (whomever that would be and assuming that was
ever complied with). The above are the two categories of documents out of the remaining six out of eight that I have been trying to obtain with my letter
demands over the last 45 days which are required by law to be provided to me.

    David Raposo stated he would provide me with those documents "within 4 days" which I then thanked him for offering. Thereafter some consultation took
place between David Raposo and the BECKER Law Firm, at which time both attorney Lilliana Farinas and David Raposo stated they would have the
Documents requested to me by email "within one week". It has nowbeen **eight days** since the December 12, 2024 Meeting and **I have not received any
Documents and have not heard from either the BOARD, ROYAL MANAGEMENT GROUP or their Lawyers Becker & Poliakoff.**

    ARE YOU BREACHING YOUR AGREEMENT MADE BEFORE ALL ATTENDEES AT THE DECEMBER 12, 2024 MEETING? ARE THOSE AGREEMNETS
CONTAINED IN THE OFFICIAL MINUTES REQUIRED BY LAW TO BE KEPT BY THE SECRETARY?

    **PLEASE PRODUCE THE DOCUMENTS TO ME BY EMAIL FORTHWITH OR EXPLAIN BY EMAIL TODAY WHY YOU HAVEN'T FULFILLED YOUR
REPRESENTATIONS AND COMMITMENTS?**

    As you can see, I am copying numerou Homeowners who either appeared in person or on the telephone that witnessed your agreement to produce the
Documents as well as Homeowners who attend and voted by PROXY.

    Mike Taraska, Unit #207

# EXHIBIT "34"

1/2/25, 7:47 AM
Gmail - DRAKE - Annual Meeting Notice unit 308

 Gmail

Mike Taraska <taraska@gmail.com>

**DRAKE - Annual Meeting Notice unit 308**

Joe <Joe@theroyalgroup.net>
Fri, Dec 20, 2024 at 1:11 PM
To: Mike Taraska <taraska@gmail.com>
Cc: Julien Pajoues <jpajoues@gmail.com>, Jo Manning <jom19401962@gmail.com>, Meyer Frucher <sandy@frucher.com>, David Raposo
<david@theroyalgroup.net>, "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>, Marlene <mtaraska@charter.net>, Jorge Ceballos
<jorgecb54@hotmail.com>, DRAKE Mattia Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari
<louise.adhikari@gmail.com>, "decocigar@gmail.com" <decocigar@gmail.com>, Steve Katz <stevenkatz30@hotmail.com>, "younkin@bellsouth.net"
<younkin@bellsouth.net>, "hwhoover@hotmail.com" <hwhoover@hotmail.com>, "misobal@comcast.net" <misobal@comcast.net>, "franz18miami@yahoo.com"
<franz18miami@yahoo.com>, "cecilegiraud@hotmail.com" <cecilegiraud@hotmail.com>, Greg Taraska <docgt1@charter.net>

There may be a slight delay in providing the requested documents because you are asking for them during the busy season of annual and
budget meetings for all the building associations. However, all requested documents will be provided, and everything has been complied
with.

From: Mike Taraska <taraska@gmail.com>
Sent: Friday, December 20, 2024 9:08:14 AM
To: Joe
Cc: Julien Pajoues; Jo Manning; Meyer Frucher; David Raposo; Farinas-Sabogal, Lilliana; Marlene; Jorge Ceballos; DRAKE Mattia Prian; Rabi Adhikari; Louise
Adhikari; decocigar@gmail.com; Steve Katz; younkin@bellsouth.net; hwhoover@hotmail.com; misobal@comcast.net;
franz18miami@yahoo.com; cecilegiraud@hotmail.com; Greg Taraska
Subject: Re: DRAKE - Annual Meeting Notice unit 308

[Quoted text hidden]

---

2 attachments

📄 SWAYSLAND - A.pdf
55K

📄 SWAYSLAND - B.pdf
53K



# SWAYSLAND
**PROFESSIONAL ENGINEERING CONSULTANTS**

September 25, 2017

Mr. Darryl Brown, Project Manager
The Drake Condominium Association, Inc.
1460 Ocean Drive
Miami Beach, FL 33139

Re:  Concrete and Stucco Repair Project

Dear Board Members:

At your request, we have reviewed the seven (7) proposals submitted to The Drake Condominium Association for the concrete and stucco repair project as set forth in the Concrete and Stucco Repair Specifications prepared by us.  American Construction & Engineering Co. (American), Beach Contracting (Beach), Bengoa Construction, Inc. (Bengoa), Core Restoration, LLC (Core), Florida's Choice Contracting (FL's Choice) C.A. Lindman of South Florida, LLC (Lindman) and Restore Construction Group, Inc. (Restore) submitted proposals.

The proposed bid prices for the concrete and stucco repair project varied from a low of $2,892,696.59 to a high of $3,751,033.88.  The bid prices are summarized in the attached spreadsheet.  The prices are different than shown in the Contractor's bid forms because we corrected any errors we saw in the bid form.  The proposed bid prices and project durations are summarized as follows:

| Contractor | Proposed Cost | Project Duration |
|---|---|---|
| Restore | $2,892,696.59 | 52 Calendar Weeks |
| Lindman | $2,909,088.69 | 82 Calendar Weeks |
| FL's Choice | $2,971,654.66 | 44 Calendar Weeks |
| American | $2,980,287.81 | 78 Calendar Weeks |
| Core | $2,990,573.56 | 32 Calendar Weeks |
| Bengoa | $3,283,595.84 | 80 Calendar Weeks |
| Beach | $3,751,033.88 | 44 Calendar Weeks |

Restore has the lowest proposed cost of $2,892,696.59.  Lindman submitted the next lowest bid which is about 1% higher than the bid from Restore.  The five (5) lowest bids are within 3.5% of one another.  The project durations varied more widely.  We recommend that you interview Restore, FL's Choice and Core and award the contract to the one you feel is the best contractor for your project.  You may also want to interview Lindman and American provided they reduce the project duration.  During the interviews you may want to negotiate the proposed prices and project durations.

You should check the references and financial status of all contractors under consideration.  You should also determine whether or not you will require payment and

The Drake Condominium Association, Inc.
Concrete and Stucco Repair Project
September 25, 2017

performance bonds.  We always recommend that our clients purchase bonds for this size project.

During the interviews, you should discuss the concrete repair, painting and waterproofing materials and methods, any proposed substitutions or changes to the specification, any bid qualifications, starting date, schedule of completion, type of contract required, who will prepare the contract, restitution for any damage, contractor's warranty, material manufacturer's warranty, insurance, performance and payment bonds, contractor's financial status, current work load, and any other aspect of the work that you feel is important.  You should make your expectations clear to the contractors at this time.

If you have any questions or need additional information, please do not hesitate to contact us.

Sincerely,

SWAYSLAND PROFESSIONAL ENGINEERING CONSULTANTS, INC.

By: _Stanley R. Swaysland_

Stanley R. Swaysland, P.E.
Florida Registration No. 29241
Special/Threshold Inspector No. 1055

The page contains a rotated financial spreadsheet table that is too small and low-resolution to read reliably.

 **Gmail**                                              Mike Taraska <taraska@gmail.com>

---

**DRAKE - Annual Meeting Notice unit 308**

---

Joe <loe@theroyalgroup.net>                                                    Thu, Dec 19, 2024 at 3:02 PM
To: Mike Taraska <taraska@gmail.com>
Cc: Julien Pajoues <jpejoues@gmail.com>, Jo Manning <jom19401962@gmail.com>, Meyer Frucher <sandy@frucher.com>, David Raposo
<david@theroyalgroup.net>, "Farinas-Sabogal, Lilliana" <L.Farinas@beckerlawyers.com>

Mr. Taraska,

David asked me to send you a copy of the estimates for the early 1.2 million assessment.  Please confirm that you received my email.

Thanks,

Joe Cespedes

Property Manager

---

2 attachments

📄 **17088 - Drake Condo - Bid Analysis - A.pdf**
55K

📄 **17088 - Drake Condo. - Bid Analysis 9-19-17 (1) - B.pdf**
53K

EXHIBIT "35"

 **Gmail**

Mike Taraska <taraska@gmail.com>

---

### DRAKE - Annual Meeting Notice unit 308

---

**Mike Taraska <taraska@gmail.com>**                                                    Fri, Dec 20, 2024 at 6:08 AM
To: Joe <Joe@theroyalgroup.net>
Cc: Julien Paques <jpajoues@gmail.com>, Jo Manning <jom19401962@gmail.com>, Meyer Frucher <sandy@frucher.com>, David Raposo
<david@theroyalgroup.net>, "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>, Marlene <mtaraska@charter.net>, Jorge Ceballos
<jorgecb54@hotmail.com>, DRAKE Mattia Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari
<louise.adhikari@gmail.com>, "decocigar@gmail.com" <decocigar@gmail.com>, Steve Katz <stevenkatz80@hotmail.com>, younkin@bellsouth.net,
hwhoover@hotmail.com, misobal@comcast.net, "franz18miami@yahoo.com" <franz18miami@yahoo.com>, cecilegiraud@hotmail.com, Greg Taraska
<docgt1@charter.net>

Hi Joe,

   Yes, I received the irrelevant to the current issues documents. Thank you. What about the relevant ones that the BOARD, ROYAL MANAGEMENT and the
BOARD'S LAWYERS promised a week ago Wednesday at the ELECTION OF BOARD MEMBERS MEETING to get to me "in 7 days"? It is now the 9th day.

   Will I be receiving **as promised** "the two AFFIDAVITS OF MAILINGS for both the October 29th, 2024 Special Assessment Meeting and the December 12,
2024 BOARD ELECTION MEETING and  ALL Minutes of past Meetings and Actions by the Board or Homeowners during formal meetings or actions as is
required to be kept by the Secretary of the Board (whomever that would be and assuming that was ever complied with)"?

   Mike Taraska, Unit #207

[Quoted text hidden]

# EXHIBIT "36"

1/2/25, 7:55 AM         Gmail - DOCUMENTS REPRESENTED AT THE DECEMBER 12TH MEETING THAT WOULD BE PRODUCED

 Gmail                   Mike Taraska <taraska@gmail.com>

**DOCUMENTS REPRESENTED AT THE DECEMBER 12TH MEETING THAT WOULD BE PRODUCED**

**Joe** <Joe@theroyalgroup.net>               Mon, Dec 23, 2024 at 1:22 PM
To: Mike Taraska <taraska@gmail.com>, "jomanning1940@gmail.com" <jomanning1940@gmail.com>, David Raposo <david@theroyalgroup.net>, "Farinas-Sabogal, Lilliana" <lfarinas@beckerlawyers.com>
Cc: Greg Taraska <doogt1@charter.net>, Marlene <mtaraska@charter.net>, Jorge Ceballos <jorgecb54@hotmail.com>, DRAKE Mattia Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louisa Adhikari <louisa.adhikari@gmail.com>, "decocigar@gmail.com" <decocigar@gmail.com>, "jpajoues@gmail.com" <jpajoues@gmail.com>, "cecilegiraud@hotmail.com" <cecilegiraud@hotmail.com>, Steve Katz <stevenkatz80@hotmail.com>, "younkin@bellsouth.net" <younkin@bellsouth.net>, "hwhoover@hotmail.com" <hwhoover@hotmail.com>, "misobal@comcast.net" <misobal@comcast.net>

Good afternoon,

Please find attached documents requested.

Happy holidays to all!

**From:** Mike Taraska <taraska@gmail.com>
**Sent:** Thursday, December 19, 2024 7:53:57 AM
**To:** jomanning1940@gmail.com; David Raposo; Joe; Farinas-Sabogal, Lilliana
**Cc:** Greg Taraska; Marlene; Jorge Ceballos; DRAKE Mattia Prian; Rabi Adhikari; Louise Adhikari; decocigar@gmail.com; jpajoues@gmail.com; cecilegiraud@hotmail.com; Steve Katz; younkin@bellsouth.net; hwhoover@hotmail.com; misobal@comcast.net
**Subject:** DOCUMENTS REPRESENTED AT THE DECEMBER 12TH MEETING THAT WOULD BE PRODUCED

[Quoted text hidden]

**2 attachments**

📄 **SPA 2025 mailout package.pdf**
163K

📄 **Annual Meeting Package -1stt and 2nd notice.pdf**
243K

**AFFIDAVIT OF MAILING**
**OF NOTICE TO UNIT OWNERS**

STATE OF FLORIDA

COUNTY OF MIAMI – DADE

I, ___Joe Cespedes_____, after being duly sworn, depose and say
that the notices of Special Assessment Meeting for THE DRAKE CONDOMINIUM,
INC., to be held on **Tuesday, October 29, 2024 commencing at 3:PM,** were mailed in
accordance with applicable law. The notices were mailed to each unit owner at the
address last furnished to the Association, as such address as it appears on the books of the
Association.

THE DRAKE CONDOMINIUM, INC.

By: _____

STATE OF FLORIDA

**COUNTY OF MIAMI-DADE**

The foregoing instrument was acknowledged before me this 15 day of October 2024 by
_Joe Cespedes____, as _Property Manager___
of **The Drake Condominium Inc.**, a Florida Not-for-profit Corporation.

NOTARY PUBLIC – STATE OF FLORIDA

Personally known ✓ or            sign _____
Produced Identification___        print _Melissa Elliot_____
_____          My Commission expires:
Type of Identification

MELISSA MARGARITA ELLIOT
Notary Public - State of Florida
Commission # HH 294582
My Comm. Expires Jul 28, 2026
Bonded through National Notary Assn.

# The Drake Condominium Association, Inc.

C/o Royal Management Group
1235 Alton Road, Suite A, Miami Beach, FL 33139
305-535-3575 ext.111
Joe@TheRoyalGroup.Net

October 15, 2024

## NOTICE OF BOARD OF DIRECTOR'S MEETING FOR
## PROPOSED SPECIAL ASSESSMENT

The special assessment meeting of the Board of Directors of the Drake Condominium Association will be held on Tuesday, October 29th, 2024 at 3 PM in Royal Management office located at address above. Space is extremely limited and we encourage attendance **via Zoom:**

**MEETING ID: 850 8231 5281**

**PASSCODE:    647023**

The Agenda will be as follows:

1. Call meeting to Order
2. Quorum/Proof of notice
3. Provide update on concrete restoration project
4. Consider and vote on levying Special Assessment in the total amount of $1,200,000.00 for the following purposes:

| CATEGORY | ASSESSMENT AMOUNT |
|---|---|
| Concrete Restoration (addresses violation (US2017-01413) | |
| Replacement of main underground plumbing line | |
| Landscaping | |
| Roof decks | |
| Hallway carpeting | |
| New lobby windows | |
| Downspouts for roof drainage | |
| New security access system and cameras | |
| Interior elevator cab improvements | |
| Drywall repairs | |
| Repair terrazzo floors | |
| Safety railings | |
| Accounting and Contingency | |
| *TOTAL* | *$1,200,000.00* |

5. Establish due dates and payment details for special assessment (Proposed payments per unit and options are attached hereto.
6. Adjournment

If you have any questions regarding this notice, please feel free to call our main office at 305-535-3575, Ext. 111.

| | 2024 Proposed Budget With Partial Reserves Allocation per Unit | |
|---|---|---|
| Unit # | % ownership | Monthly Maintenance Fee w/ partial Reserves |
| CU1 | 0.35822 | $ 3,909.00 |
| 200 | 0.040102 | 443.00 |
| 201 | 0.046634 | 515.00 |
| 202 | 0.041554 | 459.00 |
| 203 | 0.041274 | 456.00 |
| 204 | 0.034763 | 384.00 |
| 205 | 0.034578 | 382.00 |
| 206 | 0.042191 | 466.00 |
| 207 | 0.041993 | 464.00 |
| 300 | 0.040102 | 443.00 |
| 301 | 0.046634 | 515.00 |
| 302 | 0.041554 | 459.00 |
| 303 | 0.041274 | 456.00 |
| 304 | 0.034763 | 384.00 |
| 305 | 0.034578 | 382.00 |
| 306 | 0.042191 | 466.00 |
| 307 | 0.041993 | 464.00 |
| **TOTAL** | **1.004398** | **$ 11,046.77** |

## THE DRAKE CONDOMINIUM ASSOCIATION
### 2024 Proposed SPA Allocation Per Unit Type

| Unit # | Unit % | TOTAL PER UNIT Rounded | Due Dec. 1st 2024 Rounded | Due Jan. 1st 2025 Rounded | Due Feb. 1st 2025 Rounded | Due Mar. 1st 2025 Rounded | Due Apr. 1st 2025 Rounded | Due May. 1st 2025 Rounded |
|---|---|---|---|---|---|---|---|---|
| 201 | 0.03566 | $42,792 | $ 7,132 | $ 7,132 | $ 7,132 | $ 7,132 | $ 7,132 | $ 7,132 |
| 202 | 0.04681 | $56,172 | $ 9,362 | $ 9,362 | $ 9,362 | $ 9,362 | $ 9,362 | $ 9,362 |
| 203 | 0.03975 | $47,700 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 |
| 204 | 0.03959 | $47,508 | $ 7,918 | $ 7,918 | $ 7,918 | $ 7,918 | $ 7,918 | $ 7,918 |
| 205 | 0.03975 | $47,700 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 |
| 206 | 0.04512 | $54,144 | $ 9,024 | $ 9,024 | $ 9,024 | $ 9,024 | $ 9,024 | $ 9,024 |
| 207 | 0.03975 | $47,700 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 | $ 7,858 |
| 208 | 0.03916 | $46,992 | $ 7,832 | $ 7,832 | $ 7,832 | $ 7,832 | $ 7,832 | $ 7,832 |
| 209 | 0.02002 | $24,024 | $ 4,004 | $ 4,004 | $ 4,004 | $ 4,004 | $ 4,004 | $ 4,004 |
| 210 | 0.02613 | $31,356 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 |
| 301 | 0.03128 | $37,536 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 |
| 302 | 0.03091 | $37,092 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 |
| 303 | 0.03275 | $39,300 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 |
| 304 | 0.02208 | $26,496 | $ 4,416 | $ 4,416 | $ 4,416 | $ 4,416 | $ 4,416 | $ 4,416 |
| 305 | 0.02980 | $35,760 | $ 5,891 | $ 5,891 | $ 5,891 | $ 5,891 | $ 5,891 | $ 5,891 |
| 306 | 0.01980 | $23,760 | $ 3,960 | $ 3,960 | $ 3,960 | $ 3,960 | $ 3,960 | $ 3,960 |
| 307 | 0.02981 | $35,772 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 |
| 308 | 0.02311 | $27,732 | $ 4,622 | $ 4,622 | $ 4,622 | $ 4,622 | $ 4,622 | $ 4,622 |
| 309 | 0.01957 | $23,484 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 |
| 310 | 0.02120 | $25,440 | $ 4,240 | $ 4,240 | $ 4,240 | $ 4,240 | $ 4,240 | $ 4,240 |
| 311 | 0.02613 | $31,356 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 | $ 5,226 |
| 401 | 0.03128 | $37,536 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 | $ 6,256 |
| 402 | 0.03091 | $37,092 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 | $ 6,182 |
| 403 | 0.03275 | $39,300 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 | $ 6,550 |
| 404 | 0.02208 | $26,496 | $ 4,365 | $ 4,365 | $ 4,365 | $ 4,365 | $ 4,365 | $ 4,365 |
| 405 | 0.02981 | $35,772 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 |
| 406 | 0.04814 | $57,768 | $ 9,628 | $ 9,628 | $ 9,628 | $ 9,628 | $ 9,628 | $ 9,628 |
| 407 | 0.02981 | $35,772 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 | $ 5,893 |
| 408 | 0.05665 | $67,980 | $ 11,330 | $ 11,330 | $ 11,330 | $ 11,330 | $ 11,330 | $ 11,330 |
| 409 | 0.01957 | $23,484 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 | $ 3,914 |
| 410 | 0.04085 | $49,020 | $ 8,170 | $ 8,170 | $ 8,170 | $ 8,170 | $ 8,170 | $ 8,170 |

**AFFIDAVIT OF MAILING**
**OF NOTICE TO UNIT OWNERS**

STATE OF FLORIDA

COUNTY OF MIAMI – DADE

I, ___Joe Cespedes_____, after being duly sworn, depose and say
that notices of the Special Assessment meeting of The Drake Condominium Inc., **that
was held on Tuesday, October 29, 2024 and approved,** were mailed in accordance with
applicable law. The notices were mailed to each unit owner at the address last furnished
to the Association, as such address as it appears on the books of the Association.

THE DRAKE CONDOMINIUM, INC.

By: _____

**STATE OF FLORIDA**

**COUNTY OF MIAMI-DADE**

The foregoing instrument was acknowledged before me this October 31, 2024, by
_JOE CESPEDES_____, as _PROPERTY MANAGER_
of **The Drake Condominium Inc.,** a Florida Not-for-profit Corporation.

NOTARY PUBLIC – STATE OF FLORIDA

Personally known ✓ or

Produced Identification__

_____
Type of Identification

sign _____

print _Melissa M. Alliot_

My Commission expires:

MELISSA MARGARITA ALLIOT
Notary Public - State of Florida
Commission # HH 294582
My Comm. Expires Jul 28, 2026
Bonded through National Notary Assn.

**AFFIDAVIT OF MAILING**
**OF NOTICE TO UNIT OWNERS**

STATE OF FLORIDA

COUNTY OF MIAMI – DADE

I, ___David Raposo _____, after being duly sworn, depose and say
that notices of the annual meeting of The Drake Condominium Inc., to be held on
**Thursday, December 12, 2024, commencing at 3:pm**, were mailed in accordance with
applicable law. The notices were mailed to each unit owner at the address last furnished
to the Association, as such address as it appears on the books of the Association.

THE DRAKE CONDOMINIUM, INC.

By: _____

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this 9th of October 2024 by
David Raposo _____, as Property Manager
of **The Drake Condominium Inc.,** a Florida Not-for-profit Corporation.

NOTARY PUBLIC - STATE OF FLORIDA

Personally known __ or
Produced Identification __

_____
Type of Identification

sign _____
print Melissa M. Alliot
My Commission expires:

MELISSA MARGARITA ALLIOT
Notary Public - State of Florida
Commission # HH 394982
My Comm. Expires Jul 28, 2026
Bonded through National Notary Assn.

**FIRST NOTICE OF DATE OF ANNUAL MEETING
AND BOARD ELECTION OF
THE DRAKE CONDOMINIUM ASSOCIATION, INC.
AND PROCEDURE FOR QUALIFYING FOR BOARD**

**TO ALL MEMBERS:**

On **Thursday, December 12, 2024** at **3:00 PM**, in **Building Lobby (1460 Ocean Drive, Miami, FL). Conference call will also be available for owners with details to be provided in Second Notice)**, the Annual Meeting of the Association will be held for the purpose of electing Directors, and such other business as may lawfully be conducted. Subsequent to this "FIRST NOTICE" you will receive a "SECOND NOTICE OF ANNUAL MEETING" that will specify the agenda and advise of other important information concerning the Annual Meeting.

The purpose of this Notice is to advise you of the date, time and place of the Annual Meeting and Election and to inform you of the process for qualifying for the Board.

**QUALIFYING FOR THE BOARD**

On or before **Saturday, November 2, 2024**, you must give written notice to the Association of your intent to run for the Board. The enclosed "Notice of Intent to be a Candidate for the Board" may be used for that purpose. **Please note that if the deadline to receive the Notice of Intent to be a Candidate falls on a day when the Association Office is closed, the deadline is NOT extended.  The Notice of Intent to be a Candidate must be received by the Association no later than the stated deadline and it is the Candidate's responsibility to ensure timely receipt by the Association.** The notice can be sent via regular mail or hand-delivery to the Association's mailing address: **1235 Alton Road. Suite A. Miami Beach, FL 33139** or via email to: **Joe@theroyalgroup.net.**

You may submit an Information Sheet, on only 1 side of a page no larger than 8-1/2 inches by 11 inches, containing your qualifications and/or platform for office. This information sheet must be submitted to the Association on or before **Thursday, November 7, 2024**.

The ballots and timely submitted Information Sheets will be mailed to voting members, with the Second Notice of the Annual Meeting, not less than **fourteen (14)** days prior to the date of the Annual Meeting.

**VOTING CERTIFICATE**

A voting certificate is being provided to determine who the voting member will be for your unit, if your unit is owned by more than one person or a corporation. **FORGERY OF A VOTING CERTIFICATE USED IN AN ELECTION IS A CRIME PUNISHABLE AS A THIRD-DEGREE FELONY.** Please note the following information about VOTING CERTIFICATES:

1.   A voting certificate is for the purpose of establishing who is authorized to vote for a unit owned by more than one person (except if married couples) or a corporation. A voting certificate is not needed if the unit is owned by only one person.

2.   A voting certificate is not a proxy and cannot be used as such. Only an owner or an appropriate corporate officer or the authorized entity agent can be named on a voting certificate, not a third party.

3.   A voting certificate must be signed by all of the owners of the unit or an appropriate corporate officer or the authorized entity agent.

**NOTICE OF INTENT TO BE A CANDIDATE**
**FOR THE BOARD OF DIRECTORS**
**OF THE DRAKE CONDOMINIUM ASSOCIATION, INC.**

I, (print name) _____, hereby place my name in nomination as a candidate for the Board of Directors. I understand that I am responsible for the timely delivery of this Notice of Intent. I (circle one) am/am not enclosing an Information Sheet about myself. I understand that I am responsible for the accuracy of the information contained in the Information Sheet.

Unit No.: _____

Date: _____.          SIGNATURE: _____

PLEASE NOTE: UNDER THE AMENDED PROVISIONS OF THE CONDOMINIUM ACT, YOU WILL <u>NOT</u> BE ELIGIBLE FOR BOARD MEMBERSHIP IF ANY OF THE FOLLOWING APPLY:

I.     IN A CONDOMINIUM WITH MORE THAN 10 UNITS, IF YOU AND A CO-OWNER OF YOUR UNIT WOULD SERVE ON THE BOARD AT THE SAME TIME, UNLESS YOU OWN MORE THAN ONE UNIT OR UNLESS THERE ARE NOT ENOUGH ELIGIBLE CANDIDATES TO FILL THE VACANCIES ON THE BOARD AT THE TIME OF THE VACANCY;

II.    YOU WERE A DIRECTOR WHO WAS SUSPENDED OR REMOVED BY THE DIVISION AND SUCH SUSPENSION OR REMOVAL TIME PERIOD IS STILL IN EFFECT ON SATURDAY, NOVEMBER 2, 2024;

III.   ON SATURDAY, NOVEMBER 2, 2024, YOU ARE DELINQUENT IN THE PAYMENT OF ANY REGULAR OR SPECIAL ASSESSMENT OWED TO THE ASSOCIATION;

IV.    YOU WERE CONVICTED OF A FELONY IN FLORIDA OR CONVICTED OF AN OFFENSE IN ANOTHER JURISDICTION THAT WOULD BE CONSIDERED A FELONY IN FLORIDA (UNLESS YOUR CIVIL RIGHTS HAVE BEEN RESTORED FOR AT LEAST FIVE YEARS AS OF SATURDAY, NOVEMBER 2, 2024;

V.     YOU ARE A DIRECTOR CHARGED WITH A FELONY THEFT OR EMBEZZLEMENT OFFENSE INVOLVING THE ASSOCIATION'S FUNDS OR PROPERTY AND SUCH CRIMINAL CHARGE IS PENDING AS OF SATURDAY, NOVEMBER 2, 2024; AND/OR

VI.    YOU HAVE A CRIMINAL CHARGE PENDING INVOLVING FORGERY OF A BALLOT ENVELOPE OR VOTING CERTIFICATE USED IN A CONDOMINIUM ASSOCIATION ELECTION, THEFT OR EMBEZZLEMENT OF FUNDS OR PROPERTY OF A CONDOMINIUM ASSOCIATION, THE DESTRUCTION OF OR REFUSAL TO ALLOW INSPECTION OR COPYING OF AN OFFICIAL RECORD THAT IS ACCESSIBLE TO OWNERS IN FURTHERANCE OF ANY CRIME, OBSTRUCTION OF JUSTICE, OR ANY OTHER CRIMINAL VIOLATION UNDER CHAPTER 718, FLORIDA STATUTES, INCLUDING, BUT NOT LIMITED TO, FRAUDULENT VOTING ACTIVITIES.

## CERTIFICATE APPOINTING VOTING MEMBER

To the Secretary of **The Drake Condominium Association, Inc.** (the "Association")

THIS IS TO CERTIFY that the undersigned, constituting all of the record owners of Unit No. _____ in **THE DRAKE, A CONDOMINIUM,** have designated

_____

(Name of Voting Member)

as their representative to cast all votes and to express all approvals that such owners may be entitled to cast or express at all meetings of the membership of the Association and for all other purposes provided by the Declaration, the Articles and Bylaws of the Association.

The following examples illustrate the proper use of this Certificate:

1.   Unit owned by John Doe and his brother, Jim Doe. Voting Certificate required designating either John or Jim as the Voting Member. NOT A THIRD PERSON.

2.   Unit owned by Overseas, Inc., a corporation. Voting Certificate must be filed designating an officer or employee entitled to vote, signed by President or Vice President of Corporation and attested by Secretary or Assistant Secretary of Corporation.

3.   Unit owned by a married couple.   Voting Certificate not required.

This Certificate is made pursuant to the Declaration and the Bylaws and shall revoke all prior Certificates and be valid until revoked by a subsequent Certificate.

Date:_____.

Signatures for Individual Unit Owners:

_____     _____
OWNER (Print Name)                    (Signature)

_____     _____
OWNER (Print Name)                    (Signature)

_____     _____
OWNER (Print Name)                    (Signature)

Signature for Corporate Owners:

Name of Corporation:_____

By:_____ Title:_____

Print Name:_____ Attest:_____
                                          Secretary

**NOTE: This form is not a proxy and should not be used as such. Please be sure to designate one of the joint owners of the unit as the Voting Member, not a third person. Please be advised that if you previously filed a Certificate Appointing Voting Member with the Secretary of the Association, you do not need to file another Certificate unless you want to change the designation of your Voting Member.**
35627103v.1

## AFFIDAVIT OF MAILING
## OF NOTICE TO UNIT OWNERS

STATE OF FLORIDA

COUNTY OF MIAMI – DADE

I, ___Joe Cespedes_____, after being duly sworn, depose and say
that the notices of the annual meeting of The Drake Condominium Inc., to be held on
**Thursday, December 12, 2024, commencing at 3:pm,** were mailed in accordance with
applicable law. The notices were mailed to each unit owner at the address last furnished
to the Association, as such address as it appears on the books of the Association.

THE DRAKE CONDOMINIUM, INC.

By: _____.

**STATE OF FLORIDA**

**COUNTY OF MIAMI-DADE**

The foregoing instrument was acknowledged before me this 9th of November 25, 2024
by _Joe Cespedes____, as _Property Manager_
of **The Drake Condominium Inc.,** a Florida Not-for-profit Corporation.

NOTARY PUBLIC – STATE OF FLORIDA

Personally known __✓__ or
Produced Identification __

sign _____
print _Melisa M. Elliot___
My Commission expires:

_____
Type of Identification

MELISSA MARGARITA ELLIOT
Notary Public - State of Florida
Commission # HH 294582
My Comm. Expires Jul 28, 2026
Bonded through National Notary Assn.

**SECOND NOTICE OF ANNUAL MEETING**
**OF THE DRAKE CONDOMINIUM ASSOCIATION, INC.**

TO ALL MEMBERS:

Immediately before the Annual Meeting on **Thursday, December 12, 2024 at 3:00 p.m., in The Building Lobby (1460 Ocean Drive, Miami Beach, FL 33139)**, the Budget Meeting of the Board of Directors will be held to consider and adopt the budget for the 2025 fiscal year and such other business as may be lawfully conducted.  The agenda for the meeting is as follows:

1.  Certifying quorum – Call to Order.
2.  Proof of Notice of Meeting.
3.  New Business -      Consider and Adopt Budget.
4.  Adjournment.

Thereafter, **immediately following the budget meeting of Directors noticed above, the Annual Meeting of the Association will be held** for the purpose of voting on items listed below, and conducting the lawful business of the Association. The agenda for the Annual Meeting is:

1.  Certifying Quorum - Call to order.
2.  Proof of Notice of Meeting.
3.  Reading and disposal of unapproved minutes.
4.  Reports of Officers.
5.  Reports of Committees.
6.  Unfinished Business.
7.  New Business. –       a. Vote on waiver of Structural Integrity Reserves.
                          b. Vote to partially fund non-Structural Integrity Reserves as shown on the supporting materials.
                          c. Consideration and discussion regarding Hurricane Windows.
8.  Adjournment.

No less than one-third (⅓) of the members (a "quorum") must be present, in person or by proxy, at the meeting, in order for the business to be conducted. It is **VERY IMPORTANT** that you either **attend** or **provide a Limited Proxy/Meeting Ballot**

**Pursuant to Florida law, an election of the directors of this Association is not required, since the number of candidates was less than or equal to the number of vacancies to be filled. Accordingly, the names of the New Board Members will be announced at the Annual Meeting.**

<u>**ORGANIZATIONAL MEETING OF THE BOARD OF DIRECTORS**</u>

Immediately following the Annual Meeting, the organizational meeting of the Board of Directors will be held for the purpose of electing officers of the Association and such other business as may lawfully be conducted. The agenda for the Board Meeting is as follows:

1.  Certifying quorum – Call to Order.
2.  Proof of Notice of Meeting.
3.  New Business -    a.    Elect Officers
4.  Adjournment.

Date: _____  _____.

**BY ORDER OF THE BOARD OF DIRECTORS**

_____
**MARIA ARENCIBIA, SECRETARY**

**VOTING BY LIMITED PROXY/MEETING BALLOT**

If you attend the Annual Meeting and wish to vote on items on the agenda, the enclosed Limited Proxy/Meeting Ballot shall act as your Ballot. However, if you are unable to attend the Annual Meeting and wish to vote by proxy, the Limited Proxy/Meeting Ballot will act as your limited proxy. In that regard, please note the following:

1.      A **limited proxy** is for the purpose of appointing **another person** to vote for you as you specifically direct (except for non-substantive items) in the event that you might not be able to attend the meeting. It must be signed by the person authorized to cast the vote for the unit. NONE

2.      The proxy must be submitted to the Association **prior to the scheduled time of the meeting**. It can be sent via hand-delivery to the Management Office, via mail addressed to the Association's mailing address at: **1235 Alton Road, Suite A, Miami Beach, FL 33139**, or via email to:  Joe@theroyalgroup.net.  It is encouraged that the proxy be submitted as long before the meeting as possible, in order to avoid delay in registration.

3.      If you appoint a proxy and later decide you will be able to attend the meeting in person, you may **withdraw** your proxy when you register at the meeting.

4.      A proxy may be **revoked** in writing or **superseded** by a later proxy to another person. It may also be **assigned** (substituted) by the person designated on the proxy to a third person if the person you designate as proxy decides that he or she will be unable to attend the meeting.

5.      A **Limited Proxy/Meeting Ballot** form is enclosed with this notice for your use, if needed.

Please be sure to email, mail in or hand deliver your proxy, unless you plan to attend the Annual Meeting to cast your votes in person.

**LIMITED PROXY/MEETING BALLOT**

The undersigned owner(s) or voting member of Unit No. _____ in **THE DRAKE, A CONDOMINUM,** appoints (Check one):

_____ a) **Josephine Manning, President** of the Association, on behalf of the Board of Directors, or

_____ b) _____ (if you check b, write in the name of your proxy) as my proxyholder*, with power of substitution, to attend the meeting of the members of **The Drake Condominium Association, Inc.** to be held **Thursday, December 12, 2024** at **3:00 PM, in The Building Lobby (1460 Ocean Drive, Miami Beach, FL 33139)**, and any adjournment/recess thereof. In the event I attend the meeting in person, this will act as my meeting ballot. The proxyholder named above has the authority to vote and act for me to the same extent that I would if personally present, with power of substitution, except that my proxyholder's authority is limited as indicated below:

GENERAL POWERS: By signing this proxy, your proxyholder automatically has general powers to vote on other issues that might come up at the meeting for which a limited proxy is not required. You can choose not to grant such general powers by checking the box _____ I **do not** grant general powers to my proxyholder.

LIMITED POWERS: (FOR YOUR VOTE TO BE COUNTED ON THE FOLLOWING ISSUES, YOU MUST INDICATE YOUR PREFERENCE IN THE BLANK(S) PROVIDED BELOW). I SPECIFICALLY AUTHORIZE AND INSTRUCT MY PROXYHOLDER TO CAST MY VOTE IN REFERENCE TO THE FOLLOWING MATTERS AS INDICATED BELOW:

1. Under Chapter 718, Fla Statutes, condominium associations must start funding mandatory Structural Integrity Reserves ("SIRS"). This consists of components such as roof, fireproofing and fire protection systems, plumbing, electrical systems, etc. As of the date of this mailing, the SIRS report for the condominium has not yet been completed. However, the Association is proposing a waiver of SIRS funding for fiscal year 2025, so that this cost can be postponed to 2026. *If you wish to approve this and avoid the SIRS increase in 2025, once the SIRS report is complete, please vote "YES" on the following issue:*

   **Vote to Waive funding of Structural Integrity Reserves for 2025 as shown on the supporting materials?**

   ☐ YES, Waive any SIRS funding in 2025

   **WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

2. Vote to partially fund Non-Structural Integrity reserves as shown on the supporting materials.

   ☐ Yes, partially fund          ☐ No, fully fund non-structural integrity reserves

   **WAIVING OF RESERVES, IN WHOLE OR IN PART, OR ALLOWING ALTERNATIVE USES OF EXISTING RESERVES MAY RESULT IN UNIT OWNER LIABILITY FOR PAYMENT OF UNANTICIPATED SPECIAL ASSESSMENTS REGARDING THOSE ITEMS.**

Date: _____.

SIGNATURE(S) OF OWNER(S) OR VOTING MEMBER:

Signature:_____  Print Name:_____

Signature:_____  Print Name:_____

*Failure to check either (a) or (b), or, if (b) is checked, failure to write in the name of the proxy, is an appointment of the **President** of the Association as your proxyholder.

---

**DO NOT COMPLETE THIS SECTION. This section is only to be filled in by the proxyholder if they wish to appoint a substitute proxyholder.**

**SUBSTITUTION OF PROXY**

The undersigned, appointed as proxy above, does hereby designate_____ to substitute for me in the proxy set forth above.

Date:_____.                    _____
                                                                    **PROXYHOLDER**


**THIS LIMITED PROXY/MEETING BALLOT IS REVOCABLE BY THE UNIT OWNER AND IS VALID ONLY FOR THE MEETING FOR WHICH IT IS GIVEN AND ANY LAWFUL ADJOURNMENT. IN NO EVENT IS THE PROXY VALID FOR MORE THAN NINETY (90) DAYS FROM THE DATE OF THE ORIGINAL MEETING FOR WHICH IT WAS GIVEN.**

EXHIBIT "37"

1/2/25, 7:53 AM                                    Gmail - Fwd: The Drake Condominium annual and 2025 budget meeting approval notice

 Gmail                                                          Mike Taraska <taraska@gmail.com>

**Fwd: The Drake Condominium annual and 2025 budget meeting approval notice**

Comcast <misobal@comcast.net>                                                       Thu, Dec 26, 2024 at 1:18 PM
To: Taraska Mike <taraska@gmail.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Joe <Joe@theroyalgroup.net>
> **Date:** December 26, 2024 at 1:47:51 PM CST
> **Cc:** David Raposo <david@theroyalgroup.net>
> **Subject: The Drake Condominium annual and 2025 budget meeting approval notice**

Dear Members of The Drake Condominium Association,

This letter serves to inform you that the 2024 Annual and 2025 Budget Meeting was held on Thursday, December 12, 2024, at 3 p.m. in the building's lobby area.

Enclosed is a copy of the approved 2025 budget, which outlines each unit's monthly payment starting January 1, 2025. We encourage you to review the budget and reach out if you have any questions or concerns.

Please take note of the payment amount for your specific unit. If you are set up for AUTO-PAY, ensure you update the payment amount accordingly with your bank. This year, we will not be printing coupons, as all associations are transitioning to electronic payment. If you have not yet set up your account for electronic payments, please email the property manager for instructions. If you prefer to pay by mail, you can continue sending payments to the following address:

The Drake Condominium
c/o The Royal Management Group
P.O. Box 620513
Orlando, FL 32862 – 0513

During the annual meeting, there were no elections, as only Julien Pajoues from unit 308 applied for a position on the Board. With three positions available, we bid farewell to Maria Arencibia, who resigned from the Board, and appointed Julien Pajoues to take her place. The Board members for 2025 are:

- Josephine Manning – Unit 408
- Sandy Mayer Frucher – Unit 403-404
- Julien Pajoues – Unit 308

The Board would like to thank all owners for their support as we continue to oversee improvements at The Drake Condominium as we move into 2025.

Sincerely,

Joe Cespedes - LCAM
Royal Management Group

---

📎 **APPROVED 2025 BUDGET & UNIT BREAKDOWN.pdf**
   326K

### THE DRAKE CONDOMINIUM ASSOCIATION
### 2025 Approved Budget with General Partial Reserves

| | 2025 MONTHLY | 2025 ANNUAL | 2024 MONTHLY | 2024 ANNUAL |
|---|---|---|---|---|
| **INCOME:** | | | | |
| Maintenance Fees | $32,805.17 | $393,662.00 | $28,031.67 | $336,380.00 |
| Late Fees | $20.00 | $240.00 | $20.00 | $240.00 |
| Laundry Income | $183.33 | $2,200.00 | $183.33 | $2,200.00 |
| **TOTAL INCOME:** | $33,008.50 | $396,102.00 | $28,235.00 | $338,820.00 |
| **EXPENSES:** | | | | |
| **ADMINISTRATIVE** | | | | |
| Accounting Fees | $50.00 | $600.00 | $50.00 | $600.00 |
| Legal Fees | $2,083.33 | $25,000.00 | $250.00 | $3,000.00 |
| Management Fees | $1,350.00 | $16,200.00 | $1,250.00 | $15,000.00 |
| Insurance | $12,500.00 | $150,000.00 | $12,500.00 | $150,000.00 |
| Licenses & Permits | $83.33 | $1,000.00 | $83.33 | $1,000.00 |
| Postage & Printing | $83.33 | $1,000.00 | $83.33 | $1,000.00 |
| Bank Charges | $25.00 | $300.00 | $25.00 | $300.00 |
| **UTILITIES** | | | | |
| Electricity | $700.00 | $8,400.00 | $700.00 | $8,400.00 |
| Water & Sewer | $2,000.00 | $24,000.00 | $2,000.00 | $24,000.00 |
| Telephone | $366.67 | $4,400.00 | $366.67 | $4,400.00 |
| **CONTRACT SERVICES** | | | | |
| Trash Collection | $860.00 | $10,320.00 | $860.00 | $10,320.00 |
| Pest Control | $416.67 | $5,000.00 | $416.67 | $5,000.00 |
| Elevator | $500.00 | $6,000.00 | $500.00 | $6,000.00 |
| Janitorial Services | $4,583.33 | $55,000.00 | $4,750.00 | $57,000.00 |
| Cable TV | $2,400.00 | $28,800.00 | $2,400.00 | $28,800.00 |
| **REPAIRS & MAINTENANCE** | | | | |
| Building Repairs | $833.33 | $10,000.00 | $833.33 | $10,000.00 |
| Fire Prevention | $291.67 | $3,500.00 | $291.67 | $3,500.00 |
| Roof Maintenance | $833.33 | $10,000.00 | $833.33 | $10,000.00 |
| Supplies | $41.67 | $500.00 | $41.67 | $500.00 |
| **OTHER** | | | | |
| **TOTAL EXPENSES** | $30,001.67 | $360,020.00 | $28,235.00 | $338,820.00 |
| **RESERVES** | | | | |
| General Partial Reserves 10% | $3,006.83 | $36,082.00 | $0.00 | $0.00 |
| **(Subject to SIRS REPORT)** | | | | |
| **TOTAL RESERVES** | $3,006.83 | $396,102.00 | $0.00 | |
| **TOTAL EXPENSES & RESERVES** | $33,008.50 | $396,102.00 | $28,235.00 | $338,820.00 |
| **LESS OTHER INCOME** | $203.33 | ($2,440.00) | $203.33 | ($2,440.00) |
| **TOTAL MAINTENANCE FEES** | $32,805.17 | $393,662.00 | $28,031.67 | $336,380.00 |

### THE DRAKE CONDOMINIUM ASSOCIATION
#### 2025 Approved Budget Allocation Per Unit Type

| Unit # | Unit % | 2025 Approved Rounded | 2024 Approved Rounded | Increase |
|---|---|---|---|---|
| 201 | 0.03588 | $1,170 | $1,000 | $170 |
| 202 | 0.04681 | $1,536 | $1,312 | $223 |
| 203 | 0.03975 | $1,304 | $1,114 | $190 |
| 204 | 0.03959 | $1,299 | $1,110 | $189 |
| 205 | 0.03975 | $1,304 | $1,114 | $190 |
| 206 | 0.04512 | $1,460 | $1,265 | $215 |
| 207 | 0.03975 | $1,304 | $1,114 | $190 |
| 208 | 0.03916 | $1,285 | $1,098 | $187 |
| 209 | 0.02002 | $657 | $561 | $96 |
| 210 | 0.02613 | $857 | $732 | $125 |
| 301 | 0.03128 | $1,026 | $877 | $149 |
| 302 | 0.03091 | $1,014 | $866 | $148 |
| 303 | 0.03275 | $1,074 | $918 | $156 |
| 304 | 0.02208 | $724 | $619 | $105 |
| 305 | 0.02980 | $978 | $835 | $142 |
| 306 | 0.01980 | $650 | $555 | $95 |
| 307 | 0.02981 | $978 | $836 | $142 |
| 308 | 0.02311 | $758 | $648 | $110 |
| 309 | 0.01957 | $642 | $549 | $93 |
| 310 | 0.02120 | $695 | $594 | $101 |
| 311 | 0.02613 | $857 | $732 | $125 |
| 401 | 0.03128 | $1,026 | $877 | $149 |
| 402 | 0.03091 | $1,014 | $866 | $148 |
| 403 | 0.03275 | $1,074 | $918 | $156 |
| 404 | 0.02208 | $724 | $619 | $105 |
| 405 | 0.02981 | $978 | $836 | $142 |
| 406 | 0.04814 | $1,579 | $1,349 | $230 |
| 407 | 0.02981 | $978 | $836 | $142 |
| 408 | 0.05665 | $1,858 | $1,588 | $270 |
| 409 | 0.01957 | $642 | $549 | $93 |
| 410 | 0.04085 | $1,340 | $1,145 | $195 |

EXHIBIT "38"

# MIKE TARASKA  J.D., LLM
## 1460 Ocean Drive, Ste. #207   Miami Beach, FL 33139

Ph. (602) 400-5885     taraska@gmail.com

December 30, 2024

## <u>SENT BY EMAIL ONLY</u>

### Re: <u>VIOLOATIONS OF FLORIDA STATUTORY AND COMMON LAW</u>

TO: ROYAL MANAGEMENT GROUP
Att: Joe Cepsides
joe@theroyalgroup.net
cc: David Raposo
david@theroyalgroup.net

THE BOARD:
Joe Manning
Jomanning1940@gmail.com
Julian Payoues
jpajoues@gmail.com
Sandy Frucher
Sandy@Frucher.com

TO THE BOARD and ROYAL MANAGEMENT GROUP,

    I am I receipt of Joe Cepsides' email sent to me on Monday, December 23, 2024 attaching the AFFIDAVITS OF MAILING for the Special Meeting to be held on October 29, 2024; the Special Assessment Meeting held and approved on October 29, 2024; the annual meeting to be held on December 12, 2024 and the annual meeting held on December 12, 2024. Each of the Affidavits reflected that "The notices were mailed to each unit owner at the address last furnished to the Association, as such addresses **as it appears on the books of the Association**".

    That email, in response to my December 19, 2024 email demanding under the Florida Law and by the agreement stated at the December 12, 2024 Election of Board Members "to provide me with ALL Minutes of past Meetings and Actions

1

by the Board or Homeowners during formal meetings or actions as is required to be kept by the Secretary of the Board (whomever that would be and assuming that was ever complied with)" failed to provide those documents..

You have continually failed to provide me with rightfully requested records of the Association. I am convinced it is because you know that that the BOARD and its OFFICERS and ROYAL MANAGEMENT GROUP have completely and objectively through written evidence breached all fiduciary duties, violated various Florida Civil Statutes, conducted the business of the DRAKE as a RICO enterprise as well as violated innumerable Florida Criminal Statues and know that required disclosure will facilitate proof of this.

**"[T]he refusal to allow inspection or copying of an official record of a condominium association that is accessible to unit owners within the time periods required by general law in furtherance of any crime is punishable as tampering with physical evidence as provided in Fla. Stat. 918.13 or as obstruction of justice as provided in chapter 843**. . . .". Fla. Stat. 718(1)(d).

This is the LAST TIME I am going to ask you to "allow copying of the official records" of the DRAKE and/or to provide those records to me immediately in electronic form (email). I am already going to incorporate your written refusals to allow access and provide transparency of the management of the condominium through the BOARD and ROYAL MANAGEMENT GROUP as causes of action in my soon to-be-filed Federal RICO Complaint.

In addition to all of my past written requests for the eight categories which have continually been refused, please NOW provide me with "each unit owners . . . . . address last furnished to the Association, as such addresses **as it appears on the books of the Association**" which the above AFFIDAVITS attest and state such Notices were mailed.

The addresses to which the AFFIDAVITS attest the Notices were allegedly mailed are "OFFICAL RECORDS" of the Association as specifically defined by Florida Statutory Law at 720.303(2)(c)(4)(a)7 as follows:

"7.   A current roster of all unit owners and their mailing addresses, unit identifications, voting certifications, and, if known, telephone numbers. The association shall also maintain the e-mail addresses and facsimile numbers of unit owners consenting to receive notice by electronic transmission. The e-mail addresses and facsimile numbers are not accessible to unit owners if consent to receive notice by electronic transmission is not provided in accordance with sub-subparagraph (c)3.e" and Fla. Stat. 718.111(12)7.

2

**PROVIDE TO ME BY EMAIL "THE MAILING ADDRESSES, UNIT IDENTIFICATIONS, VOTING CERTIFICATIONS, AND IF KNOWN, TELEPHONE NUMBERS" <u>NO LATER THAN CLOSE OF BUSINESS DECEMBER 31st, 2024</u>.**

In addition, please provide to me by email no later than close of business, December 31, 2024 "the e-mail addresses and facsimile numbers of unit owners <u>consenting to receive notice</u> by electronic transmission". Those also constitute OFFICIAL RECORDS mandated by law to be provided to all Homeowners.

I'm not going to reiterate the description of all of the Documents which I have asked by written demand to copy, emailed to me or inspect which you have continually refused to provide in violation of the mandatory requirements under the statutory law. **YOU HAVE A LEGAL DUTY AND OBLIGATION TO PROVIDE THOSE DOCUMENTS TO ME FORTHWTH.** <u>You are in continuous violation of Fla. Stat. 718.11 and 720.303.</u>

In addition to the refusal to provide the documents, which in and of itself provide further "predicate acts" under the FEDERAL RICO STATUTES, the BOARD and ROYAL MANAGEMENT, in conjunction with Melissa Raposo, Edgar Ramirez, "Juan" and the related entities have violated **INNUMERABLE** provisions of the Florida Statutory Law set forth below.

I believe the law firm of BECKER & POLIAKOFF occupies a conflict of interest representing the interrelations between the BOARD (specifically Member Josephine Manning, who has a duty to represent the Association), David Raposo and his management company ROYAL MANAGEMENT GROUP all of which are in conflict with each other and the Association's' claim for Directors and Officers liability coverage under the D&O policy sold to the DRAKE for $150,000 by Melissa Raposa. At this point, as a Homeowner, I'm not sure who attorney Lillianna Farinas-Sabogal from BECKER is representing, because there exist a clear conflict representing BOTH the BOARD and ROYAL MANAGEMENT GROUP both involved in the related transactions. Attorney Farinas is clearly incompetent to handle the litigation that's coming her way based on her comments at the October 29th and December 12th, 2024 Meetings and the way the BOARD and ROYAL MANGEMENT has allowed me to document their corrupt actions in the letters, emails and recordings of Meetings over the past three months. The Homeowners deserve new counsel to represent their interests.

3

### Fla. Stat. 718.111 - The association.

(1)   <u>CORPORATE ENTITY</u>
(a)    The officers and directors of the association have a fiduciary relationship to the unit owners. It is the intent of the Legislature that nothing in this paragraph shall be construed as providing for or removing a requirement of a fiduciary relationship between any manager employed by the association and the unit owners. An officer, director, or manager may not solicit, offer to accept, or accept anything or service of value or kickback for which consideration has not been provided for his or her own benefit or that of his or her immediate family, from any person providing or proposing to provide goods or services to the association. Any such officer, director, or manager who knowingly so solicits, offers to accept, or accepts anything or service of value or kickback is subject to a civil penalty pursuant to s. 718.501(1)(d) and, if applicable, a criminal penalty as provided in paragraph (d). . . .
(b)    A director of the association who is present at a meeting of its board at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless he or she votes against such action or abstains from voting. A director of the association who abstains from voting on any action taken on any corporate matter shall be presumed to have taken no position with regard to the action. . . .
(d)    As required by Fla. Stat. 617.0830, an officer, director, or agent shall discharge his or her duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the interests of the association. An officer, director, or agent shall be liable for monetary damages as provided in Fla. Stat. 617.0834 if such officer, director, or agent breached or failed to perform his or her duties and the breach of, or failure to perform, his or her duties constitutes a violation of criminal law as provided in Fla. Stat. 617.0834; constitutes a transaction from which the officer or director derived an improper personal benefit, either directly or indirectly; or constitutes recklessness or an act or omission that was in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . . theft or embezzlement of funds of a condominium association is punishable as provided in Fla. Stat. 812.014 and destruction of or the refusal to allow inspection or copying of an official record of a condominium association that is accessible to unit owners within the time periods required by general law in furtherance of any crime is punishable as tampering with physical evidence as provided in Fla. Stat. 918.13 or as obstruction of justice as provided in chapter 843. . . ."
   . . .

4

(11) INSURANCE.—In order to protect the safety, health, and welfare of the people of the State of Florida and to ensure consistency in the provision of insurance coverage to condominiums and their unit owners, this subsection applies to every residential condominium in the state, regardless of the date of its declaration of condominium. It is the intent of the Legislature to encourage lower or stable insurance premiums for associations described in this subsection. . . .

(c)  Policies may include deductibles as determined by the board.

1.   The deductibles must be consistent with industry standards and prevailing practice for communities of similar size and age, and having similar construction and facilities in the locale where the condominium property is situated.

2.   The deductibles may be based upon available funds, including reserve accounts, or predetermined assessment authority at the time the insurance is obtained.

3.   The board shall establish the amount of deductibles based upon the level of available funds and predetermined assessment authority at a meeting of the board in the manner set forth in s. 718.112(2)(e). . . .

**************************************************************************

(12)  OFFICIAL RECORDS.

(a)   From the inception of the association, the association shall maintain each of the following items, if applicable, which constitutes the official records of the association:

1.   A copy of the plans, permits, warranties, and other items provided by the developer under s. 718.301(4).

2.   A photocopy of the recorded declaration of condominium of each condominium operated by the association and each amendment to each declaration.

3.   A photocopy of the recorded bylaws of the association and each amendment to the bylaws.

4.   A certified copy of the articles of incorporation of the association, or other documents creating the association, and each amendment thereto.

5.   A copy of the current rules of the association.

6.   A book or books that contain the minutes of all meetings of the association, the board of administration, and the unit owners.

7.   A current roster of all unit owners and their mailing addresses, unit identifications, voting certifications, and, if known, telephone numbers. The association shall also maintain the e-mail addresses and facsimile numbers of unit owners consenting to receive notice by electronic transmission. The e-mail addresses and facsimile numbers are not accessible to unit owners if consent to receive notice by electronic transmission is not provided in accordance with sub-subparagraph (c)3.e. However, the association is not liable for an inadvertent

5

disclosure of the e-mail address or facsimile number for receiving electronic transmission of notices.

8.   All current insurance policies of the association and condominiums operated by the association.

9.   A current copy of any management agreement, lease, or other contract to which the association is a party or under which the association or the unit owners have an obligation or responsibility.

10.   Bills of sale or transfer for all property owned by the association.

11.   Accounting records for the association and separate accounting records for each condominium that the association operates. Any person who knowingly or intentionally defaces or destroys such records, or who knowingly or intentionally fails to create or maintain such records, with the intent of causing harm to the association or one or more of its members, is personally subject to a civil penalty pursuant to s. 718.501(1)(d). The accounting records must include, but are not limited to:

a.   Accurate, itemized, and detailed records of all receipts and expenditures.

b.   A current account and a monthly, bimonthly, or quarterly statement of the account for each unit designating the name of the unit owner, the due date and amount of each assessment, the amount paid on the account, and the balance due.

c.   All audits, reviews, accounting statements, and financial reports of the association or condominium.

d.   All contracts for work to be performed. Bids for work to be performed are also considered official records and must be maintained by the association for at least 1 year after receipt of the bid.

12.   Ballots, sign-in sheets, voting proxies, and all other papers and electronic records relating to voting by unit owners, which must be maintained for 1 year from the date of the election, vote, or meeting to which the document relates, notwithstanding paragraph (b).

13.   All rental records if the association is acting as agent for the rental of condominium units.

14.   A copy of the current question and answer sheet as described in s. 718.504.

15.   A copy of the inspection report as described in s. 718.301(4)(p).

16.   Bids for materials, equipment, or services.

17.   All affirmative acknowledgments made pursuant to s. 718.121(4)(c).

18.   All other written records of the association not 'specifically included in the foregoing which are related to the operation of the association.

(b)   The official records specified in subparagraphs (a)1.-6. must be permanently maintained from the inception of the association. Bids for work to be performed or for materials, equipment, or services must be maintained for at least 1 year after receipt of the bid. All other official records must be maintained within the state for at least 7 years, unless otherwise provided by general law.

6

The records of the association shall be made available to a unit owner within 45 miles of the condominium property or within the county in which the condominium property is located within 10 working days after receipt of a written request by the board or its designee. However, such distance requirement does not apply to an association governing a timeshare condominium. This paragraph may be complied with by having a copy of the official records of the association available for inspection or copying on the condominium property or association property, or the association may offer the option of making the records available to a unit owner electronically via the Internet or by allowing the records to be viewed in electronic format on a computer screen and printed upon request. The association is not responsible for the use or misuse of the information provided to an association member or his or her authorized representative in compliance with this chapter unless the association has an affirmative duty not to disclose such information under this chapter.

(c)1.    The official records of the association are open to inspection by any association member or the authorized representative of such member at all reasonable times. The right to inspect the records includes the right to make or obtain copies, at the reasonable expense, if any, of the member or authorized representative of such member. A renter of a unit has a right to inspect and copy only the declaration of condominium and the association's bylaws and rules. The association may adopt reasonable rules regarding the frequency, time, location, notice, and manner of record inspections and copying but may not require a member to demonstrate any purpose or state any reason for the inspection. The failure of an association to provide the records within 10 working days after receipt of a written request creates a rebuttable presumption that the association willfully failed to comply with this paragraph. A unit owner who is denied access to official records is entitled to the actual damages or minimum damages for the association's willful failure to comply. Minimum damages are $50 per calendar day for up to 10 days, beginning on the 11th working day after receipt of the written request. The failure to permit inspection entitles any person prevailing in an enforcement action to recover reasonable attorney fees from the person in control of the records who, directly or indirectly, knowingly denied access to the records.

2.    Any person who knowingly or intentionally defaces or destroys accounting records that are required by this chapter to be maintained during the period for which such records are required to be maintained, or who knowingly or intentionally fails to create or maintain accounting records that are required to be created or maintained, with the intent of causing harm to the association or one or more of its members, is personally subject to a civil penalty pursuant to 718.501(1)(d). . . .

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

7

(13)  FINANCIAL REPORTING.—Within 90 days after the end of the fiscal year, or annually on a date provided in the bylaws, the association shall prepare and complete, or contract for the preparation and completion of, a financial report for the preceding fiscal year. Within 21 days after the final financial report is completed by the association or received from the third party, but not later than 120 days after the end of the fiscal year or other date as provided in the bylaws, the association shall mail to each unit owner at the address last furnished to the association by the unit owner, or hand deliver to each unit owner, a copy of the most recent financial report or a notice that a copy of the most recent financial report will be mailed or hand delivered to the unit owner, without charge, within 5 business days after receipt of a written request from the unit owner. . . .
(a)  An association that meets the criteria of this paragraph shall prepare a complete set of financial statements in accordance with generally accepted accounting principles. The financial statements must be based upon the association's total annual revenues, as follows: . . .
2.  An association with total annual revenues of at least $300,000, but less than $500,000, shall prepare reviewed financial statements. . . .
(e)  A unit owner may provide written notice to the division of the association's failure to mail or hand deliver him or her a copy of the most recent financial report within 5 business days after he or she submitted a written request to the association for a copy of such report. If the division determines that the association failed to mail or hand deliver a copy of the most recent financial report to the unit owner, the division shall provide written notice to the association that the association must mail or hand deliver a copy of the most recent financial report to the unit owner and the division within 5 business days after it receives such notice from the division. An association that fails to comply with the division's request may not waive the financial reporting requirement provided in paragraph (d) for the fiscal year in which the unit owner's request was made and the following fiscal year. A financial report received by the division pursuant to this paragraph shall be maintained, and the division shall provide a copy of such report to an association member upon his or her request. . . .

In the Interim, as a result of the December 12, 2024 Election of Board Members (despite it being illegal) and not as a Ratification or Waiver thereof by me, please ensure that all BOARD Members (**Josephine Manning, Julian Pajoues** and **Sandy Frucher**) comply with Fla. Stat. 720.3033 as follows:

720.3033 - Officers and directors.
(1)(a)  Within 90 days after being elected or appointed to the board, each director must submit a certificate of having satisfactorily completed the educational curriculum administered by a department-approved education provider.

1.   The newly elected or appointed director must complete the department-approved education for newly elected or appointed directors within 90 days after being elected or appointed. . . .

4.   The department-approved educational curriculum specific to newly elected or appointed directors must include training relating to financial literacy and transparency, recordkeeping, levying of fines, and notice and meeting requirements.

5.   In addition to the educational curriculum specific to newly elected or appointed directors:

a.   A director of an association that has fewer than 2,500 parcels must complete at least 4 hours of continuing education annually. . . .

(b)   A director who does not timely file the educational certificate is suspended from the board until he or she complies with the requirement. The board may temporarily fill the vacancy during the period of suspension. . . .

Please Note: (3)   An officer, a director, or a manager may not solicit, offer to accept, or accept a kickback. As used in this subsection, the term "kickback" means anything or service of value for which consideration has not been provided for an officer's, a director's, or a manager's benefit or for the benefit of a member of his or her immediate family from any person providing or proposing to provide goods or services to the association. An officer, a director, or a manager who knowingly solicits, offers to accept, or accepts a kickback commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, and is subject to monetary damages under s. 617.0834. If the board finds that an officer or a director has violated this subsection, the board must immediately remove the officer or director from office. The vacancy shall be filled according to law until the end of the officer's or director's term of office. . . .

(4)(a)   A director or an officer charged by information or indictment with any of the following crimes must be removed from office and a vacancy declared:

1.   Forgery of a ballot envelope or voting certificate used in a homeowners' association election as provided in s. 831.01.

2.   Theft or embezzlement involving the association's funds or property as provided in s. 812.014.

3.   Destruction of or the refusal to allow inspection or copying of an official record of a homeowners' association which is accessible to parcel owners within the time periods required by general law, in furtherance of any crime. Such act constitutes tampering with physical evidence as provided in s. 918.13.

4.   Obstruction of justice as provided in chapter 843.

5.   Any criminal violation under this chapter.

(b)   The board shall fill the vacancy as provided in s. 720.306(9) until the end of the period of the suspension or the end of the director's term of office, whichever occurs first. If such criminal charge is pending against the officer or director, he or she may not be appointed or elected to a position as an officer or a director of

9

any association and may not have access to the official records of any association, except pursuant to a court order. However, if the charges are resolved without a finding of guilt or without acceptance of a plea of guilty or nolo contendere, the director or officer shall be reinstated for any remainder of his or her term of office.

(5)   The association shall maintain <u>insurance or a fidelity bond</u> <u>for all persons who control or disburse funds of the association</u>. The insurance policy or fidelity bond must cover the maximum funds that will be in the custody of the association or its management agent at any one time. As used in this subsection, the term "persons who control or disburse funds of the association" includes, but is not limited to, persons authorized to sign checks on behalf of the association, and the president, secretary, and treasurer of the association. . . .".

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Fla. Stat. 617.0834 - Officers and directors of certain corporations and associations not for profit; immunity from civil liability.

617.0834   Officers and directors of certain corporations and associations not for profit; immunity from civil liability ARE STATUTORILY LIABLE FOR THEIR ACTS AS FOLLOWS IF:

"(a)   The officer or director breached or failed to perform his or her duties as an officer or director; and

(b)   The officer's or director's breach of, or failure to perform, his or her duties constitutes:

1.   A violation of the criminal law, unless the officer or director had reasonable cause to believe his or her conduct was lawful or had no reasonable cause to believe his or her conduct was unlawful. A judgment or other final adjudication against an officer or director in any criminal proceeding for violation of the criminal law estops that officer or director from contesting the fact that his or her breach, or failure to perform, constitutes a violation of the criminal law, but does not estop the officer or director from establishing that he or she had reasonable cause to believe that his or her conduct was lawful or had no reasonable cause to believe that his or her conduct was unlawful;

2.   A transaction from which the officer or director derived an improper personal benefit, directly or indirectly; or

3.   Recklessness or an act or omission that was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

(2)   For the purposes of this section, the term:

(a)   "Recklessness" means the acting, or omission to act, in conscious disregard of a risk:

10

1.   Known, or so obvious that it should have been known, to the officer or director; and

2.   Known to the officer or director, or so obvious that it should have been known, to be so great as to make it highly probable that harm would follow from such action or omission. . . .".

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Fla. Stat. 617.0830 General standards for directors**

617.0830 General standards for directors.

(1)   A director shall discharge his or her duties as a director, including his or her duties as a member of a committee:

(a)   In good faith;

(b)   With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(c)   In a manner he or she reasonably believes to be in the best interests of the corporation.

(2)   In discharging his or her duties, a director may rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:

(a)   One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(b)   Legal counsel, public accountants, or other persons as to matters the director reasonably believes are within the persons' professional or expert competence; or

(c)   A committee of the board of directors of which he or she is not a member if the director reasonably believes the committee merits confidence.

(3)   A director is not acting in good faith if he or she has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (2) unwarranted.

(4)   A director is not liable for any action taken as a director, or any failure to take any action, if he or she performed the duties of his or her office in compliance with this section.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

11

**Fla. Stat. 720.303   Association powers and duties; meetings of board; official records; budgets; financial reporting; association funds; recalls.—**

(1)   POWERS AND DUTIES.— . . .  The officers and directors of an association are subject to s. 617.0830 and have a fiduciary relationship to the members who are served by the association. The powers and duties of an association include those set forth in this chapter and, except as expressly limited or restricted in this chapter, those set forth in the governing documents . . .

(2)   BOARD MEETINGS.—

(a)   Members of the board of administration may use e-mail as a means of communication but may not cast a vote on an association matter via e-mail. A meeting of the board of directors of an association occurs whenever a quorum of the board gathers to conduct association business. Meetings of the board must be open to all members, except for meetings between the board and its attorney with respect to proposed or pending litigation where the contents of the discussion would otherwise be governed by the attorney-client privilege. . . .

(b)   Members have the right to attend all meetings of the board. The right to attend such meetings includes the right to speak at such meetings with reference to all designated items. The association may adopt written reasonable rules expanding the right of members to speak and governing the frequency, duration, and other manner of member statements, which rules must be consistent with this paragraph and may include a sign-up sheet for members wishing to speak. .

(c)   The bylaws shall provide the following for giving notice to parcel owners and members of all board meetings and, if they do not do so, shall be deemed to include the following:

1.   Notices of all board meetings must specifically identify agenda items for the meetings and must be posted in a conspicuous place in the community at least 48 hours in advance of a meeting, except in an emergency. In the alternative, if notice is not posted in a conspicuous place in the community, notice of each board meeting must be mailed or delivered to each member at least 7 days before the meeting, except in an emergency. . . .

2.   An assessment may not be levied at a board meeting unless the notice of the meeting includes a statement that assessments will be considered and the nature of the assessments. Written notice of any meeting at which special assessments will be considered or at which amendments to rules regarding parcel use will be considered must be mailed, delivered, or electronically transmitted to the members and parcel owners and posted conspicuously on the property or broadcast on closed-circuit cable television not less than 14 days before the meeting.

3.   Directors may not vote by proxy or by secret ballot at board meetings, except that secret ballots may be used in the election of officers. This subsection also applies to the meetings of any committee or other similar body, when a final decision will be made regarding the expenditure of association funds, and to any

12

body vested with the power to approve or disapprove architectural decisions with respect to a specific parcel of residential property owned by a member of the community.

(d)   If 20 percent of the total voting interests petition the board to address an item of business, the board shall at its next regular board meeting or at a special meeting of the board, but not later than 60 days after the receipt of the petition, take the petitioned item up on an agenda. The board shall give all members notice of the meeting at which the petitioned item shall be addressed in accordance with the 14-day notice requirement pursuant to subparagraph (c)2. Each member shall have the right to speak for at least 3 minutes on each matter placed on the agenda by petition, provided that the member signs the sign-up sheet, if one is provided, or submits a written request to speak prior to the meeting. Other than addressing the petitioned item at the meeting, the board is not obligated to take any other action requested by the petition. . . .

(3)   MINUTES.—Minutes of all meetings of the members of an association and of the board of directors of an association must be maintained in written form or in another form that can be converted into written form within a reasonable time. A vote or abstention from voting on each matter voted upon for each director present at a board meeting must be recorded in the minutes.

(4)   OFFICIAL RECORDS.—

(a)   The association shall maintain each of the following items, when applicable, for at least 7 years, unless the governing documents of the association require a longer period of time, which constitute the official records of the association:

1.   Copies of any plans, specifications, permits, and warranties related to improvements constructed on the common areas or other property that the association is obligated to maintain, repair, or replace.

2.   A copy of the bylaws of the association and of each amendment to the bylaws.

3.   A copy of the articles of incorporation of the association and of each amendment thereto.

4.   A copy of the declaration of covenants and a copy of each amendment thereto.

5.   A copy of the current rules of the homeowners' association.

6.   The minutes of all meetings of the board of directors and of the members.

7.   A current roster of all members and their designated mailing addresses and parcel identifications. A member's designated mailing address is the member's property address, unless the member has sent written notice to the association requesting that a different mailing address be used for all required notices. The association shall also maintain the e-mail addresses and the facsimile numbers designated by members for receiving notice sent by electronic transmission of those members consenting to receive notice by electronic transmission. A member's e-mail address is the e-mail address the member provided when consenting in writing to receiving notice by electronic transmission, unless the

13

member has sent written notice to the association requesting that a different e-mail address be used for all required notices. The e-mail addresses and facsimile numbers provided by members to receive notice by electronic transmission must be removed from association records when the member revokes consent to receive notice by electronic transmission. However, the association is not liable for an erroneous disclosure of the e-mail address or the facsimile number for receiving electronic transmission of notices.

8.   All of the association's insurance policies or a copy thereof.

9.   A current copy of all contracts to which the association is a party, including, without limitation, any management agreement, lease, or other contract under which the association has any obligation or responsibility. Bids received by the association for work to be performed are considered official records and must be kept for a period of 1 year.

10.   The financial and accounting records of the association, kept according to good accounting practices. The financial and accounting records must include:

a.   Accurate, itemized, and detailed records of all receipts and expenditures.

b.   A current account and a periodic statement of the account for each member, designating the name and current address of each member who is obligated to pay assessments, the due date and amount of each assessment or other charge against the member, the date and amount of each payment on the account, and the balance due.

c.   All tax returns, financial statements, and financial reports of the association.

d.   Any other records that identify, measure, record, or communicate financial information.

11.   A copy of the disclosure summary described in s. 720.401(1).

12.   Ballots, sign-in sheets, voting proxies, and all other papers and electronic records relating to voting by parcel owners, which must be maintained for at least 1 year after the date of the election, vote, or meeting.

13.   All affirmative acknowledgments made pursuant to s. 720.3085(3)(c)3.

14.   All other written records of the association not specifically included in this subsection which are related to the operation of the association. . . . .

(5)   INSPECTION AND COPYING OF RECORDS.—

(a)   Unless otherwise provided by law or the governing documents of the association, the official records must be maintained within this state for at least 7 years and be made available to a parcel owner for inspection or photocopying within 45 miles of the community or within the county in which the association is located within 10 business days after receipt by the board or its designee of a written request from the parcel owner. This subsection may be complied with by having a copy of the official records available for inspection or copying in the community or by making the records available to a parcel owner electronically via the Internet or by allowing the records to be viewed in electronic format on a computer screen and printed upon request. If the association has a photocopy machine available where the records are maintained, it must provide parcel

14

owners with copies on request during the inspection if the entire request is limited to no more than 25 pages. An association shall allow a member or his or her authorized representative to use a portable device, including a smartphone, tablet, portable scanner, or any other technology capable of scanning or taking photographs, to make an electronic copy of the official records in lieu of the association's providing the member or his or her authorized representative with a copy of such records. The association may not charge a fee to a member or his or her authorized representative for the use of a portable device.

(b) The failure of an association to provide access to the records within 10 business days after receipt of a written request submitted by certified mail, return receipt requested, creates a rebuttable presumption that the association willfully failed to comply with this subsection.

(c) A member denied access to official records is entitled to the actual damages or minimum damages for the association's willful failure to comply with this subsection. The minimum damages are to be $50 per calendar day up to 10 days, the calculation to begin on the 11th business day after receipt of the written request.

(d) Any director or member of the board or association or a community association manager who knowingly, willfully, and repeatedly violates paragraph (a), with the intent of causing harm to the association or one or more of its members, commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. For purposes of this paragraph, the term "repeatedly" means two or more violations within a 12-month period.

(e) Any person who knowingly and intentionally defaces or destroys accounting records during the period in which such records are required to be maintained, or who knowingly or intentionally fails to create or maintain accounting records that are required to be created or maintained, with the intent of causing harm to the association or one or more of its members, commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

(f) Any person who willfully and knowingly refuses to release or otherwise produce association records with the intent to avoid or escape detection, arrest, trial, or punishment for the commission of a crime, or to assist another person with such avoidance or escape, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(g) The association may adopt reasonable written rules governing the frequency, time, location, notice, records to be inspected, and manner of inspections, but may not require a parcel owner to demonstrate any proper purpose for the inspection, state any reason for the inspection, or limit a parcel owner's right to inspect records to less than one 8-hour business day per month. The association may impose fees to cover the costs of providing copies of the official records, including the costs of copying and the costs required for personnel to retrieve and copy the records if the time spent retrieving and copying the records exceeds one-half hour and if the personnel costs do not

15

exceed $20 per hour. Personnel costs may not be charged for records requests that result in the copying of 25 or fewer pages. The association may charge up to 25 cents per page for copies made on the association's photocopier. If the association does not have a photocopy machine available where the records are kept, or if the records requested to be copied exceed 25 pages in length, the association may have copies made by an outside duplicating service and may charge the actual cost of copying, as supported by the vendor invoice. The association shall maintain an adequate number of copies of the recorded governing documents, to ensure their availability to members and prospective members. . . .

(6)   BUDGETS.

(a)   The association shall prepare an annual budget that sets out the annual operating expenses. The budget must reflect the estimated revenues and expenses for that year and the estimated surplus or deficit as of the end of the current year. The budget must set out separately all fees or charges paid for by the association for recreational amenities, whether owned by the association, the developer, or another person. The association shall provide each member with a copy of the annual budget or a written notice that a copy of the budget is available upon request at no charge to the member. The copy must be provided to the member within the time limits set forth in subsection (5).

(b)   In addition to annual operating expenses, the budget may include reserve accounts for capital expenditures and deferred maintenance for which the association is responsible. If reserve accounts are not established pursuant to paragraph (d), funding of such reserves is limited to the extent that the governing documents limit increases in assessments, including reserves. If the budget of the association includes reserve accounts established pursuant to paragraph (d), such reserves shall be determined, maintained, and waived in the manner provided in this subsection. Once an association provides for reserve accounts pursuant to paragraph (d), the association shall thereafter determine, maintain, and waive reserves in compliance with this subsection. This section does not preclude the termination of a reserve account established pursuant to this paragraph upon approval of a majority of the total voting interests of the association. Upon such approval, the terminating reserve account shall be removed from the budget. . . .

(7)   FINANCIAL REPORTING.—Within 90 days after the end of the fiscal year, or annually on the date provided in the bylaws, the association shall prepare and complete, or contract with a third party for the preparation and completion of, a financial report for the preceding fiscal year. Within 21 days after the final financial report is completed by the association or received from the third party, but not later than 120 days after the end of the fiscal year or other date as provided in the bylaws, the association shall, within the time limits set forth in subsection (5), provide each member with a copy of the annual financial report or

16

a written notice that a copy of the financial report is available upon request at no charge to the member. Financial reports shall be prepared as follows:

(a)   An association that meets the criteria of this paragraph shall prepare or cause to be prepared a complete set of financial statements in accordance with generally accepted accounting principles as adopted by the Board of Accountancy. The financial statements shall be based upon the association's total annual revenues, as follows: . . .

2.   An association with total annual revenues of at least $300,000, but less than $500,000, shall prepare reviewed financial statements. . . .

(c)   If 20 percent of the parcel owners petition the board for a level of financial reporting higher than that required by this section, the association shall duly notice and hold a meeting of members within 30 days of receipt of the petition for the purpose of voting on raising the level of reporting for that fiscal year. Upon approval of a majority of the total voting interests of the parcel owners, the association shall prepare or cause to be prepared, shall amend the budget or adopt a special assessment to pay for the financial report regardless of any provision to the contrary in the governing documents, and shall provide within 90 days of the meeting or the end of the fiscal year, whichever occurs later:

1.   Compiled, reviewed, or audited financial statements, if the association is otherwise required to prepare a report of cash receipts and expenditures;

2.   Reviewed or audited financial statements, if the association is otherwise required to prepare compiled financial statements; or

3.   Audited financial statements if the association is otherwise required to prepare reviewed financial statements.

(d)   If approved by a majority of the voting interests present at a properly called meeting of the association, an association may prepare or cause to be prepared:

1.   A report of cash receipts and expenditures in lieu of a compiled, reviewed, or audited financial statement;

2.   A report of cash receipts and expenditures or a compiled financial statement in lieu of a reviewed or audited financial statement; or

3.   A report of cash receipts and expenditures, a compiled financial statement, or a reviewed financial statement in lieu of an audited financial statement.

An association may not prepare a financial statement pursuant to this paragraph for consecutive fiscal years. . . .

(10)   RECALL OF DIRECTORS.

. . . (b)1.   Board directors may be recalled by an agreement in writing or by written ballot without a membership meeting. The agreement in writing or the written ballots, or a copy thereof, shall be served on the association by certified mail or by personal service in the manner authorized by chapter 48 and the Florida Rules of Civil Procedure.

2.   The board shall duly notice and hold a meeting of the board within 5 full business days after receipt of the agreement in writing or written ballots. At the

17

meeting, the board shall either certify the written ballots or written agreement to recall a director or directors of the board, in which case such director or directors shall be recalled effective immediately and shall turn over to the board within 5 full business days any and all records and property of the association in their possession, or proceed as described in paragraph (d).

3.   When it is determined by the department pursuant to binding arbitration proceedings or the court in an action filed in a court of competent jurisdiction that an initial recall effort was defective, written recall agreements or written ballots used in the first recall effort and not found to be defective may be reused in one subsequent recall effort. However, in no event is a written agreement or written ballot valid for more than 120 days after it has been signed by the member.

4.   Any rescission or revocation of a member's written recall ballot or agreement must be in writing and, in order to be effective, must be delivered to the association before the association is served with the written recall agreements or ballots.

5.   The agreement in writing or ballot shall list at least as many possible replacement directors as there are directors subject to the recall, when at least a majority of the board is sought to be recalled; the person executing the recall instrument may vote for as many replacement candidates as there are directors subject to the recall.

(c)1.   If the declaration, articles of incorporation, or bylaws specifically provide, the members may also recall and remove a board director or directors by a vote taken at a meeting. If so provided in the governing documents, a special meeting of the members to recall a director or directors of the board of administration may be called by 10 percent of the voting interests giving notice of the meeting as required for a meeting of members, and the notice shall state the purpose of the meeting. Electronic transmission may not be used as a method of giving notice of a meeting called in whole or in part for this purpose.

2.   The board shall duly notice and hold a board meeting within 5 full business days after the adjournment of the member meeting to recall one or more directors. At the meeting, the board shall certify the recall, in which case such member or members shall be recalled effective immediately and shall turn over to the board within 5 full business days any and all records and property of the association in their possession, or shall proceed as set forth in paragraph (d).

(d)   If the board determines not to certify the written agreement or written ballots to recall a director or directors of the board or does not certify the recall by a vote at a meeting, the board shall, within 5 full business days after the meeting, file an action with a court of competent jurisdiction or file with the department a petition for binding arbitration under the applicable procedures in ss. 718.112(2)(l) and 718.1255 and the rules adopted thereunder. For the purposes of this section, the members who voted at the meeting or who executed the agreement in writing shall constitute one party under the petition for arbitration or in a court action. If the arbitrator or court certifies the recall as to any director or directors of the

18

board, the recall will be effective upon the final order of the court or the mailing of the final order of arbitration to the association. The director or directors so recalled shall deliver to the board any and all records of the association in their possession within 5 full business days after the effective date of the recall.

(e)   If a vacancy occurs on the board as a result of a recall and less than a majority of the board directors are removed, the vacancy may be filled by the affirmative vote of a majority of the remaining directors, notwithstanding any provision to the contrary contained in this subsection or in the association documents. If vacancies occur on the board as a result of a recall and a majority or more of the board directors are removed, the vacancies shall be filled by members voting in favor of the recall; if removal is at a meeting, any vacancies shall be filled by the members at the meeting. If the recall occurred by agreement in writing or by written ballot, members may vote for replacement directors in the same instrument in accordance with procedural rules adopted by the division, which rules need not be consistent with this subsection.

(f)   If the board fails to duly notice and hold a board meeting within 5 full business days after service of an agreement in writing or within 5 full business days after the adjournment of the member recall meeting, the recall shall be deemed effective and the board directors so recalled shall immediately turn over to the board all records and property of the association.

(g)   If the board fails to duly notice and hold the required meeting or fails to file the required petition or action, the parcel owner representative may file a petition or a court action under s. 718.1255 challenging the board's failure to act. The petition or action must be filed within 60 days after the expiration of the applicable 5-full-business-day period. The review of a petition or action under this paragraph is limited to the sufficiency of service on the board and the facial validity of the written agreement or ballots filed.

(h)   If a director who is removed fails to relinquish his or her office or turn over records as required under this section, the circuit court in the county where the association maintains its principal office may, upon the petition of the association, summarily order the director to relinquish his or her office and turn over all association records upon application of the association.

(i)   The minutes of the board meeting at which the board decides whether to certify the recall are an official association record. The minutes must record the date and time of the meeting, the decision of the board, and the vote count taken on each board member subject to the recall. In addition, when the board decides not to certify the recall, as to each vote rejected, the minutes must identify the parcel number and the specific reason for each such rejection.

(j)   When the recall of more than one board director is sought, the written agreement, ballot, or vote at a meeting shall provide for a separate vote for each board director sought to be recalled. . . .

(14)   REQUIREMENT TO PROVIDE AN ACCOUNTING.—A parcel owner may make a written request to the board for a detailed accounting of any amounts he

19

or she owes to the association related to the parcel, and the board shall provide such information within 15 business days after receipt of the written request. After a parcel owner makes such written request to the board, he or she may not request another detailed accounting for at least 90 calendar days. Failure by the board to respond within 15 business days to a written request for a detailed accounting constitutes a complete waiver of any outstanding fines of the person who requested such accounting which are more than 30 days past due and for which the association has not given prior written notice of the imposition of the fines.

(15)   REQUIREMENT TO PROVIDE COPIES OF RULES AND COVENANTS.—

(a)   Before October 1, 2024, an association shall provide a physical or digital copy of the association's rules and covenants to every member of the association.

(b)   An association shall provide a physical or digital copy of the association's rules and covenants to every new member of the association.

(c)   If an association's rules or covenants are amended, the association must provide every member of the association with an updated copy of the amended rules or covenants. An association may adopt rules establishing standards for the manner of distribution and timeframe for providing copies of updated rules or covenants.

(d)   The requirements of this subsection may be met by posting a complete copy of the association's rules and covenants, or a direct link thereto, on the homepage of the association's website if such website is accessible to the members of the association and the association sends notice to each member of the association of its intent to utilize the website for this purpose. Such notice must be sent in both of the following ways:

1.   By electronic mail to any member of the association who has consented to receive notices by electronic transmission and provided an electronic mailing address to the association for that purpose.

2.   By mail to all other members of the association at the address identified as the member's mailing address in the official records of the association.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**468.4335   Conflicts of interest.**—

(1)   A community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, must disclose to the board of a community association any activity that may reasonably be construed to be a conflict of interest. A rebuttable presumption of a conflict of interest exists if any of the following occurs without prior notice:

20

(a)   A community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, enters into a contract for goods or services with the association.

(b)   A community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, holds an interest in or receives compensation or any thing of value from a corporation, limited liability corporation, partnership, limited liability partnership, or other business entity that conducts business with the association or proposes to enter into a contract or other transaction with the association.

(2)   If the association receives and considers a bid that exceeds $2,500 to provide a good or service, other than community association management services, from a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, the association must solicit multiple bids from other third-party providers of such goods or services.

(3)   If a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, proposes to engage in an activity that is a conflict of interest as described in subsection (1), the proposed activity must be listed on, and all contracts and transactional documents related to the proposed activity must be attached to, the meeting agenda of the next board of administration meeting. The disclosures of a possible conflict of interest must be entered into the written minutes of the meeting. Approval of the contract, including a management contract between the community association and the community association manager or community association management firm, or other transaction requires an affirmative vote of two-thirds of all directors present. At the next regular or special meeting of the members, the existence of the conflict of interest and the contract or other transaction must be disclosed to the members. If a community association manager or community association management firm has previously disclosed a conflict of interest in an existing management contract entered into between the board of directors and the community association manager or community association management firm, the conflict of interest does not need to be additionally noticed and voted on during the term of such management contract, but, upon renewal, must be noticed and voted on in accordance with this subsection.

(4)   If the board finds that a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, has violated this section, the association may cancel its

21

community association management contract with the community association manager or the community association management firm. If the contract is canceled, the association is liable only for the reasonable value of the management services provided up to the time of cancellation and is not liable for any termination fees, liquidated damages, or other form of penalty for such cancellation.

(5)   If an association enters into a contract with a community association manager or a community association management firm, including directors, officers, and persons with a financial interest in a community association management firm, or a relative of such persons, which is a party to or has an interest in an activity that is a possible conflict of interest as described in subsection (1) and such activity has not been properly disclosed as a conflict of interest or potential conflict of interest as required by this section, the contract is voidable and terminates upon the association filing a written notice terminating the contract with its board of directors which contains the consent of at least 20 percent of the voting interests of the association.

(6)   As used in this section, the term "relative" means a relative within the third degree of consanguinity by blood or marriage.

*****************************************************************

### 718.3025   Agreements for operation, maintenance, or management of condominiums; specific requirements.—

(1)   No written contract between a party contracting to provide maintenance or management services and an association which contract provides for operation, maintenance, or management of a condominium association or property serving the unit owners of a condominium shall be valid or enforceable unless the contract: . . .

(f)   Discloses any financial or ownership interest a board member or any party providing maintenance or management services to the association holds with the contracting party.

(2)   In any case in which the party contracting to provide maintenance or management services fails to provide such services in accordance with the contract, the association is authorized to procure such services from some other party and shall be entitled to collect any fees or charges paid for service performed by another party from the party contracting to provide maintenance or management services.

(3)   Any services or obligations not stated on the face of the contract shall be unenforceable.

22

The BOARD, ROYAL MANGEMENT, DAVID RAPOSO and JOSEPHINE MANNING are in violation of the above Florida Statutory, Federal RICO and common law as well as the Governing Documents of the DRAKE.

Further obstruction to provide demanded documentation and refusal to permit transparency to the Homeowners constitutes continuing violations of law.

**PROVIDE ME WITH THE REQUESTED DOCUMENTATION FORTHWITH.**

Mike Taraska, Unit #207

cc by email:

Gregory Taraska (#207)
Louise and Rabi Adhikari (#407)
Mattia Prian (#307)
Jorge Ceballos (#203 & #205)
Bart Hoover (#311 & #210)
Steven and Cecile Katz (#402)
Julian Payoues (#308)
Giuseppe Bevilaqua (#304)
Mel and Lalaine Isobal (#202)
Franze (#405)
Bill Younkin (#305)

DRAKE Ltr VIOLATIONS 12 27 24

23

 **Gmail**

Mike Taraska <taraska@gmail.com>

---

**DOCUMENTS REPRESENTED AT THE DECEMBER 12TH MEETING THAT WOULD BE PRODUCED**

**Mike Taraska** <taraska@gmail.com>                                                             Mon, Dec 30, 2024 at 4:46 AM
To: Joe <Joe@theroyalgroup.net>
Cc: "jomanning1940@gmail.com" <jomanning1940@gmail.com>, David Raposo <david@theroyalgroup.net>, "Farinas-Sabogal, Lilliana"
<lfarinas@beckerlawyers.com>, Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>, Jorge Ceballos <jorgecb54@hotmail.com>, DRAKE
Mattie Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, Louise Adhikari <louise.adhikari@gmail.com>, "decocigar@gmail.com"
<decocigar@gmail.com>, "jpaljouas@gmail.com" <jpaljouas@gmail.com>, "cecliegiraud@hotmail.com" <cecliegiraud@hotmail.com>, Steve Katz
<stevenkatz80@hotmail.com>, "younkin@bellsouth.net" <younkin@bellsouth.net>, "hwhoover@hotmail.com" <hwhoover@hotmail.com>, "misobel@comcast.net"
<misobal@comcast.net>, Meyer Frucher <sandy@frucher.com>, franz18miami@yahoo.com

Joe,

    Attached is my Reply to your last email. Please provide me with the requested documents by close of business December 31, 2024.

    Mike Taraska (#207)
    [Quoted text hidden]

---

📎 **DRAKE Ltr VIOLATIONS 12 30 24.docx**
    72K

EXHIBIT "39"

 **Gmail**

Mike Taraska <taraska@gmail.com>

---

### DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

**Mike Taraska** <taraska@gmail.com>                                                                Tue, Nov 26, 2024 at 10:56 AI
To: "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>
Cc: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>,
"jomanning1940@gmail.com" <jomanning1940@gmail.com>, "Suarez, Ana" <ASuarez@beckerlawyers.com>, Louise Rabi Adhikari <TheAdhikaris@gmail.com>,
DRAKE Mattia Prian <mattiaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, jorgecb54@hotmail.com
Bcc: "hwhoover@hotmail.com" <hwhoover@hotmail.com>, misobal@comcast.net

Lilliana,

First, I don't believe your excuse for not responding to my emails. I have objective irrefutable proof that you received them. So let's start off with the basics that you are lying. I've practiced law for thirty-seven (37) years partially sanctioned by various State Bars and partially not. It's the lawyers that can't win cases on their own merits or ability or are unhappy with their monetary position in life because they can't attract clients with integrity to champion righteous cases.

Second, let's begin now with your letter in which you state that although "[t]he By Laws [sic] of the Association 'indicate' that the Association is subject to the Florida Condominium Act" you are only partially correct. The BYLAWS state only, that Article VII "are consistent with the requirements of Florida Statutes 718". See ARTICLE VIII, MEETINGS, SPECIAL MEETINGS, QUORUMS, PROXIES, at page BL-7.

ARTICLE X of the BYLAWS, Section 4, govern "Records" and specifically reflect "accounting records" and reflect that such accounting records "**shall** be available within 5 working days after receipt of a written request by the Board or its designee". ARTICLE X, Section 3 mandates that "Fidelity bonds **shall** be required for **all directors, officers and employees (including any illegal undocumented workers)** of the Association responsible for **Association funds**". There is no specific time limit for making the Fidelity Bonds available for inspection by me. I specifically requested them and there is no reason, unless the Board never had them, to simply email them to me. As you state in your email, "the 10th working day (which excludes Saturdays, Sundays and holidays - in this case, Thanksgiving and the Friday after Thanksgiving [which is not a "holiday"]) is December 3, 2024". My email to the Board Member and President Jo Manning, the Royal Group <aagemnetCompany was emailed on October 25, 2024 which was thirty-two (32) days ago.

[Quoted text hidden]

 **Gmail**

Mike Taraska <taraska@gmail.com>

---

## DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

**Mike Taraska** <taraska@gmail.com>                                                    Tue, Nov 26, 2024 at 1:01 PI
To: "Farinas-Sabogal, Lilliana" <LFarinas@beckerlawyers.com>
Cc: Joe <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska <docgt1@charter.net>, Marlene <mtaraska@charter.net>,
"jomanning1940@gmail.com" <jomanning1940@gmail.com>, "Suarez, Ana" <ASuarez@beckerlawyers.com>, Louise Rabi Adhikari <TheAdhikaris@gmail.com>,
DRAKE Mattla Prian <mattlaprian@yahoo.com>, Rabi Adhikari <rabiadhikari@hotmail.com>, jorgecb54@hotmail.com
Bcc: "hwhoover@hotmail.com" <hwhoover@hotmail.com>

### [I apologize for the computer glitch - here's the remainder of the previous email]

In addition, the email I sent to you, the Board and Royal Management, **on October 31, 2024 was received twenty-seven (27) days ago** asking for the eight categories of documents including the Fidelity Bonds. I reiterated these requests to the Board, the Management Company and you on November 11, 2024 to which you have now finally responded.

As you know, Florida Statutes control when there is no conflict between the Statute and the Governing Documents of a Condominium. In addition, the DECLARATION OF CONDOMINIUM OR COVENANTS AND RESTRICTIONS has been determined by the Florida Supreme Court to be an Association's constitution. See *Woodside Village Condominium Association, Inc. v Jahren*, 806 So. 2d 452 (Fla., 2002) and as the associations's constitution, the declaration stands at the top of the hierarchy insofar as other association documents, such as the Bylaws, Articles and Rules and Regulations, and in the event of a conflict it is the Declaration that takes precedency". The DRAKE DECLARATION, at Section 9.b.(3) sets forth the duty of the Board through its powers representing the Association "to maintain accounting records according to good accounting practices, **which shall be open to inspection at reasonable times during normal business hours**". In addition, at Section 9.6.(e) "[t]he Association or its designee shall maintain such records as required by 718.111, Florida Statutes". Section 9.j. of the DECLARATION sets forth the requirements for the Fidelity Bonds. Your reference in your email that "the Association must make the requested **official records** available to [me] within 45 miles of the condominium property within 10 working days" is misplaced and is different to the documentation and information to be made available to me pursuant to first, the DECLARATION and then the BYLAWS.

I am a homeowner. I have a right to receive an answer to a written question to the Board, the Management Company and its lawyers (you) whether the owner of the contractor which allegedly performed seven-hundred fifty thousand dollars ($750k) of work, without getting paid for over a year and a half, without Notice and a required vote of the Homeowners, without a disclosed competitive bidding process and without Notice that the incestuous relationship between the owner of the Insurance Company who is the wife of the owner of the Management Company that sold an insurance policy to Association for one-hundred and fifty-thousand dollars ($150k) a year, up from forty-thousand dollars ($40k) a year in 2023 is also the sister in-law to the owner of the Construction Company that married the sister of the owner of the Management Company who also had his Father working full time as the maintenance man at the property location. Your refusal to answer simple written questions on the basis that "[my] demands that [my] questions be answered, please note that neither the Association, its management nor [you] are obligated by the Associations' Governing Documents or the Florida Condominium Act to respond to [my] questions in the manner and timeline [I] have demanded". You are WRONG Lilliana. Your clients are LIABLE for everything they have done in violation of the Florida Statutes, not only within Chapter 718 - The Florida Condominium Act, but also the new Law dubbed "Condo 3.0 Law" which I made you aware of on July 1, 2024 on another matter and that went into effect on July 1, 2024, which "set CRIMINAL penalties for condo board members who accept kickbacks; engage in voting fraud related to board elections; or fail to maintain or to provide access to public records".

Keep it up Lilliana. You and your firm's existence may be at stake if you participated in any of the activities involved as set forth in my draft Complaint which you previously received and anything you are involved in thereafter.

I'm not going to quibble with you about the 5 day, ten-day or at "reasonable times during normal business hours". I will accept your incorrect analysis of the law and will fly to Miami from Medellin, Colombia to inspect the records and make arrangements to copy the records on "December 3, 2024". I'm not going to accept your offer to wait until December 18, 2024 after your clients have had an opportunity to deposit the illegal first assessment generally amounting to about $9,000 per Unit times 32 Units (or two-hundred twenty-eight thousand dollars ($228,000)) so they can fraudulently convey that money to the related General Contractor - Edgar Ramirez, to avoid having that money available for interpleader. I am demanding that you withhold those funds and that any disbursement prior to an Agreement or Interpleader is filed constitutes a fraudulent conveyance without consideration as a result of the Complaint previously provided to you and the claims made by me of the potential liability.

See Florida Statute 718-3027 Conflicts of Interest. - stating, among other:

"(1) Directors and Officers of a board of an association that is not a timeshare condominium association, **and the relatives of such directors and officers, must disclose to the board** any activity that may reasonably be construed to be a conflict of interest. A rebuttable presumption of a conflict of interest exists if any of the following occurs without prior notice, as required under section (5):
(a) A director or an officer, or a relative of a director or officer, enters into a contract for goods and services with the association.
(b) A director or officer, or a relative of a director or officer, holds an interest in a corporation . . . or other business entity that conducts business with the association or proposes to enter into a contract or other transaction with the association.

[I'm tired of typing. You can read the rest of Section 718.3027 all of which your collective group clients have violated].

To be clear, I'm going to file a Federal Lawsuit as initially set forth in my Draft Complaint and will be including Racketeer and Corrupt Corporations Act (RICO - Racketeering) claims against Melssa Raposa, David Raposa, Edgar Ramirez, Josephine Manning, the Board and any and all companies owned and/or influenced by these related individuals or their associates.

After I obtain access to the documents that you are making available to me, the next day I'm going to file the COMPLAINT in Federal District Court in Florida. Mandatory ADR is not required under Florida Statute 718.1255 since my lawsuit does not fall under the definition of a "Dispute" pursuant to that statute. If you refuse to make the requested documentation available on December 3, 2024 I will include that breach in my Complaint, which might already be an actionable allegation, based upon your current obstruction and attempts at delay to provide me with the previously requested documentation and information.

If you agree in writing not to distribute any of the assessed $1.2 Million and to be held as an Interpleader of Funds between the General Contractor and the Association, I will agree to Non-Binding Arbitration.

1/2/25, 7:25 AM                                    Gmail - DRAKE SPECIAL ASSESSMENT $1.2 MILLION BOARD MEETING OCTOBER 29, 2024

To make it clear, here's what I intend to accomplish:

1. The current Board needs to be removed and a proper election upon proper Notice needs to be held with the exclusion of Josephine Manning and any of her "proxies" participating;

2. The Homeowners shall have a proper vote to not pay the General Contractor the alleged $750k that the Board represented was for "past work" which was never voted on by the Homeowners in violation of the DRAKE Governing Documents and the General Contractor can make a claim on the Raposa Insurance Policy which includes a Directors and Officers Liability Coverage of one-million dollars ($1,000,000) which the Homeowners have paid for and should get the benefit of;

3. Royal Management Company needs to be fired;

4. A new Management Company needs to be retained by the New Board or Homeowner's Vote;

5. The $150,000 Insurance Policy needs to be reviewed and Raposa Insurance Group or whatever insurance entity in which Malissa Raposa is involved need to be replaced by the New Board or Homeowner Vote;

6. FULL AND CLEAR TRANSPARENCY OF THE BOARD AND ASSOCIATION FOR ALL HOMEOWNERS MOVING FORWARD.

Once the litigation filed by me in pro per gets rolling, I am bringing in litigation counsel so that they can represent the Homeowners' Association against the Board, Royal Management Group, Edgar Ramirez and any and all related companies so that they can recover attorneys' fees and costs. They will be bringing in the Insurance Companies.

Attached is a Complaint and Civil Cover Sheet reflecting an action in which my Company NEC-7, LLC and my brother Richard Taraska, M.D. filed on July 9, 2021 against the Board of Directors of my California residence. I spent approximately two-hundred seventy-five thousand dollars ($275,000.00) in attorneys' fees and costs in that matter. Suffice it to say that we Settled after two years of litigation with a net financial gain to me and my brother. I can provide you with proof with redacted attorneys' fees bills and settlement. Call the defendants' counsel in that case and ask them how they felt about litigating against me.

I have already been in contact with Miai Law Firm Egozi & Bennet, attorney Bernard Begozi who successfully sued David Raposa and Royal Management Group in 2020 on some of the exact same claims. I have also exchanged documentation with Florida attorney Shaun Zaclewski who has agreed to take the case and who sued the DRAKE Board and Royal Management Group in 2021 obtaining a successful settlement for his Homeowner client. David Raposa has a publicly disclosed checkered litigation past. I can promise you I am "all in" regarding this matter. If you want to attempt to resolve this amicably, if at all possible, you can contact me. It will have to track something along Items 1 - 6 as set forth above.

Mike Taraska  (602) 400-5885

[Quoted text hidden]

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

📄 JS Filed C and Cover Sheet 2021.pdf
   6866K

EXHIBIT "40"

 Gmail                                                       Mike Taraska <taraska@gmail.com>

**Relationship of Contractor Edgar Ramirez**

Farinas-Sabogal, Lilliana <L.Farinas@beckerlawyers.com>                              Mon, Dec 2, 2024 at 2:13 PM
To: Mike Taraska <taraska@gmail.com>, "cc: Joe" <Joe@theroyalgroup.net>, David Raposo <david@theroyalgroup.net>, Greg Taraska <docgt1@charter.net>,
Marlene <mtaraska@charter.net>, "jomanning1940@gmail.com" <jomanning1940@gmail.com>
Cc: "delaCamara, Rosa" <rdelacamara@beckerlawyers.com>, "Alvarez, Mikel" <MAlvarez@beckerlawyers.com>, "Suarez, Ana" <ASuarez@beckerlawyers.com>

Mr. Taraska –

At the outset, allow me to note that your aggressive, threatening and accusatory language is unwarranted, undeserved and unwelcome. Please also note that while the firm represents the Association, we do so through communications with the Board of Directors and/or its agent, which is often the management company. We do not represent individual unit owners in the Association, nor do we represent individual board members. As a result, we cannot respond to routine unit owner communications or calls without authorization from the Board of Directors.

This firm's only relevant client here is the Drake Condominium Association, Inc. It does not represent the management company, David Raposo or Edgar Ramirez or his construction company. The firm has no conflict of interest.

While a unit owner has every right to ask questions of its Association, the Florida Condominium Act provides a process for that:

When a unit owner of a residential condominium files a written inquiry by certified mail with the board of administration, the board shall respond in writing to the unit owner within 30 days after receipt of the inquiry. The board's response shall either give a substantive response to the inquirer, notify the inquirer that a legal opinion has been requested, or notify the inquirer that advice has been requested from the division. If the board requests advice from the division, the board shall, within 10 days after its receipt of the advice, provide in writing a substantive response to the inquirer. If a legal opinion is requested, the board shall, within 60 days after the receipt of the inquiry, provide in writing a substantive response to the inquiry.

Your demands for immediate answers to questions are not supported by the Florida Condominium Act. You are welcome to send your inquiry to the Association at its mailing address as noted in the statute.

In terms of your request for official records, for your convenience and so that you do not need to travel, the Association has advised me that between today and tomorrow, it will be providing you with another drop box link with additional documentation responsive to your request for official records, as well as a link for the insurance documents you requested. If you are still missing information requested, and/or wish to review them on site, please advise the Association and the management company.

Lilliana M. Fariñas-Sabogal
Shareholder
Board Certified Attorney, Condominium and Planned Development Law



Becker & Poliakoff
2525 Ponce de Leon Blvd, Suite 825
Coral Gables, FL 33134

📞 305.351.1077

📠 305.442.2232
✉ LFarinas@beckerlawyers.com
🌐 www.beckerlawyers.com
🔗 Connect with me on LinkedIn



CONDOMINIUM
AND PLANNED
DEVELOPMENT LAW

Follow Becker on...

**Confidentiality Note**: This message, together with any attachments, may contain privileged and confidential information. If the reader of this message is not the intended recipient, you are hereby notified that any examination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us by reply e-mail and permanently delete the original message, along with any attachments. Thank you.

[Quoted text hidden]
[Quoted text hidden]